```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ALASKA

 3
    VIRGINIA DUFFY,                      )
 4                                       )
                      Plaintiff,         )
 5                                       )
    vs.                                  )
 6                                       )
    MUNICIPALITY OF ANCHORAGE,           )
 7  ROY LEBLANC, individually and   in  )
    his capacity as a police officer    )
 8  for the Municipality of Anchorage,  )
    and JAMES ESTES, individually and   )
 9  in his capacity as a police officer )
    for the Municipality of Anchorage   )
10                                       )
                      Defendants.        )
11  _____ )
    Case No. A05-0152 CV (RRB)
12
```

<div align="center">

13
**DEPOSITION OF SERGEANT ROY LEBLANC**
**July 26, 2006**

</div>

```
14

    APPEARANCES:
15

16       FOR PLAINTIFF:           MS. KAREN E. BRETZ
                                   Attorney at Law
17                                 P.O. Box 91457
                                   Anchorage, Alaska  99509
18                                 (907) 277-5847

19

         FOR DEFENDANTS:          MS. MARY B. PINKEL
20                                 Assistant  Municipal  Attorney
                                   Municipality of Anchorage
21                                 632 W. Sixth Avenue
                                   Suite 730
22                                 Anchorage, Alaska  99501
                                   (907) 343-4545
23
                          *  *  *  *
24

25
```

Exhibit A Page 1



1      PURSUANT TO NOTICE, the Deposition of **SERGEANT ROY**

2  **LEBLANC** taken on behalf of Plaintiff, before Maureen Green,

3  Notary Public in and for the State of Alaska and Reporter for

4  Metro Court Reporting, at the Municipality of Anchorage,

5  Department of Law, 632 W. Sixth Avenue, Suite 730, Anchorage,

6  Alaska, on the 26th day of July 2006 commencing at the hour of

7  4:00 o'clock p.m.

8

9                        *  *  *  *

10

11                  **TABLE OF CONTENTS**

12

13     Direct Examination by Ms. Bretz . . . . . . . . . .  4
       Cross Examination by Ms. Pinkel . . . . . . . . . . 26
14

15     **EXHIBITS**

16     1 - Police Report dated March 23, 2003  . . . . . . 26

17

18                        *  *  *  *

19

20

21

22

23

24

25

1                        **P R O C E E D I N G S**

2          (On record)

3                    COURT REPORTER:  Good morning, my name is Maureen Green

4      and I'm a court reporter for Metro Court Reporting, 745 West

5      Fourth Avenue, Suite 425, Anchorage, Alaska.   Today's date is

6      July 26th, 2006.   The time is approximately 4:00 o'clock p.m.

7      We are at the offices of the Municipality of Anchorage, 632 W.

8      Sixth Avenue, Anchorage, Alaska 99501 for the deposition of Roy

9      LeBlanc in the United States District Court for the District of

10     Alaska, <u>Virginia Duffy, Plaintiff vs. Municipality of Anchorage,</u>

11     <u>Roy LeBlanc, individually and in his capacity as a police officer</u>

12     <u>for the Municipality of Anchorage, and James Estes, individually</u>

13     <u>and in his capacity as a police officer for the Municipality of</u>

14     <u>Anchorage, Defendants</u>, Case Number A05-0152 CV (RRB).

15          Before I swear in the witness could I have counsel identify

16     themselves and who they represent?

17                    MS. BRETZ:  Karen Bretz, B-r-e-t-z, for Virginia Duffy.

18                    MS. PINKEL:  Mary Pinkel, attorney for the Municipality

19     of Anchorage, Roy LeBlanc and James Estes.

20                    COURT REPORTER:   Thank you.   Please raise your right

21     hand.

22          (Oath administered)

23                    SERGEANT LEBLANC:   I do.

24

25                        **SERGEANT ROY LEBLANC**

1   having first been duly sworn under oath, testified as follows on

2   examination:

3         COURT REPORTER:  Please state your full name, spelling

4   your last.

