```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ALASKA

 3
    VIRGINIA DUFFY,                    )
 4                                     )
            Plaintiff,                 )
 5                                     )
    v.                                 )
 6                                     )
    MUNICIPALITY OF ANCHORAGE,         )
 7  ROY LEBLANC, individually and      )
    in his capacity as a police        )
 8  officer for the Municipality of    )
    Anchorage, and JAMES ESTES,        )
 9  individually and in his            )
    Capacity as a police officer for)
10  the Municipality of Anchorage,     )
                                       ) U.S. District Court
11          Defendants.                ) Case No. 3:05-cv-152-RHB
                                       )
12
                   DEPOSITION OF VIRGINIA DUFFY
13                        July 6, 2006

14  APPEARANCES:

15      FOR THE PLAINTIFF:      MS. MARY PINKEL
                                Office of the
16                               Municipal Attorney
                                Attorneys at Law
17                              632 West 6th Avenue, Suite 730
                                Anchorage, Alaska 99501
18                              (907) 343-4545

19

20      FOR THE DEFENDANTS:     MS. KAREN BRETZ
                                Law Office of Karen Bretz
21                              Attorneys at Law
                                610 C Street, Suite 2B
22                              Anchorage, Alaska 99509
                                (907) 277-5847

23      ALSO PRESENT:           MS. CONNIE ERNST
                                MR. GLENN S. SMITH
24

25                         *  *  *  *
```

***METRO COURT REPORTING***

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit B Page 1



1       PURSUANT TO NOTICE, the Deposition of **VIRGINIA DUFFY**

2   was taken on behalf of the Plaintiff before Cheri Tabor, Notary

3   Public in and for the State of Alaska and Reporter for Metro

4   Court Reporting, at the Office of the Municipal Attorney, 632

5   West 6th Avenue, Suite 730, Anchorage, Alaska, on the 6th day

6   of July 2006, commencing at the hour of 10:10 a.m.

7                              *  *  *  *

8                       **TABLE OF CONTENTS**

9       Direct Examination by Ms. Pinkel  . . . . . . . . . . 4
        Cross Examination by Ms. Bretz  . . . . . . . . . . 126
10

11  **EXHIBITS**

12  A - Report from Langdon Clinic
            dated July 30, 1990  . . . . . . . . . . . 12
13  B - PAMC Preop History and Physical
            dated August 15, 2000  . . . . . . . . . 13
14  C - Psychiatric Evaluation
            dated September 26, 2001  . . . . . . . . 15
15  D - Anchorage Police Department, Narrative
            Report dated March 24, 2003  . . . . . . . 22
16  E - Initial Consultation dated January 11, 2006 . 64
    F - Report from Dr. Beacham dated May 26, 2004 . . 67
    G - Report from Dr. Beacham dated March 1, 2004 . 68
17  H - Medication chart dated 1999 through 2003 . . . 74
    I - Sonata Consumer Information material . . . . . 78
18  J - Neuropsychological Evaluation
            dated February 29, 1997  . . . . . . . . . 85
19  K - Risperdal Consumer Information . . . . . . . . 88
    L - Plaintiff's Responses to Municipality's
20          First Discovery Requests . . . . . . . . . 103
    M - Plaintiff's Responses to Municipality's
21          Second Discovery Requests  . . . . . . . . 105
    N - Anchorage Police Department Arrest
22          Report, dated March 24, 2003   . . . . . . 109
    O - Alaska Trial Court Case Summary  . . . . . . . 113
23  P - Alaska Trial Court Case Summary  . . . . . . . 113
    Q - PBMG Langdon Clinic Progress Notes
24          dated 2003 through 2004  . . . . . . . . . 121

25                             *  *  *  *

1                          **P R O C E E D I N G S**

2          (On record)

3                          COURT REPORTER:  Good morning.  We're on

4    record.  My name is Cheri Tabor and I'm a court reporter for

5    Metro Court Reporting in Anchorage, Alaska.  Today's date is

6    July 6, 2006 and the time is approximately 10:10 a.m.  We're at

7    the Office of Municipal Attorney, 632 West 6th Avenue, Suite

8    730, Anchorage, Alaska.  We're here for the deposition of

9    Virginia Duffy.  This case is in the United States District

10   Court for the District of Alaska in the matter entitled,

11   <u>Virginia Duffy v. Municipality of Anchorage, et al.,</u>

12   <u>Defendants</u>, Case Number 3:05-cv-152-RHB.

13                         Ma'am, would you please raise your right hand

14   so I can swear you in?

15         (Oath administered)

16               MS. DUFFY:  Yes.

17                          **<u>VIRGINIA DUFFY</u>**

18   having first been duly sworn under Oath, testified as follows

19   on examination:

20                         COURT REPORTER:  Would you please state your

21   full name and spell your last name for the record?

22   A      Virginia Duffy, D-u-f-f-y.

23                         COURT REPORTER:  Thank you.  And I need your

24   mailing address, please?

25   A      3206 LaTouche Street, Apartment A17, Anchorage, Alaska

1          99508.

2               COURT REPORTER:  And a daytime or a message

3  telephone number please?

4  A      907-333-5229.

5               COURT REPORTER:  Great.  Counsel I need you to

6  identify yourselves for the record and tell us who you

7  represent, and the folks that are visiting today, please

8  identify yourselves after counsel is done.

9               MS. BRETZ:  Karen Bretz, B-r-e-t-z, for

10 Virginia Duffy.

11              MS. PINKEL:  Mary Pinkel for the Municipality

12 of Anchorage, Roy LeBlanc and James Estes.

13              MS. ERNST:  Connie Ernst, Ward North America

14 for the Municipality of Anchorage.

15              MR. SMITH:  Glenn Smith for the Municipality of

16 Anchorage, Risk Management.

17              COURT REPORTER:  Great.  You may proceed.

18                    **DIRECT EXAMINATION**

19 BY MS. PINKEL:

20 Q      Ms. Duffy, have you been deposed before?

21 A      (No audible answer)

22 Q      Have you had your deposition taken before?

23 A      No.

24 Q      Okay.  I just wanted to explain a few things to you.

25        If you don't understand my questions, please tell me

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit B Page 4

|    |   |                                                                              |
|----|---|------------------------------------------------------------------------------|
| 1  |   | and I can rephrase.                                                           |
| 2  | A | I don't know.  I don't understand the question.                              |
| 3  | Q | Okay.  If I ask you a question, and you don't                                |
| 4  |   | understand the question I'm asking you, you tell me.                         |
| 5  | A | Oh no, I -- I don't understand what you just -- if I've                      |
| 6  |   | been deposed before, I don't what you mean.                                  |
| 7  | Q | Okay.  Your lawyer didn't explain what a deposition is                       |
| 8  |   | before you came here?                                                        |
| 9  | A | I don't think so.                                                            |
| 10 | Q | Okay.  I'm going to be asking you some questions under                       |
| 11 |   | oath today, and I wondered if you've ever been asked                         |
| 12 |   | questions under oath in a room with a court                                  |
| 13 |   | reporter.....                                                                |
| 14 | A | No.                                                                          |
| 15 | Q | .....like this before?                                                       |
| 16 | A | No.                                                                          |
| 17 | Q | Okay.  Have you testified before in court?                                   |
| 18 | A | No.                                                                          |
| 19 | Q | So, basically the rules are if you don't understand the                     |
| 20 |   | question that I'm asking you can ask me to repeat it or                      |
| 21 |   | to rephrase it, and if you get tired and you want to                         |
| 22 |   | take a break, you can tell me that so we can stop and                        |
| 23 |   | you can take a break.                                                        |
| 24 | A | Okay.                                                                        |
| 25 | Q | Okay.  Are you on any medications today, Ms. Duffy?                          |

