1    Q    Well different people have different ways -- so.....

2    A    So my -- my definition of it would be what he was doing

3         -- his teeth -- his upper teeth were exposed, like when

4         a dog -- an angry dog growls and their teeth are

5         exposed and his lip is back.

6    Q    Okay.  So he was baring, or I would say gritting his

7         teeth at you, and he told you, you were under arrest

8         and you said no, and then he gritted his teeth.

9    A    No, he was baring his teeth at me, and I looked at him,

10        and I said to him who's your superior, and he said I'm

11        in charge here, do you object if I search your car, and

12        I said yes I do.  And he said, you're under arrest and

13        he grabbed my arms and he swung me around and he put

14        the handcuffs on.

15   Q    Okay.  So, he said you're under arrest, and then he put

16        your handcuffs on, is that correct?

17   A    He grabbed my arms and he swung me around.

18   Q    Okay.  Now, prior to this incident you -- he told you,

19        you were under arrest and you told him no, correct?

20   A    No, that's not correct.

21   Q    In fact, he said, to turn around, and you were under

22        arrest and you said, no.  And then he told you to turn

23        around again, and put your hands around your back and

24        you again said no, correct?

25   A    No, that's not true.

1   Q       If the officer said in his report that he told you

2           twice you were under arrest and you twice said no to

3           him --

4   A       I just told you what happened.

5                   MS. BRETZ:  Objection.  Asked and answered.

6   She already relayed what happened.

7   Q       (By Ms. Pinkel)  Okay.  So you're disputing what the

8           officer says in his report?

9   A       Yes, I am.

10  Q       Okay.  So the officer put you in handcuffs, is that

11          correct?

12  A       Yes, he did.

13  Q       Okay.  And you were -- he had placed you under arrest

14          prior to putting you in handcuffs, correct?

15  A       I think it would be simultaneously.  He said you're

16          under arrest, he grabbed my arms and he swung me

17          around, and he put the handcuffs on me.

18  Q       Okay.

19  A       So it happened in, like, one movement.

20  Q       Okay.  Now, you've had the chance to review Officer

21          LeBlanc's report by now, I assume, correct?

22                  MS. BRETZ:  Asked and answered.  You already --

23  I'll withdraw that.

24  Q       (By Ms. Pinkel)  According to the report, there was a

25          concern that you had exhibited impairment in your

```
 1              driving, correct?  Just answer yes or no.
 2    A         In this report?
 3    Q         Yes.
 4    A         Where?
 5    Q         Pardon?
 6    A         Where does it say it?
 7    Q         Have you read this report?
 8    A         A long, long time ago.
 9    Q         Okay.
10    A         I haven't read through it sitting here.  So, you've
11              been pointing these things out to me, so where does it
12              say this now?
13    Q         Well let me just ask you does it say in his report that
14              he suspects.....
15    A         I don't -- I don't know.
16    Q         You don't know if it says in his report that you're
17              impaired?
18    A         I don't know, no.
19    Q         You don't know that?
20    A         No.
21    Q         Okay.  So, do you know that he had serious concerns
22              about your impairment that night when he arrested you?
23                   MS. BRETZ:  Objection.  She can't put herself
24    in the head of the officer?
25                   (Off record comments)
```

52

1    Q        (By Ms. Pinkel)   Ms. Duffy, you were just laughing, but

2             you know that the police take impaired driving pretty

3             seriously in this town, do you know that?

4    A        I don't know anything.....

5    Q        You don't know?

6    A        I don't know about the police.

7                     MS. BRETZ:   Objection.   Again, she's not versed

8    on police procedures.

9                     MS. PINKEL:   No.

10   Q        (By Ms. Pinkel)   How long have you lived in Anchorage

11            Ms. Duffy?

12                    MS. BRETZ:   I'm going to object.   This is

13   argumentative too.

14                    MS. PINKEL:   No, it's not.   I can ask her these

15   questions.

16                    MS. BRETZ:   I'm objecting that's all.

17                    MS. PINKEL:   Okay.   That's fine, you have to

18   answer the question.

19   Q        (By Ms. Pinkel)   How long have you lived in Anchorage?

20   A        Since 1988.

21   Q        Since 1988.

22   A        Yeah.

23   Q        And do you read the newspaper?

24   A        No, I don't.

25   Q        Okay.   Do you watch the news?

1    A    Here and there.

2    Q    Okay.  Do you watch Channel 2 News?

3    A    Occasionally.

4    Q    Okay.  Do you listen to public radio?

5    A    No.

6    Q    Okay.  When you've watched the news, have you seen

7         stories on the news about people getting killed by

8         drunk drivers?

9    A    Oh, yes.

10   Q    Okay.  And so drunk driving has been a pretty serious

11        problem in Anchorage, hasn't it?

12   A    I think it's a serious problem all over.

13   Q    Okay.  And it's a serious problem in the State of

14        Alaska, as well, isn't it?

15   A    I don't know.

16   Q    Okay.  But you know it's a serious problem all over,

17        correct?

18   A    I think it is.

19   Q    Okay.  And so the issue of whether or not someone is

20        impaired is a pretty serious issue, isn't it?

21   A    It's a very issue.

22   Q    Okay.  Thank you.  And do you understand that police

23        are not medical doctors, correct?

24   A    I don't think most police would be medical doctors.

25   Q    Okay.  And they're not psychiatrists are they?

1  A    I don't think so.

2  Q    Okay.  And so when they're -- when a police officer is

3       patrolling the streets, they have to make split second

4       decisions about whether or not an individual poses a

5       threat to others, correct?

6  A    I don't know.

7  Q    You don't know that police officers have to make split

8       decisions about.....

9           MS. BRETZ:  Objection.

10 Q    .....safety issues.

11          MS. BRETZ:  Objection.  Again, she's not versed

12 on police procedures.

13 A    I don't know about police procedures.

14 Q    (By Ms. Pinkel)  I think I've already laid the

15       foundation, but you do need to answer the question.

16       You don't know if police officers have to make split

17       second decisions about issues of public safety?

18 A    No, I personally, don't -- no.  I don't know anything

19       about the police.

20 Q    Okay.  And you've lived in Anchorage since 1988?

21 A    That is correct.

22 Q    Okay.  Do you understand that according to Officer

23       LeBlanc's report, you failed two out of the three field

24       sobriety tests that he gave you on March 23rd, 2003?

25 A    I understand that Officer LeBlanc attacked me.

**METRO COURT REPORTING**

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

1  Q    Well Ms. Duffy, according to this report, you were

2       driving erratically.  The officer stopped you and then

3       he gave you these field sobriety tests, correct?

4  A    I was not driving erratically.

5  Q    Okay.  And you were driving 10 miles below the speed

6       limit though, weren't you?

7  A    There's a stop light at 36th Avenue, and it -- the

8       speed limit is 55 miles an hour, and as I recall I

9       think that the national speed limit used to be 55 miles

10      an hour, so I wouldn't even call that slow driving.

11 Q    Okay.  The speed limit where you were driving, was 65,

12      wasn't it?

13 A    Yes.

14 Q    That's -- yes?

15 A    For about a block, and then a block further on it -- it

16      decreased to 55 miles an hour, and then there's a stop

17      light, and I was in the right-hand lane, so it's my

18      understanding of driving that if you want to go the

19      maximum you would go in the left lane, but the right

20      lane, you don't have to go to the maximum speed.

21 Q    Now, you -- I don't think you answered my question.

22      The driving limit where you were driving was 65 miles

23      per hour, correct?