5   A   It's Roy Vincent LeBlanc, last name is spelled

6      L-e-b-l-a-n-c.

7         COURT REPORTER:  And your mailing address, sir?

8   A   My home mailing address?

9         COURT REPORTER:  Or you can use your work.

10  A   4501 South Bragaw, Anchorage, Alaska 99577.

11        COURT REPORTER:  And your telephone number, sir?

12  A   Is 786-2489.

13        COURT REPORTER:  Thank you, you may proceed.

14        MS. BRETZ:  Okay, thanks.

15                **DIRECT EXAMINATION**

16  **BY MS. BRETZ:**

17  Q   You're Sergeant LeBlanc?

18  A   I am now, yes.

19  Q   Okay.  Have you ever done a deposition before?

20  A   Yes, I have.

21  Q   Well, this is probably old news to you, but if you have

22      trouble hearing a question or need clarification, please

23      say something and.....

24  A   Okay.

25  Q   .....I'll be more than happy to repeat it.  And then also

| 1 | | to the -- the Court Reporter needs everything audible, so |
| 2 | | a nod of the head is not going to do the trick.  We need a |
| 3 | | yes or a no or I don't know answer. |
| 4 | A | Understood. |
| 5 | Q | Okay.  Sergeant LeBlanc, you were an APD officer on March |
| 6 | | 23rd, 2003? |
| 7 | A | Yes, I was. |
| 8 | Q | What was your assignment then? |
| 9 | A | My assignment as far as what my job classification was or |
| 10 | | my assignment that day? |
| 11 | Q | That day. |
| 12 | A | That day I was assigned as the designator SC1, which is an |
| 13 | | acting supervisor position. |
| 14 | Q | What's your assignment now? |
| 15 | A | I'm just a patrol supervisor. |
| 16 | Q | And how long have you worked for APD? |
| 17 | A | I was hired September of 1996. |
| 18 | Q | And you had contact with Virginia Duffy on March 23rd of |
| 19 | | '03? |
| 20 | A | Yes, I did. |
| 21 | Q | Could you please describe why you pulled her over? |
| 22 | A | I stopped her because she was weaving between the lines on |
| 23 | | the highway and she was driving 10 miles per hour below the |
| 24 | | speed limit. |
| 25 | Q | When you say between the lines, which lines are those? |

1  A    It would be the white lines that separate the lanes.

2  Q    Okay.  So did she move over -- well, backing up a little

3       bit, which lane was she driving in?

4  A    According to my report she was driving in the right lane.

5  Q    So, did she ever cross the yellow dotted line into the left

6       lane?

7  A    The yellow dotted line?

8  Q    Is it a yellow dotted line?

9  A    There's a yellow line on the far right side -- far left

10      side of the road.

11 Q    Okay.

12 A    Typically on the highway it should be a solid line, not

13      yellow, not dotted.

14 Q    Well, between the lanes is a dotted line, right?

15 A    Correct.

16 Q    What color is that?

17 A    On the highway that would be white.

18 Q    Okay.  So did she ever cross that white dotted line to her

19      left?

20 A    I'm not sure I understand your question.  Are you meaning

21      as she was weaving was she crossing the lines?

22 Q    Yes.

23      MS. BRETZ:  I'll draw a picture here.  So, if this is

24 your highway.....

25      MS. PINKEL:  I'm going to object to your drawing a

7

1  picture.   I think you need to be able to ask him the questions

2  without having to use some demonstrative evidence on your part,

3  Karen.

4         MS. BRETZ:  Well, let me just get it started here, how

5  about that?   Okay.  Here's the highway, no particular direction.

6  Could you -- you have a pen on you?

7  A    Uh-huh (affirmative).

8  Q    (By Ms. Bretz)   Could you draw the boundaries of where she

9        was weaving?

10 A    Well, that picture doesn't represent the proper lanes of

11       the highway.

12 Q    Okay.

13 A    So, I wouldn't be able to do it on that drawing.

14 Q    Okay.  Well change the drawing to make it suit --

15        MS. PINKEL:  Why don't you just start your own drawing,

16 Roy?

17 A    Okay.

18        MS. BRETZ:  Better yet.

19        MS. PINKEL:  That would probably be better.

20 A    I think I know the answer to the question you're wanting to

21       ask.   Can I just answer it that way?

22        MS. BRETZ:  Sure, try that.

23        MS. PINKEL:  Why don't you do that?

24 A    Okay, when she was weaving she was weaving from line to

25       line, not crossing the lines, but within the two lines.