*METRO COURT REPORTING*

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Exhibit B Page 5

1  A    No.

2  Q    Can you tell us what your date of birth is?

3  A    January 29th, 1950.

4  Q    Okay.  And are you currently working?

5  A    No.

6  Q    Are you doing any kind of volunteer work?

7  A    Yes.

8  Q    And where are you doing volunteer work?

9  A    In Loussac Library.

10  Q   Okay.  And what do you do at Loussac Library?

11  A   Primarily I work in the gift shop.

12  Q   Okay.  And how long have you worked at the gift shop?

13  A   About nine years.

14  Q   Nine years.  Okay.  And what do you do there?

15  A   There's a small gift shop and I assist people in

16      purchasing things.  And then I organize carts.

17  Q   You organizing carts?

18  A   Yeah, for shelving.

19  Q   Okay.  And how many days a week do you work there?

20  A   It varies, but, as of now, it's just one day a week.

21  Q   Okay.  And do you remember when you last worked for

22      pay?

23  A   1976.

24  Q   And what was your last job, when you were working?

25  A   I worked on the race track.

1    Q    And what did you do on the race track?

2    A    I was a hot walker.

3    Q    What's a hot walker?

4    A    The horses get exercised and they have to be cooled

5         down before they're put back in their stalls or they

6         can get pneumonia.

7    Q    So, were you cooling them down in your job as a hot

8         walker?

9    A    You cool them down by walking them around.

10   Q    Okay.  So you walked the horses around?

11   A    That's why it's called a hot walker.

12   Q    And are you currently on Social Security Disability?

13   A    Yes.

14   Q    And how long have you been on Social Security

15        Disability?

16   A    About 30 years.

17   Q    So, are you on SSI or SSDI?

18   A    SSI.

19   Q    Okay.  Now, I'm just going to ask you a few questions

20        and then ask you about the incident that is why we're

21        here.  You're no longer driving, is that correct?

22   A    Correct.

23   Q    And when did you stop driving?

24   A    After the incident.

25   Q    Okay.  Now you stopped driving after the incident

1          because you realized that it wasn't appropriate for you

2          to drive anymore, is that correct?

3                    MS. BRETZ:  I'm going to object to that.

4     That's leading.

5                    MS. PINKEL:  I can ask a leading question, this

6     is a deposition.  You can answer the question.

7     A     I stopped driving because I'm very frightened of the

8          police.

9     Q     (By Ms. Pinkel)  Now, you had problems with your

10         driving prior to this incident, didn't you?

11    A     No.

12    Q     You were stopped by the police in the year 2000,

13         correct?

14    A     I was stopped on campus.

15    Q     You actually got a citation for failure to stop in

16         2000, didn't you?

17    A     On campus.

18    Q     You were cited and had to go to court in 2000 on that?

19    A     No, I didn't -- I didn't go to court.  No.  I filed to

20         go to court and he resigned.

21    Q     Okay.  You said you filed to go to court, and he

22         resigned?  Can you explain what you mean by that?

23    A     I filed on the ticket to go to court, to protest

24         because I certainly did stop at the stop sign and then

25         I got a notice in the mail that the officer resigned.

| | | |
|---|---|---|
| 1 | Q | And the officer wrote you a letter saying he resigned, |
| 2 | | is that correct? |
| 3 | A | No, I got it from the State -- a notice that the |
| 4 | | officer resigned. |
| 5 | Q | Okay.  Now, the officer also stopped you for not having |
| 6 | | a valid operating license, is that correct? |
| 7 | A | No. |
| 8 | Q | You don't remember getting a citation for not having a |
| 9 | | valid operating license in 2000? |
| 10 | A | Oh -- no.  I think -- oh, I think it had expired. |
| 11 | Q | So..... |
| 12 | A | And I didn't get the renewal in the mail, so I went to |
| 13 | | motor vehicles and I renewed it. |
| 14 | Q | And before you went to motor vehicles to renew it, you |
| 15 | | actually got a citation from the police, because you |
| 16 | | didn't have a valid operator's license, is that |
| 17 | | correct? |
| 18 | A | It was on campus -- it was campus police, not APD. |
| 19 | Q | You had a court case initiated because you didn't have |
| 20 | | a valid driver's license, is that correct? |
| 21 | A | I don't remember any such thing happening. |
| 22 | Q | Okay.  You don't remember getting an actual citation |
| 23 | | from the police for not having a valid operator |
| 24 | | license? |
| 25 | A | From APD? |

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit B Page 9

| | | |
|---|---|---|
| 1 | Q | Correct. |
| 2 | A | Not in 2000, no.  I don't remember any such thing. |
| 3 | Q | Now, I just want to talk to you about a few things. |
| 4 | | You've had a quite a few appointments with the |
| 5 | | physicians about medical issues, in the last 5 to 10 |
| 6 | | years, correct? |
| 7 | A | Yes. |
| 8 | Q | And the physicians have indicated in their records that |
| 9 | | you are at times a fair historian, or a difficult |
| 10 | | historian, is that correct? |
| 11 | A | I don't know what you mean. |
| 12 | Q | Well you've had -- you've gone to see Dr. Frasier, |
| 13 | | Dr. Springer, some other physicians in Anchorage in |
| 14 | | recent years for medical issues, correct? |
| 15 | A | Frasier? |
| 16 | Q | Dr. Shirley Frasier.  Do you remember seeing |
| 17 | | Dr. Shirley Frasier? |
| 18 | A | Yes.  Yeah, about 10 years ago. |
| 19 | Q | Okay.  And you've also been to Providence Hospital for |
| 20 | | some medical problems within the last five years, |
| 21 | | correct? |
| 22 | A | Yes. |
| 23 | Q | And the doctors who've examined you, for example, |
| 24 | | Dr. Frasier, when she examined you, she asked you |
| 25 | | questions about your medical history, correct? |

1   A       I don't recall anymore.

2   Q       Okay.

3   A       I think -- I believe it's about 10 years ago, and I --

4           I don't remember.

5   Q       Okay.  So you don't recall, she asked you about your

6           medical history when she interviewed you in 1997,

7           correct?