24 A    That is correct.

25 Q    Okay.  And you were driving at least 10 miles below

1          that, correct?

2     A    Correct.

3     Q    And we talked about the streets and we talked about

4          your driving patterns a little bit earlier in this

5          deposition but, it's my understanding that you were

6          weaving in and out of your lane, is that correct?

7     A    I wasn't driving in any manner different than anyone

8          else that was on the road that night.

9     Q    Okay.  Ms. Duffy you -- so you're saying that you were

10         weaving in and out of your lane, correct?

11              MS. BRETZ:  It's already been asked and

12    answered.  We've already gone through.....

13              MS. PINKEL:  No, she hasn't.  I'd like to

14    clarify this.

15    Q    (By Ms. Pinkel)  You were weaving in your lane,

16         correct?

17    A    I was not weaving, but if the cars in front of me were

18         weaving, because of the ruts, then I would assume that

19         my car was also weaving because of the ruts.  But as

20         far as my control of the vehicle, I was not weaving.

21    Q    So if the other cars were weaving, you were weaving.

22         But, if the other cars were not weaving, then you were

23         not weaving, is that what you're saying?

24    A    I am saying that I had good control of the car, and

25         that I was not weaving due to lack of control of the

1  vehicle.  If there -- the vehicle was weaving, it was

2  due to the ruts in the road.

3  Q  So you're saying the car wasn't weaving, or it was

4  weaving?

5  A  I wouldn't know if the car was weaving from my point of

6  view, the other cars were weaving because of the ruts.

7  So I would assume that my car was weaving also, but it

8  would not be different from of the rest of the cars on

9  the road.

10  Q  Okay.  You still haven't answered my question.  Was

11  your car weaving in and out of the lane or not?

12  A  I wouldn't know.  I wouldn't be able -- I would have to

13  be in the car behind me to see if my car was weaving

14  because of the ruts.

15  Q  Okay.

16  A  So, I wouldn't know.  I wouldn't be able to answer you.

17  I did say that I had full control of the vehicle and --

18  and it was not weaving from lack of control.  If it was

19  weaving it was because of the ruts in the road.

20  Q  Okay.  So, it's your testimony that your car could have

21  been weaving in and out of the lane?

22  A  It -- it could have been weaving in and out -- out of

23  the lane, but so was everybody else's car or vehicle.

24  MS. BRETZ:  Could we define in and out of the

25  lane?  I think.....

1              MS. PINKEL:  Okay.  I'm taking the deposition.

2    You can ask her questions on cross examination.

3              MS. BRETZ:  Okay.

4    Q      (By Ms. Pinkel)  I may have asked you this question,

5           but I think we've gotten a little bit off the subject

6           here, so, I just want to ask you this.  You said,

7           you've lived in Anchorage since 1988, you read the

8           newspaper, you have some knowledge about what police

9           do?

10   A      I don't generally read the newspaper.

11   Q      I'm sorry.  You watch the Channel 2 News occasio-.....

12   A      Occasionally.

13   Q      Okay.  Based on your time living in Alaska and your

14          occasional watching of the news, it's the police

15          officer's job to make sure that the streets are safe

16          for the public, correct?

17             MS. BRETZ:  Objection.  She's not versed on

18   police procedures.

19             MS. PINKEL:  I'm not asking that she be versed

20   on police procedures.  You need to answer the question.

21   A      Prior to what happened to me, I -- I thought that the

22          police provided a sense of security.  They provided me

23          with a sense of security, yes.

24   Q      (By Ms. Pinkel)  And part of providing a sense of

25          security is that if they see unsafe drivers they need

*METRO COURT REPORTING*

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Exhibit B Page 58

| 1 | | to stop them, correct? |
|---|---|---|
| 2 | A | I don't know. |
| 3 | Q | Okay.  You don't know if police are supposed to stop |
| 4 | | unsafe drivers is that correct? |
| 5 | A | I -- I don't know what they do. |
| 6 | Q | Okay. |
| 7 | A | But I have seen reports that people are arrested for |
| 8 | | drunk driving, but there's never any follow-up as to |
| 9 | | who was really drunk. |
| 10 | Q | Okay.  You say you've seen some reports, and they're of |
| 11 | | people being arrested for drunk driving.  Have you been |
| 12 | | involved in some other cases of drunk driving? |
| 13 | A | No. |
| 14 | Q | Okay. |
| 15 | A | I've seen reports on T.V. and they'll say for holiday |
| 16 | | weekend, so many people were arrested for drunk |
| 17 | | driving.  But there's never any follow-up reports on |
| 18 | | how -- how many people are actually convicted of drunk |
| 19 | | driving or how many errors the police made. |
| 20 | Q | Correct.  And that's because the police have to make |
| 21 | | split second decisions when they stop someone who they |
| 22 | | suspect of drunk driving, correct? |
| 23 | A | I don't know. |
| 24 | Q | You don't know.  Okay.  And we'll -- let's just |
| 25 | | follow-up a little bit on this.  Sometimes the police |

1    might arrest someone and then the prosecutor's office

2    may later decide not to pursue the case, correct?

3     MS. BRETZ:  Objection.  She's not versed on

4 prosecutor policies.

5     MS. PINKEL:  Okay.  And you just need to answer

6 the question.

7 A  What was the question?

8 Q  (By Ms. Pinkel)  Okay.  Well you volunteered for me

9    that you've watched Channel 2 News and you see that the

10    police might arrest a certain number of people over a

11    holiday weekend, but you never know how many of those

12    people actually get charged with the crime of drunk

13    driving by the prosecutor's office, correct?

14 A  How many are convicted?

15 Q  Okay.  You don't ever find out how many of those people

16    get convicted, right?

17 A  That's right.

18 Q  Right.  And you don't know how many of those people

19    actually end up getting charged by the prosecutor's

20    office either, correct?

21 A  No.

22 Q  No.

23 A  There's no other information.  It's just that they made

24    so many arrests.

25 Q  Right.  Right.  And sometimes the police might arrest

1    an individual and the prosecutor's office later might

2    decide that they're not going to charge that

3    individual, correct?

4          MS. BRETZ:  Again, objection.

5  A    I don't know.

6  Q    (By Ms. Pinkel)  You do know, don't you?

7  A    No, I don't.

8  Q    Okay.  You don't know that maybe the police make one

9    decision and the prosecutor's office might make another

10    decision?

11  A    No, I don't know.

12  Q    Okay.  You don't know that?  Is that, in fact, what

13    happened in this case with you?

14  A    What happened?

15  Q    The police arrested you because they thought you were

16    driving as if you were impaired, correct?  Is that

17    what's happened?

18  A    I don't know -- I don't know why I was arrested,

19    actually -- no.

20  Q    You don't know why you were arrested?

21  A    No, I don't -- no.

22  Q    Now, you've read this police report, correct?

23  A    Yes, I did.

24  Q    And you don't know why you were arrested?  You're

25    saying you've read this police report, and you don't

1           know why you were arrested?

2    A      I read this police report now or went over it a bit.

3    Q      Okay.

4    A      So, no I don't know what his motives were.

5    Q      Okay.

6    A      Or his conduct -- I don't know.

7    Q      So, even though you brought this lawsuit and you've had

8           a chance to read this report, you don't really know why

9           you were arrested?

10   A      I don't know what his motives for his behavior were.

11   Q      Okay.

12   A      I don't know.

13   Q      Okay.  And.....

14   A      No, there wasn't any reason for him to -- to act in the

15          manner in which he acted and to be treated in such a

16          manner, no.