1              MS. BRETZ:  Okay, did the trick.

2  Q   (By Ms. Bretz)   What was the speed limit there?

3  A   The speed limit is 65 miles per hour.

4  Q   65?

5  A   Correct.

6  Q   And so she was driving 55?

7  A   About 55.

8  Q   Okay.  What were the weather conditions that day?

9  A   I  remember  that  it  was  dark,  but  I  don't  remember

10     specifically.  I don't recall that it was raining.  I have

11     no idea what the temperature was though.

12  Q   You don't recall what the road conditions were?

13  A   As far as being covered in snow or such?

14  Q   Yes.

15  A   There were clear road conditions.

16             MS. PINKEL:  I don't know if the court reporter picked

17  that up.  What were the road conditions?

18  A   Clear.

19  Q   (By  Ms.  Bretz)   Did  you  notice  whether  there  were  any

20     grooves in the road?

21  A   I don't remember there being any substantial grooves in the

22     road.  This is Alaska and most of our roads have some sort

23     of grooves or ruts.

24  Q   Ms. Duffy was driving on the New Seward Highway, right?

25  A   Correct.

1  Q   And what direction was she driving?

2  A   Northbound.

3  Q   And at what point did you observe the swerving?

4  A   Well, according to my report, it was about the 7600 block

5      when I came upon her.

6  Q   When you say came upon, you mean when you first observed

7      her?

8  A   Correct.   I was driving the speed limit and, of course,

9      when you're driving the speed limit you'll catch up to

10     slower traffic.

11 Q   At what point did you observe her begin to swerve?

12 A   I don't specify in my report specifically where the

13     swerving is noticed, but based on the fact that I started

14     to observe her at the 7600 block, I would anticipate that

15     it was from the 7600 block to the north until I pulled her

16     over.

17 Q   Do you recall when you put on your lights, and by lights,

18     of course, I mean your lights on top of the car?

19 A   My emergency lights?

20 Q   Right.

21 A   No I do not.

22 Q   Do you recall how many times she swerved?

23 A   No I don't.

24 Q   You don't recall how many times back and forth?

25 A   No.


1     the occupant -- what the occupant's doing.

2  Q   Is there a speed limit change on the New Seward Highway

3     between -- say Dowling Road and Tudor?

4  A   The speed limit does drop down to 55 right around Tudor

5     Road.

6  Q   Is that before or after Tudor?

7  A   I believe it's right before.

8  Q   Then as you're going on the New Seward Highway northbound,

9     you pass Tudor and then you've got 36th, right?

10  A   Correct.

11  Q   And there are stop lights at 36th, right?

12  A   There are.

13  Q   That's a pretty busy intersection?

14  A   At times, yes.

15  Q   So a person who's driving down the New Seward Highway

16     should think that perhaps I need to slow down because I may

17     be stopped at a stop light when I get to 36th Avenue?

18  A   Correct.

19  Q   That's a safe way to drive?

20  A   You should be thinking about the fact that you may have to

21     slow down and stop when you approach a red light, yes.

22  Q   So, did -- well, do you recall Ms. Duffy's speed changing

23     any time between when you first saw her at 76th and you

24     know, then when you put your lights on?

25  A   No.

*METRO COURT REPORTING*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Exhibit A Page 11

1  Q   Do you recall how long she had been driving 55?

2  A   From the time that I pulled behind her at about the 7600

3      block.  76th actually doesn't merge with the highway.

4  Q   Right.  Right, but you're talking about that exit?

5  A   That area of the city.

6  Q   Okay.  So when you first came upon her around 76th you

7      observed that she was driving about 55?

8  A   Approximately 10 miles below the speed limit.

9  Q   Okay.  And the speed limit during that whole stretch is 65?

10 A   Correct.

11 Q   Are there any laws prohibiting somebody from driving 55 in

12     a 65?

13 A   There are some laws that indicate that a person can't drive

14     so slow as to impede the flow of traffic.

15 Q   Did it appear that Ms. Duffy was impeding the flow of

16     traffic?

17 A   She was.  I was required to slow down when I pulled behind

18     her.

19 Q   But, were there other cars behind her that she was

20     blocking?

21 A   I don't recall if there was much traffic on the highway.

22     I do recall that she was blocking my way.

23 Q   But you could have gone into the left lane and gone around

24     her, right?