8   A       I don't remember.

9   Q       Do you remember being evaluated by Dr. Greg McCarthy of

10          Langdon Clinic in 1990?

11  A       In 1990?  Vaguely.

12  Q       Okay.  Do you remember why you went to see

13          Dr. McCarthy?

14  A       No.

15                  MS. PINKEL:  I'm going to show you what is

16  Bates numbered 599 and your lawyer should have already gotten a

17  copy of this, but I will just show you it -- an unmarked copy

18  of it here.  And this is an evaluation Dr. McCarthy did of you

19  in 1990.  Let me find an unmarked copy.  I apologize, my

20  records are out of order here.

21  Q       (By Ms. Pinkel)  I'm just going to show this July 30th,

22          1990 evaluation.  It says history of current illness

23          and Dr. McCarthy says that you are a somewhat

24          inconsistent historian during your interview, do you

25          remember having an interview with Dr. McCarthy?

1  A      No.

2  Q      Okay.

3  A      I do remember Dr. McCarthy, but I don't remember any

4         details.

5  Q      Okay.  Now, I'm going to mark that as Exhibit A, I

6         guess.

7                 COURT REPORTER:  Should I put it over here on

8  the side?

9                 MS. PINKEL:  Yes.

10                COURT REPORTER:  Exhibit A marked.

11                             **(Deposition Exhibit A marked)**

12  Q      (By Ms. Pinkel)  Now, you were at Providence Hospital

13         in 2000 and again in 2005, correct?

14  A      I would need specifics regarding the year 2000.

15  Q      Okay.  In approximately August 15th of 2000, you were

16         at Providence for issues -- urological problems you'd

17         been having, do you remember that?

18  A      In 2000?

19  Q      Correct.

20  A      I was in Providence Hospital for logical problems?

21  Q      You were in Providence Hospital for urological --

22         urology problems?

23  A      I don't remember.

24  Q      You don't remember that?

25  A      I don't remember.

1  Q   I don't want to embarrass you, so I didn't want to go

2      into too much detail, but do you remember having a

3      urinary stress problem?

4  A   Oh, yes.

5  Q   Okay.

6  A   Yes.

7  Q   The doctor who saw you was Dr. Carol Springer.  Do you

8      remember.....

9  A   Yes.

10 Q   .....Dr. Springer?  Okay.  She also did a past medical

11     history on you and she indicated that you had reported

12     to her decreased speech and memory.  Do you remember

13     reporting that to Dr. Mitchell-Springer.....

14 A   No.

15 Q   .....in 2000?  Okay.

16          MS. PINKEL:  Let me just show you this.  This

17 is Bates number 1110 and I've got a copy of that.  I'm going to

18 ask that you mark 1110, B.

19          COURT REPORTER:  Exhibit B marked.

20                              **(Deposition Exhibit B marked)**

21 Q   (By Ms. Pinkel)  And Ms. Duffy, at the bottom of the

22     page here, it says past medical history and the doctor

23     wrote that you are on disability, that's correct, isn't

24     it?  That were you were on disability in 2000?

25 A   That is correct?

1  Q    Okay.  And it also indicates that you had or you have a

2       depressive disorder neurosis?

3  A    I don't know.  I'm not familiar with psychological

4       terminologies.

5  Q    Okay.  So you don't know if you had a depressive

6       disorder neurosis?

7  A    I don't know.

8  Q    Okay.  It also indicates you were being followed by a

9       Dr. Alberts.....

10  A    Uh-huh (affirmative).

11  Q    .....at that time?

12  A    Yes, I did see Dr. Alberts.

13  Q    It also indicates that you were -- you had decreased

14       speech and memory at that time, do you remember that?

15  A    No, I don't.

16  Q    Okay.  So you don't remember you were having decreased

17       speech and memory in 2000?

18  A    I don't remember the conversation and I don't -- don't

19       remember anything associated with this.

20  Q    You don't remember anything associated with this,

21       meaning this hospital visit?

22  A    I don't believe Dr. Springer was in the hospital.  She

23       has her own practice so it -- it's not in the hospital.

24  Q    So you don't remember seeing her at the hospital?

25  A    Well I had surgery.  So the surgery took place in the

1          hospital, but as far as the visits they were in her

2          office.

3  Q      So you don't remember the doctor visiting you in the

4          hospital after your surgery?

5  A      I don't remember.

6  Q      Okay.  Now, do you remember seeing Nella Davis in 2001?

7  A      No, I don't.

8  Q      Nella Davis is a psychiatric nurse practitioner, that's

9          correct isn't it?

10 A      I don't know.

11 Q      Okay.

12                MS. PINKEL:  I'm going to show you what's been

13 marked as 332, Ms. Duffy.  I'll try to find you a better copy.

14 Mark this as Exhibit C.

15                COURT REPORTER:  All right.  Exhibit C marked.

16                **(Deposition Exhibit C marked)**

17 Q      (By Ms. Pinkel)  What I'm showing you, it's Bates

18         numbered 332 through 336, it's a psychiatric evaluation

19         of you Ms. Duffy, and it's author is Nella Davis, ANP.

20         And she, on the first page there it says history of

21         present illness, it says how you had come for an intake

22         with Rose Sayre, do you remember seeing a Rose Sayre?

23 A      Yes, I do.

24 Q      Okay.  And then the second paragraph, Nurse Davis says

25         that you've been on Desyrel, 100 milligrams, 3 every

1      night.  And it further states that you've been taking

2      this medication for sleep and depression as prescribed

3      by Dr. Burgess at the Langdon Clinic for the last few

4      years, do you remember talking to someone about the

5      fact that you had been seeing Dr. Burgess for two

6      years?

7  A   No.

8  Q   Okay.  Do you remember seeing a Dr. Burgess?

9  A   Yes, definitely.

10 Q   Okay.  But you don't remember talking to Nurse Davis

11     about it?

12 A   No, I don't.

13 Q   Okay.  It further states that your mood is improving,

14     however, the trauma with the hate crime against a

15     printer in town has set you back, do you remember that?

16 A   I remember the hate crime.

17 Q   Okay.  And do you remember saying that this trauma with

18     the hate crime has set you back?

19 A   No, I don't.

20 Q   Okay.  This also says that you had gotten a letter from

21     Social Security saying that you had some overpayment

22     dating back to 1984, do you remember this incident of

23     getting a letter from Social Security?

24 A   No.

25 Q   Okay.  It also states you've had some suicidal thoughts

1    after that note with no intent or plan, do you remember

2    that?

3  A   No.

4  Q   Okay.  It further states that she, meaning you, states

5    her short term memory has gotten worse since a head

6    injury in 1976 which she was disabled, do you remember

7    saying that?

8  A   No.

9  Q   Okay.  If this record said that, in 2001, your short-

10    term memory had gotten worse, would that be accurate?