17   Q      Okay.  Now, in your discovery responses you've talked

18          about how you have admitted that you had perhaps not

19          done well on these field sobriety tests, correct?

20   A      I don't remember.

21   Q      And you've talked about how, you've had what you think

22          is a stroke back in 1976, correct?

23   A      That's correct.

24   Q      Okay.  Now, you didn't tell Officer LeBlanc when he

25          arrested you in march of 200, that you had had what you

1          thought was some type of stroke in 1976, correct?

2    A     I did not.  I -- told him I was neurologically

3          impaired.

4    Q     You did not tell him you were neurologically impaired,

5          did you?

6    A     I told you.....

7                MS. BRETZ:  Objection.  Asked and answered.

8    A     I told him.

9                MS. BRETZ:  I'm sure he didn't volunteer that.

10   Q     (By Ms. Pinkel)  You told -- and in your case, however,

11         his report doesn't mention that you were neurologically

12         impaired, correct?

13   A     I don't think it does.

14   Q     Now, if you told him you were neurologically impaired,

15         he would have put that in the report, correct?

16               MS. BRETZ:  Objection.  Again, she's not versed

17   on police procedure.  She doesn't know what goes in and --

18               MS. PINKEL:  Okay.  Your objection is noted for

19   the record.

20   Q     (By Ms. Pinkel)  He wrote a pretty thorough report,

21         didn't he?

22   A     I really don't know what you mean by thorough.

23   Q     Okay.

24   A     I mean is fiction -- is fiction writing what you mean

25         by thorough?

1   Q      I would say thorough is how it's defined in the

2          dictionary, which means, great detail.  There's great

3          detail in this report, correct?

4   A      Oh, there's great detail, definitely.  Yes.

5   Q      And it doesn't mention in the report, that you had

6          neurological impairment, does it?

7   A      No.

8   Q      Okay.  Now, in your case you've seen Dr. Beacham and

9          Dr. McGlinn recently, correct?

10  A      Yes.

11  Q      Now, both of those doctors have actually found that

12         you're normal neurologically, haven't they?

13  A      I don't know.

14  Q      Okay.  Well did you go see Dr. McGlinn in January of

15         2006?

16  A      She's a radiation oncologist.

17  Q      That's correct.

18  A      I --

19             MS. PINKEL:  I'm going to just show you what's

20  been Bates numbered 386, and I've got another copy for you here

21  Ms. Duffy.  I'm going to mark this as Exhibit --

22             COURT REPORTER:  E is the next one I have.

23  Exhibit E marked.

24                         **(Deposition Exhibit E marked)**

25

1              MS. PINKEL:  And I just want to apologize for
2    bringing up this record and I'm very sorry you've had medical
3    problems, but I just wanted to ask you about this one finding
4    with respect to neurologic.

5    Q        (By Ms. Pinkel)  It says that on page 386 it says
6             neurologic here.  I'm pointing right there.  Oh, I'm
7             sorry you've got -- 386.  It says grossly intact with
8             cranial nerves, deep tendon reflexes, sensation, and
9             coordination appropriate, correct?

10   A        Uh-huh (affirmative).  Yes, that's correct.

11   Q        Okay.  And Dr. McGlinn is an oncologist, correct?

12   A        A radiation oncologist.

13   Q        Okay.  And she's an M.D., correct?

14   A        Yes.

15   Q        Okay.  So an M.D. found on January 11, 2006, that you
16            were neurologically normal, correct?

17   A        I don't have any answer to that.  I -- I don't know
18            what her -- her --

19   Q        Does it --

20   A        It says neurologic colon, grossly intact with cranial
21            nerves, deep tendon reflexes, sensation, and
22            coordination appropriate.  I don't know what --
23            appropriate to what.  I mean, I don't know.

24   Q        All right.

25   A        I'm not a doctor.

1  Q    Okay.  But you've been going to Dr. McGlinn for a
2       while, correct?
3  A    Well no, I have not.  No, I've only had one visit with
4       here.
5  Q    Okay.  And she's an M.D., correct?
6  A    She is a radiation oncologist.
7  Q    Okay.  Right.  And she's got a medical degree.
8  A    I would think that she does.
9  Q    Oncology is a subspecialty in medicine, correct?
10          MS. BRETZ:  Objection.  Again, she's not --
11          MS. PINKEL:  I think she's qualified to --
12 Q    (By Ms. Pinkel)  You know that she's an M.D., correct?
13 A    I would hope so.
14 Q    Okay.
15 A    As far as I know she's a cancer -- a specialist in --
16       in treating cancers with radiation.
17 Q    Okay.  And you also have gone to -- is it Dr. Sherman
18       Beacham?
19 A    That is correct.
20 Q    And you saw Dr. Beacham in 2004, 2003, correct?
21 A    Yes, I did.
22 Q    Okay.  And do you remember seeing him in May of 2004?
23 A    Not particularly.
24 Q    Okay.
25          MS. PINKEL:  Let me just show what's been Bates

1    numbered 392, Ms. Duffy.  Will you mark this?

2                    COURT REPORTER:  F as in Frank.

3                              **(Deposition Exhibit F marked)**

4    Q      (By Ms. Pinkel)  I'm just going to show you what's been

5           marked as Exhibit F, Ms. Duffy.  And this is a record

6           from Dr. Beacham from May 26, 2004.  And towards the

7           bottom of Exhibit F, it has neurologic, and it said the

8           DTR's are very brisk, but there is no clonus.  Speech,

9           gait and orientation are normal.

10   A      Yes, it does.

11   Q      Is that correct?

12   A      It does say that.

13   Q      Okay.  And Dr. Beacham is also an M.D., correct?

14   A      Yes, he's cardiologist, internal medicine.

15   Q      And he's a very well regarded doctor, correct?

16   A      I think so.

17   Q      Now, you also saw, Dr. Beacham in March of this year,

18          correct?

19   A      I don't remember specifically, I've seen Dr. Beacham.

20   Q      You don't remember seeing Dr. Beacham in March of 2006?

21   A      I see Dr. Dr. Beacham, but I don't remember a specific

22          date.

23   Q      Okay.  So you don't remember seeing him in March?

24   A      I didn't say that.  I don't remember if March was the

25          specific date that I saw him.

1    Q    Okay.

2    A    Or month that I saw him, but I did see Dr. Beacham.

3                MS. PINKEL:  I'm going to mark what's Bates

4    number 382, the next exhibit.  I don't mean to paper you here.

5                COURT REPORTER:  Exhibit G marked.

6                            **(Deposition Exhibit G marked)**

7    Q    (By Ms. Pinkel)  Now Exhibit G is a -- I'm going to

8         represent to you it's a record from Dr. Beacham from

9         March 1st, 2006 and it says neurologic towards the

10        bottom of the page, and it appears that Dr. Beacham

11        said neurologic speech, gait and orientation are

12        normal.  Is that correct, what that says?

13   A    Yeah, it does say that.

14   Q    Okay.  Now, you've also see a Dr. Shirley Frasier back

15        in 1997?  Do you remember Dr. Frasier?

16   A    Yes, I do remember seeing her.

17   Q    And she performed on MRI on you didn't she?

18   A    I don't remember.

19   Q    You don't remember getting an MRI in '97?

20   A    I don't -- I don't remember.

21   Q    Okay.  And do you remember Dr. Frasier saying that she

22        did not think you had had a stroke?