25 A   I could have, yes.

1  Q  And that's what the left lane is for, right?

2  A  The left lane is for that and also just for traveling.

3  Q  But you didn't observe a whole parade of people behind her?

4  A  I don't recall, no.

5  Q  You've received, I'm sure, substantial training in police

6     procedures and identifying possible drivers who are driving

7     under the influence, right?

8  A  Yes.

9  Q  What does your training have to say about pulling somebody

10    over for DUI who's traveling 10 miles below the speed

11    limit?

12 A  I'm not sure I understand your question.

13 Q  Let me rephrase, it didn't come out as well as I had hoped.

14    In your training, I'm sure that you've -- I'm sure that

15    you've been trained to identify certain driving behaviors

16    that may indicate that somebody's driving under the

17    influence, right?

18 A  Yes.

19 Q  Is driving 10 miles below the speed limit one of those

20    types of behaviors?

21 A  Driving under the posted speed limit is an indicator.

22 Q  Driving under the posted speed limit?

23 A  Correct.

24 Q  Does -- or would you differentiate somebody driving say 25

25    in a 35 from somebody driving 55 in a 65?  What I'm getting

1      at is that it's a -- a larger -- what's the right word?

2      It's a larger variance from the posted speed limit if

3      you're driving 25 in a 35 and 55 in a 65 proportionately?

4      Does that make sense?

5  A   It.....

6          MS. PINKEL:  Object to the form of the question.

7          MS. BRETZ:  Okay, let me rephrase the question.

8  Q   (By Ms. Bretz)  If somebody's driving 25 in a 35 their

9      deviation from the posted limit is proportionately greater

10     than somebody driving 55 in a 65, wouldn't you say?

11 A   No, I'd come up with 10 miles per hour different with both

12     of those.

13 Q   True.  But proportionately somebody driving 25 in a 35 is

14     driving approximately, oh boy, I'm not too good at numbers

15     sometimes.  I don't know, about two-thirds of the speed

16     limit while somebody driving 55 in a 65 is driving quite a

17     bit closer to what the posted speed limit is, isn't he?

18         MS. PINKEL:  Object to the form of the question.  This

19 isn't really making sense to me, but it also appears to be a

20 compound question.

21         MS. BRETZ:  Okay.  Well, let me give one more stab at

22 it.

23 Q   (By Ms. Bretz)  If somebody was driving 25 in a 35, would

24     you believe that -- I'm just going to skip that.  Are you

25     aware of any 911 calls that were made that night?

1   A   No, I'm not.

2   Q   Okay.   Were there any other officers involved in this

3       incident besides you and Officer Estes?

4   A   Not that I'm aware of.

5   Q   What was Ms. Duffy's demeanor when you first approached her

6       car after pulling her over?

7       MS. PINKEL:  Object to the form of the question.  Can

8   you explain what you mean by demeanor, Karen?

9       MS. BRETZ:  Sure.

10  Q   (By Ms. Bretz)  Was she sitting up right?  Was she slumped

11      over?  Did she look like she was about ready to pass out?

12      Did she look angry?  Sad?

13  A   Referring to my report, I documented she seemed confused

14      and disoriented.

15  Q   She didn't make any attempt to outrun you or anything when

16      you put your lights on, did she?

17      MS. PINKEL:  Object to the form of the question.

18  Q   (By Ms. Bretz)  She didn't try to get away from you when

19      you put your lights on?

20  A   She did not elude.

21  Q   Exactly.

22  A   She did fail to stop in the most timely manner.

23  Q   Could you explain that please?

24  A   Sure.  When I activated my emergency lights as -- as we

25      were approaching Tudor as anticipated she took the Tudor

1    exit, however, she continued to drive down the length of

2    the exit passed where it merges with the Frontage Road.

3    The most appropriate place to pull over would have been

4    immediately on the exit after she got off the highway.

5  Q  Okay.  She pulled over in a place that was safe and away

6    from traffic?

7  A  As safe as the initial start of the exit would have been,

8    yes.

9  Q  But you didn't get the impression that she was going to try

10    to elude you?  She didn't speed or make any kind of quick

11    changes or anything like that?

12  A  No.

13  Q  When you first approached her after the stop was she

14    hostile towards you?

15  A  According to my report I indicate that she seemed confused

16    and disoriented.

17  Q  You don't.....

18  A  I don't have any indication of her being hostile on the

19    initial contact.