11  A   I don't remember this conversation at all.

12  Q   Do remember that your short-term memory was getting

13    worse in 2001?

14  A   No, I don't.  I don't know that my short-term memory

15    was getting worse.

16  Q   So, if this record says your short-term memory had

17    gotten worse, since 1976, that record would be

18    inaccurate?

19  A   Would you say it again, please?

20  Q   If this record from Nurse Davis says that your short-

21    term memory had been getting worse, as of 2001, that

22    record would be inaccurate?  Are you saying this

23    medical record is inaccurate?

24  A   I don't remember this at all, so I can't comment.

25  Q   Okay.

1   A     I just don't remember any -- any of this transpiring at

2         all.

3   Q     Okay.  All right.  I just wanted to move on with you

4         and just talk to you a little bit about the incident

5         which is why we're here today and which is what caused

6         you to bring this lawsuit.  Do you remember March 23rd

7         of 2003 when Officer LeBlanc stopped you for your

8         driving?

9   A     Yes, I do.

10  Q     Do you mind telling me, where were you coming from that

11        night, before you got stopped by Officer LeBlanc?

12  A     Royal Fork Restaurant.

13  Q     The Royal Fork Restaurant?

14  A     Yes.

15  Q     And which Royal Fork Restaurant had you been at?

16  A     South Anchorage.

17  Q     And, had you been there with another person?

18  A     I don't recall.

19  Q     And this was a Sunday night, is that correct?

20  A     That's correct.

21  Q     Where had you been before the Royal Fork Restaurant?

22  A     I don't remember.

23  Q     Do you remember what time you were at the Royal Fork

24        Restaurant?

25  A     It was in the evening.

1  Q    Okay.  And did you have dinner there?

2  A    Yes, I did.

3  Q    Okay.  And then where did you go after the Royal Fork

4       Restaurant?

5  A    I was heading home.

6  Q    And home was where?

7  A    LaTouche Street.

8  Q    Is that the LaTouche address where you live right now?

9  A    Yes, it is.

10  Q    Now, do you remember what road you were on?

11  A    I was on the Seward Highway.

12  Q    Okay.  Can you briefly tell us what happened that

13       night?  And maybe just starting from what you were

14       doing when you got stopped?

15  A    I was driving.  I was in the right-hand lane, and I was

16       just past Dowling Road, and I noticed police lights and

17       there was an exit sign for Tudor Road.  I didn't think

18       there was enough room to pull over so I exited at Tudor

19       Road, and pulled over and then he came to my door, and

20       I said to him, what did I do, and he said, you're going

21       55 miles an hour in a 65-mile zone.

22  Q    Did he also report your vehicle was weaving on the

23       road?

24  A    No.

25  Q    You don't recall him tell you that you were weaving?

1  A       No.

2  Q       Your vehicle was in fact weaving on the road, wasn't

3          it, when you were driving?

4  A       I think everyone's vehicle was weaving on the road,

5          because there were ruts in the road and that causes the

6          vehicles to weave.

7  Q       And you say everyone was weaving that night?

8  A       Well if there're ruts in the road, and the cars are in

9          and out of the tracks --

10 Q       So, did you observe other cars weaving in and out of

11         traffic that night too?

12 A       Yeah, it -- it's -- was standard because there were

13         ruts in the road and they paved them over later on but

14         --

15 Q       Now, the officer reported to you that you had swerved

16         to the right and then sharply corrected back to the

17         proper lane of travel, do you remember that?

18                 MS. BRETZ:  Objection.  It's already been asked

19 and answered.

20                 MS. PINKEL:  No.

21                 MS. BRETZ:  She said she wasn't weaving.  She

22 said that the officer -- she doesn't recall the officer telling

23 her that she was weaving.

24                 MS. PINKEL:  This is another question, though.

25 Q       (By Ms. Pinkel)  I'm asking you -- he reported to you

1    that he noticed that you were -- you sharply corrected

2    yourself.....

3 A    No, he did not.

4 Q    Okay.  Now, you would agree your driving that night was

5    not appropriate, don't you?

6         MS. BRETZ:  Objection.  Argumentative.  But you

7 still have to answer.

8 A    I'm a very careful driver.  There wasn't anything wrong

9    with my driving that night.

10 Q    (By Ms. Pinkel)  Now the officer turned on his red

11    lights and those were flashing behind you, correct?

12 A    Correct.

13 Q    And what's your understanding of why officers turn on

14    their flashing lights?

15 A    To signal to pull over.

16 Q    And it's also a signal that there might be an

17    emergency, correct?

18 A    Yeah.

19 Q    Okay.  And they don't turn on their flashing lights

20    unless they think that there's an emergency, correct?

21 A    I think so.

22 Q    Okay.  That's a yes?

23         MS. BRETZ:  I'm going to object to this too.  I

24 mean she doesn't -- she hasn't had any training in officer

25 procedures.  She can't speak to that.

1           MS. PINKEL:   You need to answer the question.

2   Q    (By Ms. Pinkel)   And the question was yes, correct?

3   A    Would you repeat the question, please?

4   Q    The question was based on your experience as a driver,

5        police officers doesn't turn on their flashing red

6        lights unless there's an emergency, correct?

7   A    I don't know.

8   Q    Okay.  You say you don't know.

9   A    I don't know, no.

10  Q    Okay.  Have you had a chance to read Officer LeBlanc's

11       report?

12  A    Yes, I have.

13  Q    Okay.  Have you read it recently?

14  A    No, I have not.

15  Q    Now officer -- let me just show you Officer LeBlanc's

16       report.

17       (Off record comments)

18           COURT REPORTER:   Exhibit D marked.

19                       **(Deposition Exhibit D marked)**

20  Q    (By Ms. Pinkel)   Let me just show you what we've marked

21       as Exhibit D, and this is Officer LeBlanc's police

22       report.  In this report he indicates that he contacted

23       you where it says contact the driver, Ms. Duffy?

24  A    Uh-huh (affirmative).

25  Q    He said that you seemed confused and disoriented.  Do

1      you remember having that conversation with him where

2      you seemed confused and disoriented?

3   A  I wasn't confused and disoriented.  I was very, very

4      frightened.

5   Q  Now, he asked you for your -- you said you were

6      frightened?

7   A  Yes.

8   Q  Okay.  And you were frightened because you'd been

9      pulled over, correct?

10  A  Not particularly.

11  Q  Okay.  So you were just frightened?

12  A  I was frightened of him.

13  Q  Okay.  And previously you had been afraid of police

14     officers back in 2000, correct?

15  A  No.

16  Q  You don't remember talking to your therapist about

17     being frightened about being pulled over in 2000 by the

18     police?

19  A  I would -- I don't recall ever being frightened of the

20     police, no.

21  Q  Okay.  Now, the officer -- do you remember the officer

22     asked you for your driver's license and your

23     registration and proof of the insurance, correct?