23   A    As I recall she said I did have a stroke.

24   Q    Okay.

25   A    Can we take another break?

1         MS. PINKEL:   Sure.

2         (Off record)

3         (On record)

4    Q    (By Ms. Pinkel)   Ms. Duffy, we were talking a little

5         bit about your records and about the fact that the

6         medical records that I showed you didn't show any

7         neurological impairment in recent years.   And I just

8         wanted to ask you that, in your case, wouldn't you

9         agree that it wouldn't be unreasonable for Officer

10        LeBlanc and later Officer Estes to conclude that

11        something other than a neurological impairment caused

12        you to drive in the way in which you were driving?

13        MS. BRETZ:   Again, objection.   She's not versed

14   on police procedures.

15        MS. PINKEL:   Okay.   You can answer the question

16   Ms. Duffy.

17   A    Would you say it again please?

18   Q    (By Ms. Pinkel)   Sure, in your case, it's not

19        unreasonable for these officers, Duffy -- excuse me,

20        LeBlanc and Estes to have concluded that there was

21        something other than what you say is a neurological

22        impairment, that caused you to drive in the way you

23        were driving?

24   A    I'm a very careful driver and there wasn't anything

25        wrong with my driving.

*METRO COURT REPORTING*

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Exhibit B Page 69

1　Q　Okay.  If they thought you had driven improperly, it
2　　　was not unreasonable for them to conclude that it was
3　　　something other than your neurological, or what you say
4　　　is your neurological problems, that caused you to drive
5　　　in the way you were driving?
6　　　　　　　MS. BRETZ:  Same obj-.....
7　A　There wasn't anything wrong with my driving.
8　Q　(By Ms. Pinkel)  Assuming, Ms. Duffy, that they did
9　　　feel there was something wrong with your driving, it
10　　　wasn't unreasonable of them to conclude it could have
11　　　been something other than what you say are your
12　　　neurological problems?
13　A　Did you ever see the Odd Couple years ago?
14　Q　Well, you know.....
15　A　Never assume, it makes an ass of you and me.  Remember
16　　　that?
17　Q　I'm sorry.
18　A　A-s-s, and then u and me?
19　　　　　　　MS. PINKEL:  I never watched the Odd Couple.
20　　　　　　　MS. BRETZ:  That's, like, 20 years before us,
21　isn't it?
22　　　(Off record comments)
23　Q　(By Ms. Pinkel)  Okay.  I'm not asking you to assume
24　　　anything other than the fact that these officers
25　　　concluded that you had driven inappropriately.  And I'm

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

1          asking you, in your case, assuming they felt your
2          driving was inappropriate, it wasn't unreasonable for
3          them to conclude that it was something other than what
4          you say are your neurological impairments.....
5    A     There was nothing wrong with my driving.
6                MS. BRETZ:  The same objection as before the
7    police procedures.
8                MS. PINKEL:  Okay.  Well it sounds like you're
9    not going to answer my question, so I'll just move on.
10   Q     (By Ms. Pinkel)  It's a fair assumption Ms. Duffy that
11         for a police officer, that if a stroke or a
12         neurological problem impaired someone's ability to
13         drive, that person should not be driving, and, in fact,
14         would not be driving, correct?
15   A     Would you say it again please?
16   Q     It's a fair assumption for a police officer that if a
17         stroke or some type of neurological ailment impaired
18         someone that they would not be driving, and they would
19         not be driving?
20   A     I don't know what the police would assume or think, I
21         don't know.
22                MS. BRETZ:  Same objection.
23   Q     (By Ms. Pinkel)  Now, you've given this explanation
24         earlier in discovery that you had had a stroke and that
25         this may have explained why you drove the way you were

**METRO COURT REPORTING**

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit B Page 71

1      driving or why you drove the way you did?

2   A  There wasn't anything wrong with the way I was driving.

3      I'm a very careful driver.

4   Q  Well let me just ask you some questions about your

5      driving that night.  You had been -- you've been on a

6      variety of medications in the last 20 years, correct?

7   A  Oh, I would think so, yeah.

8   Q  Okay.  And you've been on Valium, correct?

9   A  Years ago.

10  Q  And you were on Valium at least through 1997?

11  A  I don't remember.

12  Q  Do you remember when you last took Valium?

13  A  Oh, no.  No, it's years ago.

14  Q  Okay.  And do you remember being prescribed Sariquel?

15  A  No.

16  Q  Okay.  Do you remember being prescribed Risperdal?

17  A  No.

18  Q  Do you remember being prescribed Risperdal in 2002?

19  A  No.

20  Q  You don't remember taking a pill called Risperdal?

21  A  No.

22  Q  Okay.  And you don't remember taking a pill called

23     Sariquel?

24  A  No.

25  Q  Do you remember taking a pill called Sonata?

1    A       No.

2    Q       You don't remember taking Sonata?

3    A       No.

4    Q       Okay.  Do you remember seeing Dr. Charles Burgess?

5    A       Yes.

6    Q       And he was at the Langdon Clinic?

7    A       Yes.

8    Q       Okay.  And he prescribed you Sonata in January of 2003,

9            didn't he?

10                   MS. BRETZ:  Objection.  Asked and answered.

11   She said she hasn't taken it.

12   A       I don't -- I don't remember.

13                   MS. PINKEL:  I don't think that's what she

14   said.  She said she doesn't remember being prescribed Sonata.

15   Q       (By Ms. Pinkel)  You don't remember being prescribed

16           Sonata in January of 2003?

17   A       I don't remember taking it.  I don't -- I -- the

18           medication doesn't sound at all familiar to me.  I

19           don't know what it is.

20   Q       You don't know what Sonata is?

21   A       No.

22   Q       If I told you it was a sleeping aide, do you remember

23           that?

24   A       No.

25   Q       Okay.

74

1   A       I don't really take pills so --

2               MS. PINKEL:  I'm going to mark this as

3   Exhibit --

4               COURT REPORTER:  H as in Harry.

5               MS. BRETZ:  Which page is that?

6               MS. PINKEL:  This is Bates numbered 580 from

7   the Langdon Clinic records.  I might have it.

8   Q       (By Ms. Pinkel)  This is Exhibit H, and it's Bates

9           numbered 580, and I'm going to represent to you that it

10          is from the Langdon Clinic records which we received

11          from the Langdon Clinic.  And I'm going to represent to

12          you that's a medication chart on Ms. Duffy.  And just

13          going towards the bottom of that chart, it looks like

14          in 2002, you were prescribed Risperdal and then in 2002

15          you were also prescribed Sariquel, and then on January

16          21st of 2003, you were prescribed Sonata.

17  A       Oh, it's a box of samples.

18  Q       Okay.  So you were given some Sonata in January of

19          2003?

20  A       I probably never took it.  I don't know the medicine at

21          all.  I probably threw it out.

22  Q       So the doctor wrote down here that he gave you some

23          Sonata in January of 2003, you don't dispute that he

24          gave you Sonata?

25  A       Well it's written there, I -- I don't know what it is.

1  Q    Okay.

2  A    I don't have any recollection of it.

3  Q    Okay.  You don't recall it?

4  A    No.

5  Q    If I could just correct you, it looks like Sonata was a

6       prescription, Ms. Duffy, it was not a sample.  I

7       believe you got Sariquel samples in January or June of

8       2002, correct?

9  A    I don't know.  I don't know the medication, it doesn't

10      sound familiar to me.  I don't ever recall taking it,

11      so --

12 Q    Okay.  Now, it looks like you were given Trazadone in

13      2001.  Do you recall Trazedone?