20  Q  Okay.  Could you smell alcohol on her breath?

21  A  No.

22  Q  Did you have any reason to believe that she had been

23    drinking?

24  A  No.

25  Q  Did you see any bottles in the back seat or open containers

1          or anything like that?

2   A    No.

3              MS. PINKEL:  I'm just going to object to the line of

4   questioning here.  This isn't an issue of alcohol, this is an

5   issue of his concern that she had abused prescription medication.

6

7              MS. BRETZ:  Sure.  Well, when we had the deposition of

8   my client I remember you giving her a public service message on

9   the evils of drunk driving, which I agree is an evil, but that

10  had nothing -- you know.

11             MS. PINKEL:  Okay.  Why don't you just ask him the

12  questions?  I don't.....

13             MS. BRETZ:  Sure.

14             MS. PINKEL:  ......think I was giving her a public

15  service message, but -- you can continue.

16             MS. BRETZ:  Thank you.

17  Q    (By Ms. Bretz)  Did you ask Ms. Duffy whether she'd had

18        anything to drink?  Do you recall?

19  A    I don't recall if I asked her specifically if she'd had any

20        alcohol.

21  Q    Is that a pretty standard question, though?

22  A    If I have a suspicion that somebody has been drinking, like

23        I can smell the alcohol, then that is a standard question,

24        yes.

25  Q    Did you believe that she was under the influence of drugs?

1    A    Yes, I did.

2    Q    What made you think that?

3    A    Based on my report, not only her driving, but also her

4         demeanor.  Her behavior was inappropriate and her responses

5         for the questions were inconsistent and additionally, she

6         failed the field sobriety tests.

7    Q    Did you ask her whether she had taken any drugs recently?

8    A    Yes.

9    Q    Do you recall what she was wearing that night?

10   A    No, I do not.  I do have in my report -- I annotated that

11        she was dressed appropriately for the weather and was

12        wearing a sandal type of footwear.

13   Q    So she was wearing sandals?

14   A    Sandal type.

15   Q    Okay.  Did she tell you that she had bad ankles?

16   A    According to my report, she had indicated that she had bad

17        ankles.

18   Q    Did you take that into consideration while you were

19        administering the field sobriety tests?

20   A    Yes, I did.

21   Q    And how did that weigh in -- how did that affect the --

22        affect your field sobriety tests?

23   A    She did extremely poor on the field sobriety tests.

24   Q    And then as far as having bad ankles, would the bad ankles

25        contribute to her performance?

1   A    It could.

2   Q    Did you take that into account?

3   A    Yes.

4   Q    How did you take that into account?

5   A    She did extremely poorly on the tests versus doing

6        marginally on the tests.

7   Q    Did Ms. Duffy tell you that she was disabled?

8   A    No, she did not -- I don't believe so.  If you give me a

9        moment I'll refer to my report and see if there's anywhere

10       in there, but I don't recall that she did.

11  Q    Okay.

12       (Pause - reviewing document)

13  A    No.  I don't see anywhere where I've annotate- -- annotated

14       in my report that she had indicated that she was disabled.

15  Q    Okay.  Did she mention to you any type of health problems

16       that she may have besides the bad ankles?

17  A    No.  I believe after she was already in custody she had

18       indicated that she was taking hormone pills.

19  Q    In your report you noted that she'd had a piece of tape or

20       paper covering her license where the year is -- is that

21       right?

22  A    Correct.

23  Q    It's about halfway down the first page.  Did that

24       contribute to your decision to arrest her for DUI?

25  A    Not really.  A lot of women don't want to -- people to know

1      how old they are.  I know my wife doesn't.

2  Q  Was Ms. Duffy cited for anything else besides the DUI?

3  A  No, she was not -- by me, at least.

4  Q  Did you ever run her license to see whether she had any

5      warrants out or whether she had a valid driver's license?

6  A  Yes, I did.  In my report I indicate that I completed my

7      computer checks for her license and vehicle registration.

8  Q  So, apparently everything came up okay?

9  A  Apparently, yes.

10  Q  So, would it be correct to say that the reasons why you

11      pulled her over for the -- for the stop were because she

12      was driving 55 in a 65 and then also the swerving?

13  A  I would say that I pulled her over because she was weaving

14      within her lane and she was driving below the speed limit.