24  A  No, he did not.

25  Q  You don't remember --

1  A    No, he did not ask me for my license because I had it

2       out already.

3  Q    Okay.  I'm going to direct you to his police report

4       where it says, contact with driver.  And first of all,

5       the officer says he contacted the driver who was

6       identified as Virginia Duffy by her Alaska driver's

7       license, so that would be you, correct?  Do you

8       remember that?

9  A    Remember what?

10  Q    Do you remember him contacting you when you stopped

11       there?

12  A    Coming to my door?

13  Q    Yes.

14  A    I remember him coming to my door.

15  Q    Okay.  Now, here he says now he asked for your driver's

16       license and your registration and your proof of

17       insurance?  Do you remember -- you don't remember him

18       asking for your driver's license?

19  A    No, I already had it out and I had my proof of

20       insurance out.

21  Q    All right.  Now, he says here that you searched through

22       your wallet several times before producing your

23       driver's license, do you remember that?

24  A    Well it's not true, no.

25  Q    Okay.

1  A    I had it out already.

2  Q    Okay.  Now, you immediately already had your driver's

3       license and your proof of registration out?

4  A    Not my proof of registration.  I had my proof of

5       insurance, my insurance card, and my driver's license,

6       I had it out when he came to the door.

7  Q    And your registration was not with you?

8  A    No.

9  Q    Okay.  Where was your registration?

10 A    At home.

11 Q    Okay.  You didn't keep it in your car?

12 A    No.

13 Q    Okay.  It's required by law that you keep registration

14       and proof of insurance in your car at all times,

15       correct?

16 A    I don't know.

17 Q    Okay.  You don't know that that's what the law

18       requires?

19 A    Say it again?

20 Q    You don't know that the law -- you're not aware that

21       the law requires that you have insurance and proof of

22       registration in your car at all times?

23 A    I'm aware that I have to have insurance and I've always

24       had insurance.  But, I didn't know that I had to keep

25       my registration in the car.

1  Q    Okay.  Now do you remember that when you were talking

2       to Officer LeBlanc you were swaying back and forth?

3  A    I was in my car.

4  Q    Okay.  But when you got out of the car, you were

5       swaying.

6  A    Well that was later on.

7  Q    Okay.  Well why don't you tell me about what happened

8       then, you said you were in the car, he asked for your

9       insurance, you believe that you.....

10 A    No, he didn't ask for my insurance, he didn't ask for

11      my license, I already had it out.

12 Q    Okay.

13 A    And I handed him my license and the insurance card, and

14      I had a piece of masking tape over the year of my

15      birth.

16 Q    And in fact this police report indicates you had your

17      masking tape over your birth, correct?

18 A    Say it again?

19 Q    His police report indicates that you had masked over

20      your birth date?

21 A    I don't know, I'd have to look -- look at it.

22 Q    Okay.  Looking down on line five, he states in his

23      report -- can you find line five?  I noticed that Duffy

24      had a piece of paper covering her birth date on her

25      driver's license?

1  A    Uh-huh (affirmative).

2  Q    That's correct, isn't it?

3  A    That is correct.

4  Q    Right.  And he indicated Duffy was unable to locate her

5       registration, but indicated she keeps it at home, that

6       was correct?

7  A    I don't think so, no.

8  Q    It's not correct that you couldn't locate your

9       registration?

10 A    It is correct I couldn't locate my registration, but

11      it's not correct that I said I kept it at home.

12 Q    Okay.  So, you did not tell him you keep it at home?

13 A    I don't recall saying that I kept it at home.

14 Q    Okay.  So.....

15 A    I don't think I knew where it was.

16 Q    So you know now -- you're now saying you don't know

17      where you're registration was?

18 A    Yeah.  No, I didn't know where it was.

19 Q    You don't know now where it was and you're not sure you

20      knew then where it was?

21 A    I don't know now where it was, it was at home.

22 Q    It was at home?

23 A    Yeah.

24 Q    So, your registration, your proof of registration was

25      at home when you were stopped that night?

1    A    Yes.

2    Q    Now, Officer LeBlanc asked you to get out of the car,

3         is that correct?

4    A    This is later on.

5    Q    Okay.  He asked you if you were taking any prescription

6         medication, didn't he?

7    A    No, he did not.

8    Q    You don't remember him asking you if you were taking

9         any prescription medication?

10   A    I remember him saying, are you taking any medication

11        that would impair your driving?

12   Q    So he did ask you if you were taking any medication?

13   A    That would impair my driving.

14   Q    And what did you say when he asked you that?

15   A    I said no.

16   Q    Now, you sat in the car, he asked for these documents

17        from you, and then he asked you to get out of the car,

18        correct?

19   A    No, he didn't ask you for these document, because I

20        already had my driver's license and my insurance card,

21        and I handed them to him.

22   Q    Okay.  Well after you gave him those documents did he

23        then ask you to get out of the car?

24   A    No, he did not.

25   Q    Okay.  Did you at some point get out of the car?        .

| | | |
|---|---|---|
| 1 | A | Much later. |
| 2 | Q | Okay.  And after you gave him the documents, then what |
| 3 | | did you do? |
| 4 | A | I sat there. |
| 5 | Q | You sat there. |
| 6 | A | And he had a tantrum. |
| 7 | Q | Okay.  And what do you mean by a tantrum? |
| 8 | A | He got extremely upset that I had the piece of masking |
| 9 | | tape over the date of birth -- over the year. |
| 10 | Q | And what did he say about the masking tape over the |
| 11 | | year? |
| 12 | A | He said, what is this? |
| 13 | Q | And what did you say? |
| 14 | A | I said it's a piece of masking tape.  And he said, this |
| 15 | | is coming off right now, and he -- I (sic) had |
| 16 | | difficulty controlling himself from jumping up and |
| 17 | | down. |
| 18 | Q | And how do you know that he had difficulty controlling |
| 19 | | himself from jumping up and down? |
| 20 | A | Well it -- he was going like this.  And, he -- |
| 21 | | MS. BRETZ:  You have to use words, it won't |
| 22 | pick up | your body language. |
| 23 | A | His arms started moving up and down, and his knees were |
| 24 | | bending, as though he were beginning to jump, but was |
| 25 | | trying to force himself from jumping up and down. |

1    Q    (By Ms. Pinkel)   Okay.   So it's your understanding --

2         it's your testimony that he got -- he was upset with

3         you for having masking tape over your driver's license

4         birth date?

5    A    I -- I wouldn't think that had -- had anything to do

6         with me.

7    Q    Okay.   And so he was sort of jumping up and down, or

8         trying to keep himself from jumping up and down and

9         that's your testimony.   And then he asked you to get

10        out of the car, correct?

11   A    Oh, no.

12   Q    He didn't ask you to get out of the car?

13   A    Not then, no.

14   Q    Okay.   He then conducted three field sobriety tests,

15        didn't he?