14 A    Yeah.  And I think it has another name, Desyrel.

15 Q    And that's an anti-depressant, correct?

16 A    I'm not sure.  I don't know what it is.

17 Q    You don't know if Trazadone is an anti-depressant or

18      not?

19 A    No, I don't.  I don't know what it is.

20 Q    You just know you were taking it?

21 A    I took it for a while, yes.

22 Q    Okay.  Now, do you know why you were taking Risperdal

23      in 2002?

24 A    I don't ever recall taking it.  I don't know what it

25      is.

1  Q    If I were to represent to you that's an anti-psychotic,
2       would that strike a memory in you?
3  A    No.
4  Q    You don't remember being prescribed anti-psychotics?
5  A    No.
6  Q    Okay. Do you know that anti-psychotics are sometimes
7       prescribed to compact paranoia symptoms?
8  A    No.
9  Q    No. Okay. Ms. Duffy, a different explanation for your
10      driving, might include that you were under the
11      influence of prescription drugs on March of 2003,
12      correct?
13 A    There wasn't anything wrong with my driving. I'm a
14      very careful driver.
15 Q    Well you say you are a careful driver, but you made an
16      officer very concerned on that evening that he pulled
17      you over, didn't you?
18 A    (Laughing)
19 Q    Just answer the question.
20 A    I -- repeat it please?
21 Q    You say that you're a careful driver, but your driving
22      made an officer very concerned the evening of March
23      3rd, 2003, didn't it?
24 A    I wouldn't call him concerned at all. I would call him
25      a thug.

*METRO COURT REPORTING*

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Exhibit B Page 76

1    Q    Do you realize that -- and we've been over this before,

2         but drunk driving or impaired driving is considered a

3         pretty serious threat to other drivers?

4    A    I wasn't impaired and I'm a very careful driver.

5    Q    Okay. Well let me just talk to you a little bit. Do

6         you know what the Sonata side effects are?

7    A    No, I don't know this medication at all.

8              MS. BRETZ:  I'm going to object on the grounds

9    of relevance.  A blood test was taken.  The blood test came up

10   clean as far as finding any kind of drugs in her.

11             MS. PINKEL:  Ms. Bretz, you're not testifying

12   and these are speaking objections which are inappropriate in a

13   deposition.  Also, I think you're mischaracterizing the blood

14   testing.  The testing did not test for prescription drugs, so

15   -- and I can ask these questions.

16   Q    (By Ms. Pinkel)  Do you know what Sonata side effects

17        are?

18   A    No.

19   Q    Okay. So you don't know that Sonata makes you drowsy?

20   A    No.

21   Q    All right. And it can cause memory loss, did you know

22        that?

23   A    No.

24   Q    Okay. And the doctor gave you some -- what you think

25        are some samples of Sonata in January 2003?

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit B Page 77

1  A    Well that's what it says here.  Because I don't know

2      this medication.  I don't ever recall taking it.  I

3      doubt I ever took it, so --

4  Q    Okay.  But he gave you some Sonata, either by

5      prescription or by samples in January 2003, correct?

6  A    That's what it says here.

7  Q    Okay.  And when he gave you this medication, did he

8      tell you about the side effects?

9  A    I don't ever recall -- I don't recall this medicine.  I

10      don't ever recall taking this medicine.

11  Q    Okay.  Well I'm going to just show you some information

12      that I found on Sonata from the FDA.  And I just want

13      to draw your attention to where it says general

14      precautions with Sonata.  Do you see that on the middle

15      of the page?

16  A    Yes.

17          MS. PINKEL:  I'd like to mark this as an

18  exhibit.  Do you have a sticker?

19          COURT REPORTER:  I'm going to put it on the

20  side here.  Exhibit I marked.

21          **(Deposition Exhibit I marked)**

22  Q '  (By Ms. Pinkel)  It says under general precautions with

23      Sonata it says Sonata, like all sleep medicines may

24      make you drowsy during the day, do you see that?

25  A    Yes.

1  Q    Okay.  And then at the bottom of the page, it says
2       there is a chance that you may experience a certain
3       type of memory loss (amnesia), do you see that?
4  A    Yes.
5  Q    Okay.  And then on the second page it says here, until
6       you know Sonata causes you drowsiness during the day,
7       be extremely careful while doing anything that requires
8       your complete attention or physical coordination like
9       driving a car or operating machinery.  It says that,
10      doesn't it?
11 A    I guess it does.
12 Q    Okay.  And your doctor didn't tell you about being
13      careful when you drive if you take Sonata?
14 A    I don't ever recall receiving this medication and I
15      doubt I ever took it.
16 Q    Okay.  That's not my -- my question was do you remember
17      your doctor telling you about the side effects of
18      Sonata?
19 A    No, I don't.
20 Q    And so you don't remember him telling you about being
21      careful about driving?
22 A    I don't remember this medication at all.
23 Q    So, what is your answer to my question?
24 A    I don't -- I don't recall -- I wouldn't see what he was
25      talking about being careful while driving.

1  Q    So your answer is he did not tell you about being
2       careful about driving?
3  A    I don't recall receiving this medication.  I don't
4       think I ever took this medication.  I definitely don't
5       recall that Dr. Burgess ever said be careful about
6       driving.
7  Q    Okay.
8  A    There wouldn't be any reason for him to -- to give me
9       any instructions such as that.
10 Q    So if the medical record says you were given Sonata,
11      either by -- and it look here to me by prescription, on
12      January 21st, 2003, you would disagree with that
13      record?
14 A    Say it again?
15 Q    If the record from Langdon Clinic says that you were
16      given Sonata in January of 2003, you would disagree
17      with that record?
18 A    Say it again, I'm sorry.
19 Q    Okay.  That's all right.  If the Langdon record says
20      that you were given Sonata in January of 2003, you
21      would disagree with that record?
22 A    No, I wouldn't disagree with it, just because I
23      received the prescription, it doesn't necessarily mean
24      I took any of it.
25 Q    So you agree that you probably received.....

1  A    I was.....

2  Q    .....Sonata?

3  A    I would think that.

4  Q    You would think that you did?

5  A    I would think that I received it, if the record

6       indicates that I received it.

7  Q    Okay.  Now, you had used Valium quite a bit, prior to

8       this incident, correct?

9  A    Not quite a bit, no.

10 Q    Okay.  Well you had been prescribed Valium in 1985

11      through 1997, correct?

12 A    Yeah.

13 Q    Is that a yes?

14 A    Yes.

15 Q    Okay.  In fact, you had to change providers when you

16      couldn't get more Valium prescribed for you, correct?

17 A    I don't think so.

18 Q    Okay.  Well let me just -- oh, you don't remember when

19      you saw -- oh, you don't remember seeing Dr. McCarthy,

20      but I think I marked an exhibit of Dr. McCarthy's

21      evaluation of you from 1990.  Let's see if I can just

22      find it real quick.  I'm going to refer you to what's

23      been marked Exhibit A and that's Dr. McCarthy's

24      evaluation and that's Bates numbered 500, I just wanted

25      to direct your attention to that.