15

16  Q  Okay, just those two things?

17  A  Correct.

18  Q  And then you arrested her for DUI because of her

19      performance on the field sobriety tests and then her

20      general demeanor?

21  A  Based on my observations of her and then her performance on

22      the field sobriety tests.

23  Q  And then sometime you -- you asked -- I'm just asking,

24      maybe this isn't correct, but at some point you asked for

25      Officer Estes to come on the scene?

1  A    I don't remember if I actually asked for him or if he just
2       automatically started heading my way.

3  Q    What stage were you at in the arrest that Officer Estes
4       came on the scene?

5  A    I didn't annotate in my report when he arrived on scene,
6       but I do recall that she was already under arrest when he
7       arrived.  I can't remember if she was in a -- sitting in my
8       police car or if she was still just standing on the
9       roadside with me.

10          MS. BRETZ:  Do you want to take a little break -- water
11  break?

12      (Off record)

13      (On record)

14  Q    (By Ms. Bretz)    Then Officer Estes eventually took Ms.
15       Duffy off to the substation, right?

16  A    Officer Estes took custody of her and took her for DUI
17       processing.

18  Q    But before that happened, did you and Officer Estes search
19       Ms. Duffy's car?

20  A    I know that I searched two bags.  I don't remember if I
21       completely -- completely searched her vehicle all by
22       myself.

23  Q    Were those bags on her person or were they in the car?

24  A    According to my report they were on the front passenger
25       seat.

1    Q    Why did you search her bags?

2    A    Her bags were searched incident to arrest.

3    Q    Did Ms. Duffy ever give you permission to go through her

4         bags?

5    A    No, she did not.

6    Q    Did you believe you might find something illegal in the

7         bags?

8         MS. PINKEL:  Object to the form of the question.

9    Q    (By Ms. Bretz)  Did you have any idea what you might find

10        in the bags?

11   A    Did I have any idea?

12   Q    Well, did you.....

13        MS. PINKEL: Object to the form of the question.   Why

14   don't you just ask him why he searched her bags?

15        MS. BRETZ:  He already answered that.

16        MS. PINKEL:  Okay, well --

17   Q    (By Ms. Bretz)  Did you have any suspicions of what you may

18        find in the bags?

19   A    A search.....

20   Q    Before you searched them.

21   A    A search incident to arrest is completed in order to search

22        for weapons and for evidence of a crime.

23   Q    Did you find any evidence of a crime in the bags?

24   A    Yes.

25   Q    And what did you find?

1   A   According to my report there were four bottles containing
2       various drugs, one bottle contained aspirin, the other
3       three contained unknown drugs.

4   Q   Were those drugs ever tested?  The unknown drugs?

5   A   No, they were not.

6   Q   Why -- do you know why they never were?

7   A   I can guess why they never were, but it would be my
8       opinion.

9   Q   What's your opinion of why they never were?

10  A   My opinion is a breakdown in the communication system
11      between the prosecutor's office and the police department.

12  Q   Ms. Duffy had a independent blood draw done, right?

13  A   She did.

14  Q   Are you aware of what the results of that test were?

15  A   I believe they're in the report.

16      (Pause - reviewing documents)

17  A   It doesn't appear that I have that page with me.

18  Q   Is this the report you got from the hospital?

19  A   Well, I never got a report from the hospital.

20  Q   Oh.

21      MS. PINKEL:  Are you referring to Bates Number 000020?

22  A   Uh-huh (affirmative).

23      MS. PINKEL:  Is that a yes?

24  A   Yes.  Bates is the number on the bottom right?

25      MS. BRETZ:  That's correct.

1  A    This is an Alaska Regional outpatient report with the

2       appropriate APD case number written on the top right corner

3       of it with Virginia Duffy's name on it.    It looks like

4       there's four copies of the same thing.

5  Q    (By Ms. Bretz)  Right.  I -- is that what shows that it was

6       a negative?

7  A    This shows that it was negative for legal blood alcohol.

8  Q    But you eventually got information that the blood draw was

9       also negative for drugs?

10 A    I never actually got information until I went to seek the

11      information when I found out that this lawsuit was filed.

12 Q    Oh, okay.  But, it's your information now that the results

13      of the drug tests were negative?

14 A    For drugs of abuse.

15 Q    Right.

16      (Pause - reviewing documents)

17          MS. BRETZ:  I don't have any thing else.  I would just

18 like his report, Bates Number six, seven, and eight to be an

19 exhibit.