16   A    No.

17   Q    Have you looked at Officer LeBlanc's report?

18   A    Yeah.

19   Q    Well the report indicates he gave you the Horizontal

20        Gaze Nystagmus test where he looked at your eyes with a

21        flashlight, do you remember that?

22   A    Yes, he did but I was still in my car at that time.

23   Q    Okay.   So, while you were in your car, it's your

24        recollection that he gave you the test of your eyes,

25        correct?

1  A    Yeah.

2  Q    Now, his report indicates that you were standing while

3       he gave you this test, you don't remember standing?

4  A    I was in my car.

5  Q    Well his report says that he noticed that you swayed

6       from side to side while standing, do you know recall

7       that?  I'm looking that the bottom of page one of

8       Officer LeBlanc's report, where it says Horizontal Gaze

9       Nystagmus.

10  A   Yeah, but this didn't happen later on.  He gave me this

11      test while I was in my vehicle.

12  Q   Okay.  Well, his report says that I instructed and

13      administered the Horizontal Gaze Nystagmus (HGN) test,

14      using a standard APD pen, and illumination from my

15      flashlight.  Do you remember him using this pen in

16      illumination from his flashlight?

17  A   He didn't have a flashlight.

18  Q   You don't remember him having a flashlight?

19  A   No, he didn't have a flashlight.

20  Q   Okay.  Now, he said that he also noticed that both of

21      your pupils of equal size and reactive to light.  He

22      says your eyes tracked together, correct?

23  A   I.....

24  Q   That's what the report says?

25  A   I wouldn't know, I don't -- I wouldn't know how to

1    administer the test or interpret the results, I -- I
2    don't know.

3  Q  Okay.  And, in fact, it says during the instruction
4    phase I noticed that Ms. Duffy swayed from side to side
5    while standing, do you see that in his report?

6  A  I see that, but I was in my car.

7  Q  Okay.  You were in your car when he was looking through
8    your eyes and doing this test?

9  A  That's correct.

10  Q  Okay.  Now, it further says that he noticed during the
11    test distinct Nystagmus at maximum deviation in both
12    eyes.  That's what his report says, doesn't it?

13  A  Yes, it does.

14  Q  And he said he saw no other clues, correct?

15  A  That's correct.

16  Q  Okay.  Then according to Officer LeBlanc's report, he
17    says he also did what's a walk and turn test.  Do you
18    remember being given a walk and turn test?

19  A  Yes, I do, but this was much later.

20  Q  Much later than the eye test?

21  A  He returned to his vehicle for several minutes, so,
22    this didn't transpire until he returned and ordered me
23    out of my car.

24  Q  Okay.  He actually ordered you out of your car, before
25    he did all three tests?

1           MS. BRETZ:  Objection.  Asked and answered.

2    She already testified that the Nystagmus test was done when she

3    was sitting in the car.

4           MS. PINKEL:  You can still answer the question.

5    A      He did the follow the light test, if this is the

6           Nystagmus test.

7    Q      (By Ms. Pinkel)  Right.

8    A      While I was in my vehicle.

9    Q      Okay.  Well, I'm just going to direct you page one of

10          his report.  You see how the report has the -- towards

11          the middle of the page -- it's says Action Taken?

12   A      Yes.

13   Q      Okay.  It says, I completed my computer checks of her

14          license and the vehicle registration and recontacted

15          Duffy and had her step out of the car for some field

16          sobriety tests.  The report says that, doesn't it?

17   A      Yes, it does.

18   Q      Okay.  Then the report also says I noticed that when

19          she was standing, she swayed while standing.  The

20          report says that, correct?

21   A      Yes, it does.

22   Q      Okay.  And so after that he says that he did field

23          sobriety tests underneath Action Taken, correct?  I'm

24          just direct- -- what does it say under Field Sobriety

25          Tests?

1          MS. BRETZ:  I'm going to object to the general

2    relevance of this.  We're just going through the police report.

3    I mean --

4          MS. PINKEL:  Well I'm asking her about what she

5    remembers and she needs to answer these questions?

6          MS. BRETZ:  Well you're not asking her about

7    what she remembers, you're asking here about what's in the

8    report.

9          MS. PINKEL:  Well the report is obviously

10   contradictory to what she's saying, so I'm trying to see if

11   she's having some memory problems here or if there's something

12   else.

13         MS. BRETZ:  Maybe the officer has memory

14   problems.

15         MS. PINKEL:  You're not testifying Ms. Bretz.

16   Q    (By Ms. Pinkel)  Ms. Duffy, I was asking you about the

17        action taken, and it looks to me like Officer LeBlanc

18        said he completed the computer checks of your license

19        and your vehicle registration and then he recontacted

20        you, correct?

21   A    That's correct.

22   Q    Okay.  And it then he had you step out of your car, for

23        some field sobriety tests, correct?

24   A    That's correct.

25   Q    Okay.  Then he says he noticed you were standing --

1     that when you were standing that you were swaying while

2     you were standing, correct?

3  A  That's what he says.

4  Q  Right.  And do you remember that, that you were swaying

5     when you were standing?

6  A  No, I wasn't swaying.

7  Q  Okay.  You don't remember that, correct?

8  A  I wasn't swaying.

9  Q  Okay.  Now, according to this report, he then had you

10    stand and then did the three field sobriety tests,

11    correct?

12 A  He -- what --

13           MS. BRETZ:  Objection.  It's already asked and

14 answered.  She testified that the Nystagmus test was done when

15 she was sitting in the car.

16           MS. PINKEL:  I'm asking.....

17 A  I don't understanding.  I'm sorry.  Please repeat the

18    question.

19 Q  (By Ms. Pinkel)  Now it's been your testimony that you

20    were given this Horizontal Gaze Nystagmus test in the

21    car, correct?

22 A  That's correct.

23 Q  Now, the report says something different, doesn't it?

24 A  Yes, it does.

25 Q  The report says that after you got out of the car,

1        Officer LeBlanc did these three tests, correct?

2  A    That's correct.

3  Q    Okay.  All right.  Now, after he did this Nystagmus

4        test, Office LeBlanc also asked you to do a walk and

5        turn test, correct?

6  A    No, that's not correct because he did the Nystagmus

7        test while I was in my car bef- -- before he went back.

8  Q    Okay.

9  A    To his vehicle.  So, no, that's not correct.

10  Q    Well.....

11  A    I have to go the ladies room, can we take a break?

12          MS. PINKEL:  You sure can.

13  A    Oh, good.

14        (Off record)

15        (On record)

16  Q    (By Ms. Pinkel)  Ms. Duffy, we were talking about

17        Office LeBlanc's report and your recollection of what

18        events were versus what he has in his report, and we

19        were also talking just about, in general, about what

20        happened.  Now, we've already discussed the fact that

21        he gave you a Horizontal Gaze Nystagmus test --

22          MS. ERNST:  Hold on.

23          MS. BRETZ:  It came apart.

24  A    May I leave it here?

25         COURT REPORTER:  You may do that.

37

1          MS. PINKEL:  Just for the record, Ms. Duffy's

2  microphone came apart, but it seems to still operate.