1          MS. BRETZ:  Five-ninety-nine, actually.

2          MS. PINKEL:  Oh, okay.  Thank you.

3    Q    (By Ms. Pinkel)  Now, although you don't remember this

4          evaluation, I just wanted to ask you a little bit about

5          it to reference your use of Valium.  If you look on the

6          first page, it says identifying data:  Virginia Duffy

7          is a 40 year old white female seen at Langdon Clinic on

8          7/30/90 with complaints of I want a prescription for

9          Valium, that's correct isn't it?

10   A    I don't know.  I don't remember.

11   Q    You don't remember?

12   A    No.

13   Q    Okay.  And then where it says history of current

14         illness, it says:  Ms. Duffy was a somewhat

15         inconsistent historian during this interview.  She

16         initially stated that she need Valium because she has

17         PMS and because she gets angry and rageful.  She later

18         stated that she wanted Valium because she was feeling

19         anxious.  She admits the Valium has not controlled her

20         anxiety, anger or PMS and, in fact, these symptoms have

21         progressively worsened.  Still she demands to take

22         Valium at this time, but was quite vague as to why

23         except that without Valium the symptoms could be worse.

24         Do you recall having this exchange with Dr. McCarthy

25         about needing Valium?

1  A    Uh-uhn (negative).  No.

2  Q    Okay.  On the second page of this report on Bates

3       number 600, in the second paragraph, Dr. McCarthy says

4       I told Ms. Duffy that Valium was not indicated for PMS

5       nor is it indicated for the control of anger.  I

6       pointed that many of her symptoms are highly consistent

7       with depression, and that anti-depressants may be a

8       reasonable class of medicine to try.  I also encouraged

9       her to remain in therapy with Mr. Losely.  She seemed

10      quite angry and upset that I would not prescribe Valium

11      for her.  And as the interview progressed, increasingly

12      made more absolute black and white statements such as

13      nothing will ever work and I've tried everything.  And

14      then apparently you later admitted that you had not

15      tried many of the medicines in the anti-depressant

16      class.  And then he says that when he suggested that

17      you consider looking at other medicines you stated that

18      you had tried all the medicines and then you got up and

19      left the appointment early.  Do you remember that?

20 A    No.

21 Q    Okay.  In his impression, Dr. McCarthy stated, I would

22      not be surprised if she suffering from a post traumatic

23      stress disorder and from a borderline personality

24      disorder.  Do you remember him tell you that?

25 A    No.

1   Q    Did you know that you had been diagnosed with possible

2         borderline personality disorder?

3   A    No.

4   Q    Okay.  He also said your global assessment of

5         functioning was 40 to 50.  Do you know what a global

6         assessment of functioning is?

7   A    No.

8   Q    At the end of his report, Dr. McCarthy said as

9         Ms. Duffy did not request any ongoing therapy, and as

10        she refuses to consider any other options of

11        medications except for Valium, her case at the clinic

12        will be closed.  It appears that overall she has

13        changed relatively little since last seen at the

14        clinic.  Unfortunately, I see her overall prognosis as

15        being quite poor.  You don't recall this meeting with

16        Dr. McCarthy?

17  A    No.

18  Q    Okay.  And you don't remember talking to him about

19        Valium?

20  A    No.

21  Q    Okay.  And that was in 1990?

22  A    I don't know.

23  Q    Okay.  That was 16 years ago, correct?

24  A    1990 was 16 years ago, yes it was.

25  Q    Okay.  Now, you saw Dr. Craig in 1997 for a

1          neuropsychiatric evaluation, do you remember that?

2    A     No.

3    Q     Okay.  Do you remember going to his office?

4    A     No.

5    Q     And you don't remember meeting Dr. Paul Craig?

6    A     No.

7    Q     If I told you he was a nice handsome, tall, blonde man

8          would you remember that?

9    A     No.

10   Q     Okay.  If I told you he asked you some questions, and

11         tested you, would you remember that?

12   A     No.

13   Q     I'm going to show you Dr. Craig's report of 2/19/97,

14         and it's Bates number 674.

15              COURT REPORTER:  Exhibit J.

16              MS. PINKEL:  Exhibit J.

17                        **(Deposition Exhibit J marked)**

18              MS. BRETZ:  You know, we've been at this for a

19   little over two hours --

20              MS. PINKEL:  Yeah, I'm about to finish up.  I

21   don't think this will take that long.

22   Q     (By Ms. Pinkel)  I just wanted to ask you -- we were

23         talking about Valium, Dr. Craig had done some

24         background information at the very beginning of his

25         report and it says that he obtained a history through a

1        clinical interview with the patient.  And he says that

2        you report -- she reportedly has been treated with

3        Valium for 20 years and was most recently being treated

4        at SouthCentral Counseling Center.  They were going to

5        discontinue her Valium and the patient her mental

6        health service provider to Dr. Alberts's practice.  do

7        you remember talking to Dr. Craig about changing

8        providers?

9  A      No.

10  Q      Okay.  On the last page of Dr. Craig's report, he has

11       one, two, three and four -- he has four items he

12       discusses in his recommendations.  The first one is he

13       recommended an MRI of you.  The second one was that you

14       had a two-decade history use of Valium.  And he says it

15       may be extraordinarily difficult to change her habit --

16       I'm sorry the last page.  That's Bates numbered 680.

17       Okay.  In the second paragraph here, the doctor says

18       that you had a two-decade history of Valium use and it

19       maybe extraordinarily difficult to help you change your

20       habits in relation to the use of this medication.  Do

21       you remember discussing Valium with Dr. Craig at all

22       during this interview?

23  A      No.

24  Q      Okay.  And that was in February of 2007 (sic), correct?

25       Is that what the date of the evaluation was?  The first

1          page, that is the date of that evaluation?

2   A      '97.

3   Q      Is that February?

4   A      February 1997 is the date of the evaluation.

5   Q      Okay.  And then you went to see Dr. Frasier in about

6          July or August of 1997?

7   A      I don't remember.

8   Q      You don't remember seeing Dr. Frasier?

9   A      I remember going to Dr. Frasier, but I don't remember

10         the date.

11  Q      Okay.  Now you were still on Valium, six months later

12         when you saw Dr. Frasier, weren't you?

13  A      I -- I don't' remember.  I never took Valium that much.

14  Q      Okay.  It's your testimony you didn't take Valium that

15         much?

16  A      No.

17  Q      But Dr. McCarthy and Dr. Craig thought you took Valium

18         quite a bit, didn't they?

19  A      I don't know what they thought.

20  Q      Dr. Craig thinks you have a Valium habit in 1997,

21         correct?

22  A      I don't know.

23              MS. BRETZ:  Objection.  I don't think he says

24  that.

25              MS. PINKEL:  Oh, yes he does.

88

1           MS. BRETZ:  Oh, her habit.  I'll withdraw the

2  objection.

3           MS. PINKEL:  Okay.  Yeah, he does.

4  Q     (by Ms. Pinkel)  Now, you don't deny the fact that what

5        we've marked as the exhibit with the medications from

6        Langdon, which is Exhibit H, indicates you were getting

7        Risperdal in 2002, correct?

8  A     Say it again.

9  Q     You don't deny the fact that you were getting Risperdal

10       in 2002, correct?

11  A    That's what's written here.

12  Q    Yeah.  And are you familiar with what Risperdal is?

13  A    No.

14  Q    Did anyone talk to you about it's side effects?

15  A    I don't remember.

16  Q    Okay.  I'm going to show you a bit of research that I

17       did on Risperdal, Ms. Duffy, and I'm going to mark this

18       as an exhibit.

19           COURT REPORTER:  Exhibit K as in Kelly.

20                         **(Deposition Exhibit K marked)**

21           MS. BRETZ:  I'm going to object to all this

22  too, it really isn't relevant.

23           MS. PINKEL:  Well this is in deposition and I

24  can ask these questions.  And it is relevant.  She was stopped

25  for driving under the influence and it looks like she's had

1  access to medications that would be medication that would

2  impair.