20          MS. PINKEL:  I think it's also nine as the seizure of

21 the drugs, too so that it be part of his report.

22          MS. BRETZ:  Well, I'm just asking for part of the

23 report to be entered -- six, seven and eight.

24          MS. PINKEL:  You don't want the -- the part that says

25 what the bottles of drugs that he seized to be part of the

1  exhibit?

2          MS. BRETZ:  Let's see, I don't know that I have it with

3  me.

4          MS. PINKEL:  Yeah, it's just page nine.

5          MS. BRETZ:  Yeah, I don't have it with me, but --

6          MS. PINKEL:  Okay, well.....

7          MS. BRETZ:  I'm okay with six, seven, and eight.

8          MS. PINKEL:  Pardon?

9          MS. BRETZ:  I'm okay with six, seven, and eight.

10          MS. PINKEL:  Well, just -- it's not a completed --

11  complete report is all I'm saying.  That's just part of his

12  report.

13          MS. BRETZ:  Oh, here it is here.  I'll just do the

14  whole thing.

15          MS. PINKEL:  Okay.

16          MS. BRETZ:  Six, seven, eight, nine.  That'll be

17  Exhibit 1.

18          MS. PINKEL:  Exhibit 1.

19          COURT REPORTER:  Exhibit 1 has been marked.

20                          **(Deposition Exhibit 1 marked)**

21          MS. BRETZ:  That's all I've got.

22          MS. PINKEL:  Okay, I just have a few follow up

23  questions for Roy.  Did you need to use the restroom or anything

24  or --

25  A     Yes.

1     MS. PINKEL:  Just give me a minute here.  Let's go off

2  record and come back for a break.

3     (Off record)

4     (On record)

5                    **CROSS EXAMINATION**

6  **BY MS. PINKEL:**

7  Q    Roy, I just had a few follow up questions.  You had said

8       that you took into account Ms. Duffy's statements that she

9       had poor ankles when you administered the field sobriety

10      test, correct?

11 A    Correct.

12 Q    Did the fact that she did so poorly on the field sobriety

13      tests, did you conclude, based on your experience, that her

14      bad ankles were the reason for that?

15 A    No.  I -- I didn't conc- -- conclude that she did so poorly

16      because of any kind of injury or physical problem other

17      than impairment due to what I believed to be prescription

18      drugs.

19 Q    I just wanted to ask you about prescription drugs.  There

20      was a -- some type of a lab testing done of Ms. Duffy's

21      blood sample and Ms. Bretz just talked to you about that a

22      little bit, correct?

23 A    Yes.

24 Q    You had said that it was, although the blood sample was

25      negative for drugs of abuse, I guess my question is was it

1     -- was the sample tested for other types of drugs?

2  A   No.  When -- when I found out about this lawsuit I pulled

3     the reports, I was actually surprised that the case had

4     been dismissed by the prosecutor so, I -- I researched and

5     actually found the lab reports and then I -- at that time

6     I learned that the blood had been tested for legal alcohol

7     and then the drugs of abuse, which are just the common

8     types of drugs like methamphetamine, cocaine, opiates.  So

9     like Valium would show up in that or heroin, things along

10    those natures, but it wasn't tested for pharmaceuticals.

11  Q  And based on your experience and training as a police

12    officer, are there concerns about pharmaceuticals also

13    being a basis for people driving erratically and being

14    under the influence?

15  A  Yes.

16  Q  And are sleeping medications such as Ambien and Sonata

17    included in that group?

18  A  There are and there's a lot.  I mean anyone -- any adult

19    who's received medication from any doctor, any kind of

20    prescription, you know the majority of the bottles of

21    medicine you get nowadays have a label on the side and it

22    actually warns you that it may cause drowsiness, it may

23    cause fatigue, and a lot of them actually caution you from

24    operating machinery or motor vehicles.

25  Q  Based on your research it doesn't look like the blood

1    sample that was done on Ms. Duffy was tested for these

2    types of pharmaceuticals, like a sleeping medication?

3  A   Correct.

4         MS. PINKEL:  I have no further questions.

5         MS. BRETZ:  I don't have anything else either.

6    (Off record)

7

8

9                 **\* \* \* END OF PROCEEDINGS \* \* \***

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25