3  Q       (By Ms. Pinkel)  Anyway, so, we talked about the

4          Horizontal Gaze Nystagmus test, and I was going to ask

5          you about the other two tests that he gave you.  He

6          gave you what was called a walk and turn test, do you

7          recall being given that test?

8  A       Yes, I do.

9  Q       Now, you had some difficulty with that test now, didn't

10         you?

11  A       Oh, yes, I did.

12  Q       He said that you were unable to maintain the heel to

13         toe position in that test, correct?

14  A       Where --

15  Q       I'm sorry, that's on page two, under where it says,

16         Walk and Turn.  In his report, Office LeBlanc says

17         Duffy was unable to maintain the heel to toe position

18         despite using her arms for balance.  Do you remember

19         having trouble maintaining the heel to toe position?

20  A       Oh, yes I do.

21  Q       Okay.  And do you remember that you tried to use your

22         arms for balance?

23  A       (No audible response)

24  Q       I'm looking at the first paragraph under Walk and Turn.

25  A       I don't recall using my arms to balance myself in this

1      test.   It was in the next test.

2  Q   Okay.   If his report further states that during the

3      walking phase, Ms. Duffy used her arms for balance and

4      failed to touch heel to toe on all steps but step nine,

5      would that be correct?

6  A   So you're asking me what his report says?   During the

7      instruction phase, Duffy was unable to maintain the

8      heel to toe position despite using her arm (sic) for

9      balance.   That's what his report says.

10 Q   And you agree that -- at least with the first part of

11     that, you were unable to maintain the heel to toe

12     position, correct?

13 A   I don't recall using my arms to balance myself.   I did

14     heel to toe.

15 Q   And you did have difficulty with the heel to toe

16     position, correct?

17 A   Well I was wearing clogs.

18 Q   You were wearing clogs?

19 A   Yes.

20 Q   Okay.   And you were having trouble maintaining heel to

21     toe, correct?

22 A   I don't recall having trouble doing heel to toe.

23 Q   Okay.   So, now you're saying you don't recall having

24     trouble with heel to toe?

25 A   I don't recall having trouble with doing the heel to

1          toe.

2  Q      Okay.  You just told me.....

3  A      He -- my balance -- that balance, I mean, it would be

4          two different issues wouldn't it?  If -- if I put heel

5          to toe, heel to toe, that would be one issue, but

6          balancing myself would be a separate issue.  Is that

7          it?

8  Q      I'm just asking you if you remember having trouble

9          using --

10  A      I just don't understand because it would seem to me

11         that it's two separate issues.  Putting heel to toe,

12         heel to toe, would be one -- one aspect and then --

13         then balancing would be a different asp- -- aspect.

14                MS. BRETZ:  Maybe if you could just reask the

15 question?

16  Q      (By Ms. Pinkel)  Yeah, I guess my question is:  You

17         were having trouble maintaining the heel to toe

18         position, weren't you?

19  A      I don't think so, no.

20  Q      Okay.  Now, it's your testimony you were not using your

21         arms for balance, correct?

22  A      (No audible answer)

23  Q      You were not using your arms for balance during the

24         heel to toe?

25  A      No.

1  Q    Okay.  So if his report says you were trying to use

2       your arms for balance, during this walk and turn test,

3       then the report would be inaccurate?

4  A    That's correct.

5  Q    Okay.  Now, it further states that you failed to

6       complete a proper turn.  Do you remember failing to

7       complete a proper turn?

8  A    I don't know what a proper turn is.

9  Q    Okay.  Well, I'm just asking you what you recall about

10      this so -- you don't know what a proper turn is?

11 A    No, I -- I wouldn't have any idea what this a proper

12      turn is.

13           MS. BRETZ:  Yeah, I'm going to object to the

14 question too, she's not versed on police procedures.

15 Q    (By Ms. Pinkel)  Okay.  You did not complete a turn,

16      correct?

17 A    I turned.

18 Q    Okay.  You remember turning?

19 A    Yes, I did.

20 Q    Okay.  Now, this -- according to Roy's report, he says

21      you took several steps to turn around, and you failed

22      to touch heel to toe on the return walk, do you

23      remember failing to touch heel to toe after you had

24      taken several steps to turn around?  Just answer yes or

25      now, if you don't remember that's.....

1  A     I don't remember.

2  Q     Okay.

3  A     I don't remember.

4  Q     Okay.  Now, you were also given another test that Roy

5        refers to as the one leg stand in this report.  Do you

6        remember Officer LeBlanc instructing and demonstrating

7        the one leg stand here?

8  A     He did not demonstrate anything.

9  Q     Okay.  You don't remember being -- having him

10       demonstrate this to you?

11  A    Oh, no.

12  Q    Okay.  So you didn't see him stand, doing a one-leg

13       stand?

14  A    Oh, no.

15  Q    Okay.  Now, according to this report you became

16       impatient and got irritated with him, do you remember

17       that?

18  A    I did not become confronta- -- or irritated with him.

19  Q    Okay.

20  A    I was very frightened.

21  Q    Now, do you remember swaying while you were standing,

22       before you did the one leg stand?

23  A    No.

24  Q    It says here during the performance phase of the one

25       leg stand, Ms. Duffy was unable to complete the task,

|   |   |   |
|---|---|---|
| 1 |   | keeping her foot off the ground for only several |
| 2 |   | seconds at a time, and in fact nearly fell during the |
| 3 |   | test.  Do you remember nearly falling when you were |
| 4 |   | doing the one leg test? |
| 5 | A | I kept my arms out to balance myself, and he repeatedly |
| 6 |   | -- put your arms at your side, straight at your side. |
| 7 |   | Put your arms at your side, straight at your side.  Put |
| 8 |   | your arms straight at your side. |
| 9 | Q | Okay. |
| 10 | A | If I didn't use my arms to balance myself, I would have |
| 11 |   | fallen over, yes.  I would have fallen over. |
| 12 | Q | Okay.  So you remember having trouble with the one leg |
| 13 |   | stand test? |
| 14 | A | I remember being terrified of him, and trying to do |
| 15 |   | what I was order -- ordered to do and him becoming |
| 16 |   | increasingly demanding. |
| 17 | Q | Okay.  Do you remember that you almost fell when you |
| 18 |   | did the one leg test?  I'm just asking you, do you |
| 19 |   | remember that? |
| 20 | A | No, no.  I don't.  No. |
| 21 | Q | Now, you don't remember that you nearly fell? |
| 22 | A | I did not nearly fall.  I kept my arms out -- |
| 23 | Q | Do you remember..... |
| 24 | A | Because I had put my arms at my side, I would have |
| 25 |   | fallen, yes, but I kept my arms out and he kept |

1          insisting that I put my arms at my side so I would

2          fall.