3  A      These are, like, 10 years ago, for number 1.

4  Q      (By Ms. Pinkel)  Okay.  Ms. Duffy, I.....

5  A      I haven't taken any Valium in 10 years probably.

6  Q      Well Ms. Duffy, it looks like you have a history of

7         having drug problems, and it looks like you were

8         getting Sonata.

9  A      I don't have any drug problems at all.  I hardly take

10        any drugs.  Sometimes they're prescribed and I don't

11        even take them so, no, I do not have any drug problems.

12 Q      Okay.  Well let me just show you what I've marked as

13        Exhibit K, and this is the information I found on

14        Risperdal, and it talks about common side effects with

15        Risperdal are sleepiness, correct?

16 A      What?  Where are you?

17 Q      On the first page of Risperdal, it says they have

18        important safety information at the top.  And then it

19        says the most common side effects that may occur with

20        Risperdal in the treatment of bipolar mania either

21        alone or in combination with a mood stabilizer are

22        sleepiness, and they talk about muscle stiffness and

23        restlessness and some other problems and dizziness.

24        That's in the treatment of bipolar mania.  In the

25        treatment of schizophrenia it is anxiety, sleepiness,

1          restless, tremors, and muscle stiffness, and dizziness,

2          correct?  Those are some side effects of Risperdal.

3                    MS. BRETZ:  I'm going to object to that.

4                    MS. PINKEL:  Well you can object, but this is

5     relevant.

6                    MS. BRETZ:  Ms. Duffy is not a doctor.  This is

7     just some pages off the internet.

8                    MS. PINKEL:  You just need to answer my

9     question.

10    A     What was your question?

11    Q     (By Ms. Pinkel)  The question was the side effects of

12          Risperdal include sleepiness and dizziness, don't they?

13    A     What's written here?

14    Q     That's correct.

15    A     You want me to say -- verify what's written here?

16    Q     That's correct.

17    A     So it says here the most common side effects that may

18          occur with Risperdal in the treatment of bipolar mania

19          either alone or in combination with a mood stabilizer,

20          Valproate or Lithium, are sleepiness, muscle stiffness,

21          restlessness, tremor, indigestion, nausea, abnormal

22          vision, muscle aches, dizziness, runny nose, diarrhea,

23          increased saliva, stomach pain, and urinary

24          incontinence.  In the treatment of schizophrenia,

25          anxiety, sleepiness, restlessness, tremors, and muscle

1        stiffness; dizziness, constipation, nausea,

2        indigestion, runny nose, rash and rapid heartbeat.

3        Studies suggest an increased risk of elevated blood

4        sugar-related side effects and sometimes potentially

5        fatal in patients treated with this class of

6        medications, including Risperdal.  Some people may need

7        regular blood sugar testing.  You may have heard the

8        term.....

9    Q   Okay.  You know what?  You don't have to read it all.

10   A   Okay.

11   Q   I was just trying to make the point with you that

12       Risperdal has some side effects that include sleepiness

13       and dizziness.

14   A   I don't know.  I -- I never took this medication so I

15       don't know anything about it.

16   Q   Okay.  So it's your testimony --

17   A   (Coughing)

18            MS. PINKEL:  Sorry, do you want to take some

19   water?

20   A   Yeah.

21            MS. BRETZ:  We're out of water here.

22       (Off record)

23       (On record)

24   Q   (By Ms. Pinkel)  Okay.  Ms. Duffy, we're going to

25       finish up here.  Now, after Officer LeBlanc had

1    arrested you and had put you in handcuffs, Officer

2    Estes arrived, correct?

3  A  Almost simultaneously.

4  Q  Okay.  So Officer Estes responded to Officer LeBlanc in

5    some manner and arrived on the scene, correct?

6  A  Oh, he was already there.

7  Q  Okay.

8  A  He was walking along the side of my car.

9  Q  Okay.

10 A  He grabbed my arms -- he grabbed my arms and twisted me

11    around and put the cuffs on and then Officer Estes was

12    coming on the scene at that time.

13 Q  Okay.

14 A  That's when I first saw Officer Estes.

15 Q  So, after you were in handcuffs Officer Estes arrived,

16    correct?

17 A  That's correct.

18 Q  Officer Estes processed you for the arrest and then

19    took you to one of the substations, correct?

20 A  Officer Estes brought me back to a police vehicle and

21    then he locked me in the police vehicle and then he

22    went back with Officer LeBlanc and they searched my

23    car, and my backpack.

24 Q  Now, in fact, you asked for your backpack from your

25    car, is that correct?

1    A    No, I did not.

2    Q    Okay.  Your backpack was -- you had a backpack in your

3         car, correct?

4    A    Yes, I did.

5    Q    And it was on the front seat of the car?

6    A    Yes, it was.

7    Q    And so after you were placed in -- was it Officer Estes

8         vehicle?

9    A    It was in the vehicle that was behind my vehicle.

10   Q    Okay.  So, after you were placed -- you were already in

11        handcuffs and you were placed in the vehicle, the

12        officers went and got your backpack, correct?

13   A    They both went into my vehicle.  I don't know how they

14        fit, but they both were in there.  One was leaning in

15        and one was actually in- -- inside my vehicle.

16   Q    And they went to your vehicle, and this was what --

17        after you were under arrest?

18   A    I was locked in --

19   Q    Okay.

20   A    The police vehicle and then -- then they were both in

21        my vehicle.

22   Q    Okay. So you were locked in the police vehicle and then

23        you think both officers or one of the officers went to

24        your car and got your backpack, correct?

25   A    They were both in my vehicle.  One was leaning in and

1        one was actually inside of it.

2   Q    Okay.  And they retrieved your backpack?  They got your

3        backpack, correct?

4   A    And my book bag.

5   Q    Okay.  So then in your backpack you had some pills,

6        correct?

7   A    My hormones.

8   Q    You had four bottles of pills in your backpack,

9        correct?

10   A    I had bottles with aspirin in it, I had a bottle with a

11        beta carotene tablet in it, and then I had a bottle

12        with estrogen and a bottle with progestogen.

13   Q    Now, these four bottles you had, you said one had

14        aspirin in it, correct?

15   A    Right.

16   Q    And then you had three other bottles?

17   A    Correct.

18   Q    Okay.  And those other bottles were unlabeled, correct?

19   A    Correct.

20   Q    And there was some maroon pills in one bottle, correct?

21   A    There was one beta carotene tablet.

22   Q    And that was a maroon pill?

23   A    Yes.

24   Q    And there was some orange pills, correct?

25   A    Progestogen.

1  Q   Okay.  And those bottles were unlabeled, correct?

2  A   Okay.

3  Q   And they searched your backpack and took these bottles

4      out of your backpack, correct?

5  A   Yeah, they would have had to have gone into my backpack

6      to get them because the whole thing was in sight,

7      inside of my backpack.

8  Q   Okay.  And this was while you were sitting in the

9      police car and before Officer Estes took you down to

10     the substation, correct?

11 A   Correct.

12 Q   Okay.  So this is pretty shortly after you've been

13     placed in the police vehicle?

14 A   Yeah, it was right after.

15 Q   Right after, okay.  And then Officer Estes took you to

16     the front station and fingerprinted you, correct?

17 A   No.

18 Q   Okay.  He did not fingerprint you?

19 A   No.

20 Q   He fingerprinted you before he took you down there?

21 A   Oh, no.

22 Q   Okay.  Do you remember when he fingerprinted you?

23 A   He didn't fingerprint me.  I got fingerprinted in the

24     jail.