3  Q     Now, you're concluding there that he wanted you to

4          fall, and that's your conclusion, correct?

5  A     Well I don't know who else's it could be.

6  Q     So, you remember having trouble with the one leg stand

7          test, correct?  And you can just answer yes or no.

8  A     (No audible answer)

9  Q     You had trouble with that test, didn't you?

10  A    Oh, yes, I did.  Yes.

11  Q    And you were having trouble so you go irritated with

12         the officer, didn't you?

13  A    No, I did not.

14  Q    Okay.  You don't remember getting irritated with the

15         officer?

16  A    No I did not.

17  Q    Okay.  Now, after Officer LeBlanc did these three tests

18         on you.....

19  A    Which three tests?  There were two tests.

20  Q    These three.  Well he did three field sobriety tests on

21         you, correct?

22  A    I don't know.  What are the three field sobriety tests?

23  Q    Okay.  Well we've gone through them, but I'll go

24         through them again.  There were three tests that he

25         gave you.

| | | |
|---|---|---|
| 1 | A | Uh-huh (affirmative). |
| 2 | Q | Those tests -- just to summarize -- one was the |
| 3 | | Horizontal Gaze Nystagmus test, do you remember that? |
| 4 | A | That did not -- that did not transpire after I was out |
| 5 | | of the vehicle, that was before I was out of the |
| 6 | | vehicle.  So there was that one test and then there |
| 7 | | were two tests later on. |
| 8 | Q | Okay.  So there were three tests that he ultimately |
| 9 | | gave you, that we've discussed?  The Horizontal..... |
| 10 | A | Oh, no, there was another one. |
| 11 | Q | There was another test? |
| 12 | A | Oh, yes.  Yeah.  He ordered me to stand erect with my |
| 13 | | feet together as though I was saluting the American |
| 14 | | flag. |
| 15 | Q | He ordered you -- so, that was part of -- which test |
| 16 | | was that? |
| 17 | A | This was after the one leg stand. |
| 18 | Q | Okay.  So after you did the one leg stand he asked you |
| 19 | | to stand erect, is that correct? |
| 20 | A | He didn't ask me, he ordered me.  He pointed and said |
| 21 | | over here, and stand with your feet together, stand |
| 22 | | erect as though you're saluting the American flag. |
| 23 | Q | And did you do that? |
| 24 | A | Yes, I did. |
| 25 | Q | Okay.  Now, he asked you some questions about |

1         medication again, didn't he?

2  A     Oh, no, he did not.  No.

3  Q     Okay.  He.....

4  A     Are you referring -- are you saying that after the

5         stand with your feet together?

6  Q     After he'd done the test, he asked you if you'd been

7         taking any medications, correct?

8  A     No, he did not.

9  Q     He did not?

10  A    No, that's incorrect.  No.  That's when he attacked me.

11  Q    Okay.  You're saying he attacked you?

12  A    Oh, yes he did.

13  Q    Okay.  Well let me ask you this:  So, you don't recall

14       that he asked you for any medications, correct?

15  A    He asked me when he first contacted me, if I was taking

16       any medication that would impair my driving?

17  Q    Okay.  And you said no, correct?

18  A    That is correct.

19  Q    Okay.

20  A    There was never any other mention of medication

21       thereafter.

22  Q    So, if on page two, where it says Action Taken, I asked

23       Duffy some additional questions about her taking any

24       medications and she indicated she did not take any

25       prescription or other drugs, if it says that in the

1    report, that he asked you that again, you would

2    disagree with that report?

3 A  Definitely.

4 Q  Now, the report says that based on my -- his

5    observations -- and I'm looking at the Action Taken

6    section, he said, he told you to turn around and that

7    you were.....

8 A  What page are you on?

9 Q  The same page.  Page two, under Action Taken.

10 A  Oh, it's -- some of the border is missing.

11 Q  So, it says I asked some additional questions, about

12    taking medications and she indicated she did not take

13    any prescription or other drugs.  Based on my

14    observations of her impairment I told Duffy to turn

15    around and she was under arrest for DUI.  Do you

16    remember this transpiring?

17 A  It did not happen.

18 Q  Okay.  So it didn't happen that he told you, you were

19    under arrest, is that what you're saying?

20 A  He did tell me I was under arrest.

21 Q  Okay.  So he told you, you were under arrest and this

22    was after he'd given you these tests, correct?

23 A  It was after he had given me these tests but other

24    things transpired in between.

25 Q  Okay.  And what were these?  If you could just explain

1     to me -- well let me just ask you this:  The report

2     says that he arrested you because you were impaired,

3     correct?  He thought you were impaired?

4  A    Where does it say?  I --I don't --

5  Q    Well it says, based on my observations of her

6     impairment, I told Duffy to turn around and that she

7     was under arrest.

8  A    That's -- that's what his report says, yes.

9  Q    Right.  And he did tell you, I think you're impaired

10    and you're under arrest, didn't he?

11  A   No, he did not.

12  Q   Well if his report says that he told you were impaired

13    and that you were under arrest, correct?

14  A   No, he did not.  No, that's not correct.

15  Q   So, he says based on -- so then he said -- do you agree

16    that he said you're under arrest, and you told him no,

17    do you remember that?

18  A   I did not say no.

19  Q   Okay.  He says he (sic) told you no, and then he

20    commanded you to turn around and put your hands behind

21    your back or you would be charged with resisting.  Do

22    you remember him telling you that?

23  A   No, he did not.  He grabbed my arms.

24  Q   Okay.

25  A   He was baring his teeth at me and -- he was baring his

1       teeth at me, and I asked him who was his superior and

2       he told me I'm in charge here, do you object if I

3       search your car, and I said, yes I do.  And he said

4       you're under arrest and he grabbed my arms and he swung

5       me around, and -- and then he put handcuffs on.

6  Q    Okay.  So, he told you, you were under arrest and then

7       he was baring his teeth at you?

8  A    No.  He was baring his teeth at me.

9  Q    Can you just explain what does it mean to bare your

10       teeth?  So he kind of ground.....

11  A    Like a dog -- like a vicious dog.

12  Q    So, he ground his teeth down or he put his teeth

13       together?

14  A    He raised his lips up like a vicious dog.  He raised

15       his lip up and his teeth were exposed and I --

16  Q    So, he gritted his teeth?

17  A    Well I would call gritting like this, but my mouth

18       wouldn't be open.  His teeth were bared, like a vicious

19       dog, like that, with his teeth -- upper teeth exposed

20       and his lip drawn back.

21  Q    Okay.  So, he was gritting his teeth.....

22  A    No, he was baring his teeth.

23  Q    Okay.

24  A    I -- I don't call gritting -- I would call gritting

25       keeping my mouth closed in and my jaw clenched.