25 Q   Oh, you got fingerprinted -- that's your recollection,

| | | |
|---|---|---|
| 1 | | you got fingerprinted in the jail? |
| 2 | A | Oh, yeah -- yeah.  No, he didn't fingerprint me. |
| 3 | Q | Okay.  Now, have you ever had a chance to look at |
| 4 | | Officer Estes report? |
| 5 | A | A long time ago. |
| 6 | Q | Okay.  You haven't looked at it recently? |
| 7 | A | No. |
| 8 | Q | Okay.  According to his report and I've got an extra |
| 9 | | copy for you here.  (Off record comments)  This is your |
| 10 | | arrest report that Officer Estes had filled out on the |
| 11 | | incident and he said that he arrived at the area and he |
| 12 | | advised Channel 2 that he needed a tow truck and I |
| 13 | | assume that's not the Channel 2 News, but another |
| 14 | | channel within the police department -- a tow truck to |
| 15 | | your location -- to their location for a DUI.  He took |
| 16 | | custody of you, who was sitting in the back of Officer |
| 17 | | LeBlanc's car.  Do you remember that?  Do you remember |
| 18 | | Officer..... |
| 19 | A | He -- he escorted me to the car. |
| 20 | Q | Okay. |
| 21 | A | He did.  I was not already in the car.  I don't know |
| 22 | | where you're reading. |
| 23 | Q | Okay.  I'm reading to you from the..... |
| 24 | A | Oh, the top paragraph there? |
| 25 | Q | Yeah.  He said that he took custody of you and you were |

1        in the back of Officer LeBlanc's car.

2  A    Oh, no.  No, definitely not.

3  Q    Okay.  So.....

4  A    LeBlanc grabbed me and then put the handcuffs -- and

5        then Officer Estes came along side of my car at

6        approximately the same time, and then he -- I don't

7        ever remember him touching me, so he must have just

8        verbally said come -- come with me, and then we went to

9        the car that was in back of my car.

10  Q    Okay.  So you went to another car with Officer Estes

11       though?

12  A    I went to the police vehicle that was in the back of my

13       car.

14  Q    Okay.  So, you went to a police vehicle and then you

15       waited until a tow truck arrived, correct -- with

16       Officer Estes?

17  A    No.  Officer Estes put me in the vehicle.  I guess I

18       shouldn't say put me in.  I mean, I got -- got into the

19       vehicle and he locked me in and then he went and went

20       into my car with Officer LeBlanc -- Sergeant LeBlanc.

21  Q    Okay.  And isn't it actually -- wasn't it Officer

22       LeBlanc that went and got your backpack from the car

23       not Officer Estes?

24  A    Well both of them were in my vehicle.

25  Q    Okay.

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

1  A    And.....

2  Q    And then they got your backpack, and the backpack had

3       the pills in it, correct?

4  A    Oh, no.  He took -- he took the pills.  LeBlanc took

5       the pills because I saw him and he was holding them and

6       waiving them around, and then he ran a good distance up

7       to the vehicle that was in front of my car.

8  Q    The police vehicle?

9  A    Yeah.  There were to vehicles during the -- he went to

10      the police vehicle in front of my car, and then Officer

11      Estes returned to the vehicle that I was in and then he

12      got in the car.

13 Q    Okay.

14 A    In the driver's part.

15 Q    Okay.  So -- and then the got in the car, and then he

16      took you to the Seely Substation for DUI processing?

17 A    He took me to the north side of West 36th Avenue -- the

18      building on the north side of West 36th Avenue.

19 Q    Okay.  And that would be the Seely Substation?

20 A    I don't think so.

21 Q    Okay.  Well you were taken to some police station on

22      36th Avenue, correct?

23 A    There wasn't any identification on it, but there was

24      another policeman in it.

25 Q    Okay.

**_METRO COURT REPORTING_**

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit B Page 98

| | | |
|---|---|---|
| 1 | A | So, I suppose so. |
| 2 | Q | Okay.  So, you don't remember Estes telling you, you |
| 3 | | were going to the Seely Substation? |
| 4 | A | He pulled up to Tudor Road..... |
| 5 | Q | Well you can just answer my question.  Do you remember |
| 6 | | him telling you we're going to Seely Substation? |
| 7 | A | He didn't say that. |
| 8 | Q | Okay.  You don't remember him telling you that? |
| 9 | A | He didn't say it. |
| 10 | Q | He did not say, Seely Substation? |
| 11 | A | No.  He made a left and I said -- I said to him -- he |
| 12 | | was heading west and I said the police station is in |
| 13 | | the other direction.  I didn't know there were any |
| 14 | | other stations besides the police station on Tudor |
| 15 | | Road.  And he said we're not going there, they don't |
| 16 | | have the equipment. |
| 17 | Q | So, he took you to what's called a substation, correct? |
| 18 | A | Yes -- yeah. |
| 19 | Q | Okay.  And then he told you he was required to get a |
| 20 | | sample of your breath, correct? |
| 21 | A | He told me I had to be observed. |
| 22 | Q | Okay. |
| 23 | A | And to sit -- sit there.  He pointed to a chair and -- |
| 24 | | and he said sit.  You have to be observed 20 -- I think |
| 25 | | it was 20 minutes. |

1   Q    Okay.  So, then did he observe you for 20 minutes?

2   A    He sat there and he positioned himself in a manner that

3        he wasn't looking directly at me, so --

4   Q    So, he observed you for 15 to 20 minutes, correct?

5   A    Well he sat there.

6   Q    Okay.

7   A    He didn't make any sudden moves or anything.  He just

8        sat there, appeared to be doing paperwork.

9   Q    Okay.  So, he sat with you for 15 minutes or 20

10       minutes, correct?

11  A    I was here and he was at the desk -- the desk here

12       faced this way, but he was kind of on an angle.

13  Q    Okay.

14  A    So, he wasn't looking directly at me.

15  Q    Okay.

16  A    And he -- he -- I think did paperwork.

17  Q    Okay.  So, now you provided a breath sample.  Then he

18       gave you -- and the breath sample was .000, correct?

19  A    I don't know.  I never saw the machine.

20  Q    Okay.

21  A    I never saw anything.  He said -- he said it's zero.

22  Q    Okay.  He did tell you it was zero?

23  A    Yes.

24  Q    And then you told him you wanted a test at Municipal

25       expense, correct?

1  A    Yes, I did.

2  Q    Okay.  And then he finished reading you some forms and

3       gave you copies of them.  Do you remember that?

4  A    I didn't get -- me in the station -- I was in

5       handcuffs.

6  Q    Okay.

7  A    I didn't receive any copies of anything.

8  Q    Okay.  Well he said that he finished reading you some

9       forms and that he gave you copies and then he

10      transported you to Alaska Regional Hospital for a blood

11      draw?

12 A    Yes, we did.  We went to Regional Hospital.

13 Q    Okay.  And after the blood draw was done, he used what

14      he said was a bail schedule and set bail at $250.00,

15      unsecured, do you remember that?

16 A    He -- he told me he was going to take me home.  He --

17      he said -- I said I wanted a blood test and he said I'm

18      going to take you -- we're going to go to the lab and

19      then I'm going to take you home.

20 Q    Okay.  He -- according to his report, he transported

21      you to the jail, and then you were remanded at the

22      jail?

23 A    He did bring me to the jail.

24 Q    Okay.  And then said that he took your handcuffs off

25      and you lifted your arms and told you -- and you told