1      him that you hoped the handcuffs didn't cut your wrist?

2  A    Well this is in the lab.

3  Q    Oh.

4  A    This is not at the jail.

5  Q    Oh, I see, okay.  So, you were at the lab and that's

6      when he took the handcuffs off?

7  A    We went into the room in the lab and then he un-did the

8      handcuffs and took them off, and I put my arms in front

9      of me and they're all red and swollen, and he looked

10     alarmed.  And there was some creme on the countertop

11     there, and he said here, put some of this on it'll

12     help, and I said no, I didn't want to put any creme on

13     it because I didn't know if the skin was broken.

14  Q    Okay.  Now, his report said, you told him you were

15     worried about some microsized cuts and you were worried

16     that they could infected?

17  A    That was in response to him offering me to put creme.

18  Q    I see.  And then he said that during his contact with

19     you, you seemed somewhat lethargic, correct?  That's

20     what he said in the report?  I'm looking at the last

21     page, Ms. Duffy.

22  A    During my contact with Duffy she seemed lethargic,

23     that's what he says.

24  Q    Yeah, okay.  And he also -- in his report, and I'm

25     going back to the first page, he said that Officer

1   LeBlanc when he got there, and he's waiting for the tow

2   truck and he said Officer LeBlanc advised that you had

3   not been drinking, but he believed that you were

4   impaired by some type of drug, do you see that on the

5   first page of the report?

6   A   Yes, I do.

7   Q   Okay.  I just have a few questions.  We've done some --

8       what are called interrogatory responses to you.  And

9       I've provided them to your lawyer.  Did you want me to

10      ask you something else?  You've got your finger on the

11      page somewhere.

12  A   No, it's where you were last time.

13  Q   Okay.

14  A   I was trying to --

15  Q   Oh, okay.  I've kind of moved on from that, sorry.  I

16      was going to ask you some questions about the

17      interrogatory responses that you have provided.  We

18      have asked you some questions in discovery and I've got

19      a copy of your response to our first request.  I'm

20      going to make it the next exhibit and I've got another

21      copy in here, I believe.

22          COURT REPORTER:  Exhibit L has been marked.

23                          **(Deposition Exhibit L marked)**

24  Q   (By Ms. Pinkel)  Do you remember seeing these

25      interrogatory requests?  I think we sent them to you in

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit B Page 103

104

1        November.

2   A        Do you want these back?

3            MS. PINKEL:  Yeah, those are exhibits.  I've
4   got copies that I can give you though.  But, yeah, those need
5   to stay with the court reporter, but I've got extra copies.
6   And the record should just reflect that Ms. Duffy was asking
7   about the drug information I gave her on Risperdal.

8   A    .   No, it was in response to a whole pile of papers.

9            MS. PINKEL:  Oh, okay.  All of the exhibits.

10  A        Exhibit 4 (sic) and all kinds of stuff.

11           MS. PINKEL:  Yeah, they're exhibits.  Okay.

12  Q        (By Ms. Pinkel)  You signed some interrogatory
13           responses on January 24th of 2006, do you remember
14           signing those response, Ms. Duffy?

15  A        Vaguely.

16  Q        Vaguely, okay.  In the questions I asked you some
17           things about your lawsuit.  The first thing I asked you
18           about was in interrogatory number two, which is on page
19           three, I said please describe in detail all injuries,
20           ailments, or pains which you claim to have suffered as
21           a result of the occurrence alleged in your complaint,
22           stating the severity and duration of such injuries and
23           the current prognosis.  Your answer was:  Damages are
24           still accumulating and discovery is continuing,
25           therefore damages cannot be assessed nor calculated at

1        this time.  Do you remember answering that?

2  A    Uh-huh (affirmative).

3  Q    And then I recently asked you to update your discovery

4        responses and your lawyer gave me an answer today, and

5        I said please update  all your previous interrogatory

6        responses and you indicated there is nothing to update,

7        is that correct?  Did you say that?  You had nothing

8        new to add to what you said in January?

9  A    To question number two?

10  Q    To the whole -- I'm sorry, let me mark this as an

11        exhibit.

12            MS. PINKEL:  This is an original.  I may have

13  to use the original.  There's some releases attached to this

14  too.

15            COURT REPORTER:  Exhibit M marked.

16                   **(Deposition Exhibit M marked)**

17            MS. PINKEL:  And I'm just going to need to make

18  a copy of M before we leave.

19            COURT REPORTER:  All right.

20      (Off record comments)

21            MS. PINKEL:  I'm showing you what's been marked

22  as Exhibit M, and this was your discovery responses that we

23  just got today from you and your attorney.  And it said you had

24  nothing to add to the responses from January 2004.

25  A    So this is to number one?

1  Q    (By Ms. Pinkel)  This is in response to interrogatory

2       number two.  Oh, it's in response to all of your

3       previous responses?

4  A    All of them?

5  Q    Yes.  And so I just wanted to ask you a little bit

6       about that interrogatory number two.  You said damages

7       are still accumulated and discovery is continuing

8       therefore damages cannot be assessed nor calculated at

9       this time.  So, I guess, what I want to know is what

10      are your -- you say you have some injuries or ailments

11      problems from this incident, can you tell me -- give me

12      a little bit more understanding of what you think your

13      damages are as a result of this incident?

14  A    Well.....

15  Q    What do you mean by damages are accumulating, I guess,

16      would be my first question?

17  A    Well I'm afraid to drive, and the police -- I always

18      felt a sense of security having the police, that if I

19      needed them I could call them.  So, that's no longer

20      the case and they didn't provide me -- and I'm afraid

21      of them.  The Municipality has $500.00 of mine.

22  Q    And was this the cost of having your car impounded?

23  A    Yes, it was.  It was $750.00, plus I was assaulted.  I

24      had never been mugged before.  So this is the first

25      time that I've ever been mugged.

1  Q    Okay.  Now, can you just explain -- you said you're

2       afraid to drive?  You were -- you don't feel security

3       with the police, you paid $5.00 (sic) to have your car

4       impounded.....

5             MS. BRETZ:  Five hundred.

6  A    Five hundred.

7             MS. BRETZ:  Five hundred.

8  Q    (By Ms. Pinkel)  I'm sorry.

9  A    It was $750.00, but I did eventually get $250.00

10      returned to me.

11 Q    Okay.  So you had $500.00 that you paid for the

12      impoundment, and you felt like you were mugged?

13 A    Oh, yes he did.  He mugged me.  I --

14 Q    And who mugged you?

15 A    Sergeant LeBlanc.

16 Q    And why do you think he mugged you?

17 A    Well he attacked me.  He assaulted me.  There was

18      absolutely no reason for him to conduct himself in such

19      a manner.  And if it was like a regular criminal, I

20      could have run away, I would have run away and gone to

21      the police, but now, he is the police and I just have

22      to cope with him as best as I could and if the police

23      act like that, I can't go the police and -- for help.

24 Q    Now, Ms. Duffy you're saying that this officer mugged

25      you and assaulted you.  What did he do to make you

**METRO COURT REPORTING**

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Exhibit B Page 107

| | | |
|---|---|---|
| 1 | | think that he mugged you or assaulted you? |
| 2 | A | Well people don't usually go around baring their teeth |
| 3 | | at people.  He physically attacked me. |
| 4 | Q | Okay.  When you say he physically attacked you, what do |
| 5 | | you mean by that? |
| 6 | A | Well he grabbed my arms and he swung me around and then |
| 7 | | he used the handcuffs as a weapon. |
| 8 | Q | Okay.  And you say he used the handcuffs as a weapon, |
| 9 | | what do you mean by that? |
| 10 | A | Well I -- I -- they hurt.  And then he tightened them. |
| 11 | Q | Having the handcuffs on hurt you? |
| 12 | A | Oh, yes they did. |
| 13 | Q | And..... |
| 14 | A | And grabbing me -- I was all black and blue. |
| 15 | Q | Did you take any pictures? |
| 16 | A | No I didn't. |
| 17 | Q | Where were you black and blue? |
| 18 | A | My arms.  Particularly, in my wrists, they were rather |
| 19 | | swollen and for a good while and then they eventually |
| 20 | | went black and blue and the swelling subsided. |
| 21 | Q | Did you seek medical attention for this? |
| 22 | A | No, I didn't. |
| 23 | Q | You said on your wrist you had some -- you had -- okay. |
| 24 | | Just so can go back through this.  Your wrists were red |
| 25 | | and swollen? |

```
 1   A      They were already red and swollen by the time that

 2          Officer Estes removed the handcuffs in -- in the

 3          hospital lab, and they remained so for several days,

 4          and then eventually they turned black and blue and the

 5          swelling subsided.

 6                 MS. PINKEL:  I'm just going to ask you to look

 7   at Officer Estes's report, which we've marked as an exhibit, I

 8   believe.  Oh, maybe we did not mark it as an exhibit.

 9                 MS. BRETZ:  I think it was earlier.

10                 MS. PINKEL:  I thought that was Roy's.

11                 COURT REPORTER:  There was one police report,

12   but I don't think this one with the fingerprint on it is one

13   that I marked.

14                 MS. PINKEL:  Yeah, I believe that was just

15   Roy's.  Roy's is D.

16                 MS. BRETZ:  What's Exhibit L?

17                 COURT REPORTER:  That's when we were talking

18   about the interrogatory.

19          (Off record)

20                              (Deposition Exhibit N marked)

21          (On record)

22   Q      (By Ms. Pinkel)  Ms. Duffy, I was asking you about

23          Officer Estes's report.  I was going to ask you about

24          it because you said you felt like your wrists were red

25          and swollen after you had the handcuffs were taken off?
```

1  A    I didn't feel like it, they were.

2  Q    Okay.  And you took them off when you got to Alaska

3       Regional with Officer Estes?

4  A    I didn't take the handcuffs off, Officer Estes took

5       them off.  I wouldn't have any way of getting them off.

6  Q    Right.  Thanks for clarifying that.

7  A    You need a key.

8  Q    Right.  According to his report, you told him you were

9       worried about micro-sized cuts?

10  A    That was in response to him offering me some lotion

11       when he saw how red and raw my wrists were, he appeared

12       to be a bit alarmed, and he said here, take some creme

13       and put this on, it'll help.  And I said, no, I don't

14       want to put any creme on them, because I don't know if

15       they're cut.

16  Q    Okay.  So you were worried about micro-sized cuts?

17  A    Correct.

18  Q    Okay.  What are your interrogatory responses?  So, you

19       never went to a physician after this incident?

20  A    No, I didn't.

21  Q    And you did not go to get any kind of attention for

22       what you considered to be your swollen wrists after

23       this, correct?

24  A    Correct.

25       MS. PINKEL:  Now, just let me check one thing.

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit B Page 110

1    Q    (By Ms. Pinkel)  You didn't have any other medical

2         complaints then about this other than -- or I shouldn't

3         say medical, but just complaints of the wrists were red

4         and swollen and you felt that you were black and blue

5         on your wrists, and on your arms?

6    A    I didn't feel it, I was.

7    Q    Okay.  But you didn't get any medical attention?

8    A    No, I didn't.  No.

9    Q    Okay.  Now, sitting here today did you want to add

10        anything to your discovery responses?

11   A    (No audible response)

12   Q    Or do these completely state what you feel your damages

13        are from this incident?

14   A    I'm out $500.00, that they didn't reimburse -- the

15        Municipality didn't reimburse me and -- yeah, I'm

16        afraid to drive, and I'm afraid of the police.

17   Q    Okay.  I'm just going to show you, these are the court

18        cases that were on Court View involving you from 2000

19        and I apologize they're -- I highlighted the case

20        numbers, so that part doesn't show, but it indicates

21        that you had two cases with the court involving your

22        driving in 2000, and we had talked about that a little

23        bit, but I just found these documents, I just wanted to

24        bring those to your attention.  It looks like you were

25        charged with no valid operating license and also

1      failure to stop in 2000.

2  A   This was on campus, and my license had expired, so I

3      got it -- I got it -- they didn't send the paperwork in

4      the mail for renewal, so I had to go over there and do

5      it.

6  Q   Okay.

7  A   I didn't even know it had expired.

8  Q   Okay.  But you were stopped by the police and --

9  A   Well it was the campus -- on campus.

10 Q   Okay.  They are police officers, aren't they --

11     correct?

12 A   I don't know.  I -- I don't know, but they're not APD,

13     I don't think.

14 Q   Somebody.....

15 A   So, I think they have their own office on campus.

16 Q   But, regardless of what they're actual title or

17     position is, they had the authority to cite you for not

18     having a license and for failure to stop?

19 A   Okay.  I -- I don't know the status of the campus

20     police.

21 Q   Okay.  But, someone cited you and you had a court case

22     started on this, correct?

23 A   A court case started on it?

24 Q   In 2000, there was a court case with your name on it,

25     involving your driving, correct?

1  A       He said I didn't stop for the stop sign, and I did, and

2          I got a ticket.  And then I -- I signed in, I wanted to

3          plead not guilty and go to court.  And then I got

4          something from the State and it said he resigned.

5  Q       Okay.

6  A       That's all I remember.

7  Q       Okay.  That's what you remember?

8  A       Yeah.

9          MS. PINKEL:  Okay.  I'm going to mark these as

10 exhibits here.  Just a few more questions.

11              **(Deposition Exhibits O and P marked)**

12 Q       (By Ms. Pinkel)  Now, Ms. Duffy, you're on disability

13         for life, correct?

14 A       Yes.

15 Q       Okay.  And this is because of psychiatric problems,

16         correct?

17 A       Correct.

18 Q       Okay.  And your diagnosis in 2001, we kind of talked a

19         little bit about you went to see Nurse Davis in 2001,

20         and you don't recall that?  Nurse Davis -- Nella Davis.

21 A       No, I don't.  I don't remember.  The last diagnosis I

22         had was from Dr. Burgess and he said it was out of

23         simple order, secondary to stroke.

24 Q       That wasn't exactly what was your last diagnosis, now

25         was it?

1  A     That's what he told me.

2  Q     Okay.  In July of 2003, you had some diagnosis from

3        Perr-Crawford, correct?

4  A     No, I never received a diagnosis from her.  Doctor --

5        Dr. Burgess was closing his practice in Anchorage and

6        that's the diagnosis he gave me.  I never received any

7        diagnosis from Perr-Crawford.

8              MS. PINKEL:  Well let me talk to you a little

9  bit about Ms. Davis or Nurse Davis.  She saw you in September

10  2001 and we talked about that diagnosis just a little bit.  I'm

11  going to just look through the exhibits, because I believe

12  we've already made her evaluation an exhibit.  Let me see if I

13  can find it here real quick.  Here it is, Exhibit C, and it's

14  Bates number 332.  Let me see if I can find it in my documents

15  here.

16  Q     (By Ms. Pinkel)  If you look at Bates 335 which is part

17        of the same exhibit, she made several diagnoses of you,

18        didn't she?

19  A     Where -- where?

20  Q     Page 335 at the bottom of the page.

21  A     Uh-huh (affirmative).

22  Q     She has DMS-IV Diagnoses.

23  A     Uh-huh (affirmative), I see that.

24  Q     Now she has Axis I, she has depressive disorder NOS.

25  A     Uh-huh (affirmative).

1    Q    Otherwise, specified.  Then she has anxiety disorder,

2         not otherwise specified.  And she says personality

3         disorder not otherwise specified.  Do you see that?

4    A    Personality disorder N-O-S.

5    Q    Not otherwise specified.

6    A    Uh-huh (affirmative).

7    Q    Right.  And she saw avoidant and schizotypal traits.

8    A    Uh-huh (affirmative).

9    Q    Correct?  And then on page five, she talks about some

10        of your past history as stressors and Axis V says your

11        GAF, which I'm going to represent to you is your Global

12        Assessment of Functioning was 53.  And then Axis VI,

13        your prognosis was guarded.  It would be dependent on

14        whether you were willing to -- or able to -- follow

15        treatment recommendations.  So, I just wanted to bring

16        to your attention on page 333, at the bottom of the

17        page she talks about your past medical history.  You

18        don't remember this visit with Nella or Nurse Davis,

19        but apparently.....

20   A    I don't remember this person at all.

21   Q    Yeah, she said -- she talks some 1976 episodes where

22        you claim to have had a stroke from coughing very hard

23        and then a year later you were reevaluated -- oh, you

24        were disabled and got Social Security, excuse me.  And,

25        then one year later you were reevaluated and you told a

1          long history of being threatened by other people in

2          doctors' offices where the doctors were not actually

3          present.  And then at this point apparently, you stated

4          to Nurse Davis that you wondered if Nurse Davis thought

5          you were crazy.  Do you.....

6     A    I don't even know where you're reading?

7     Q    Well, okay.  I was reading at the bottom of page 333.

8     A    Oh, and then it goes into 334?

9     Q    Right.

10    A    At this point, she stated she wondered if I thought she

11         was crazy.

12    Q    Yeah and that you're apparently recounting to her, that

13         you had a long history of having people threaten you in

14         doctors' office when doctors weren't even there.

15    A    That's a long -- I don't understand your conclusion on

16         that.

17    Q    I just --

18    A    Where are you getting this conclusion from?

19    Q    Well I'm just reading to you from what's in your

20         medical records.

21    A    Where -- where are you getting this conclusion?  Where

22         is it?

23    Q    Okay.  I'm sorry.

24              MS. BRETZ:  Do we have a question coming up

25    here, because it's.....

1              MS. PINKEL:  Yeah, we do.

2              MS. BRETZ:  Okay.

3              MS. PINKEL:  It's at the bottom of page 333.

4    Q    (By Ms. Pinkel)  You say, one year later, she, meaning

5         you -- was reevaluated and told a long history of being

6         threatened by other people in doctors' offices where

7         the doctors were not actually present.  Do you remember

8         having episodes of being threatened in doctors' offices

9         where.....

10   A    No.

11   Q    .....doctors weren't there?

12   A    No.  Oops.

13   Q    So, you have no idea of what these incidences would

14        involve?

15   A    No.

16   Q    And so, if the Nurse -- Nurse Davis, who's a

17        psychiatric nurse, put in your medical history that you

18        had recounted having episodes where you were in several

19        doctors' offices and people were threatening you, you

20        don't -- you would dispute the accuracy of that record?

21   A    I have no idea.  I have no -- no recollection of this

22        person or this meeting.

23   Q    Okay.

24   A    I have absolutely no recollection of it at all.

25   Q    Okay.  Well she did a mental status exam on you on

1       apparently the same date.  You don't remember a mental

2       status exam?

3   A   No, I do not.

4   Q   Okay.  This mental status exam says that -- it talks

5       about how you were on time for your appointment, you

6       were well groomed.....

7   A   What page are you on?

8   Q   Bates number 335.  Do you have that -- page 335?

9   A   I have page 335.

10  Q   Okay.  She -- on the mental status exam she mentioned

11      how, like I said, that you were well groomed, and you

12      were on time.  You had no psychomotor agitation or

13      retardation.  Your attitude was cooperative.  You say

14      your memory is worse since 1976 with your head injury.

15      You were unable to remember 3 out of 3 items after 10

16      minutes, and it says here that your concentration is

17      impaired.  Do you remember telling her that your

18      concentration was impaired?

19  A   I haven't a clue who this person was, so I couldn't

20      possibly remember what the -- having this conversation

21      with her.

22  Q   Okay.  Well she also says that you'd gotten a recent

23      letter from Social Security recording an overpayment.

24      And you had -- that you might have to pay back, and you

25      had vague thoughts of suicide without plan or intent.

1        Do you remember having thoughts of suicide because of a

2        letter from Social Security?

3   A    No.

4               MS. BRETZ:  Objection.  Asked and answered.

5   She doesn't have any recollection of this whole meeting.

6               MS. PINKEL:  Okay.  Well I can still ask these

7   questions.

8   Q    (By Ms. Pinkel)  So you don't remember having an

9        incident with the Social Security Administration and

10        being upset with them?

11   A    Oh, I've had incidents with the Social Security

12        Administration and being upset with them, yes I do.

13        But this, I have no idea what this is that you're

14        referring to.

15   Q    So do you remember having paranoia about the Social

16        Security Administration?

17   A    What do you mean by paranoia?

18   Q    Well were you afraid they were out to get you?

19   A    Oh, no.  I think -- you mean, paranoia in the sense

20        that they're out to get me in particular?

21   Q    Right.

22   A    No.

23   Q    No.  Okay.  So if this was reported to one of your

24        providers that you were paranoid about Social Security

25        Administration, you wouldn't recall that?

1  A    No, I don't remember this at all.

2  Q    Okay.  She also said that your insight and judgment

3       were fair.  Do you think your insight and judgment are

4       fair?  It's at the end of the mental status exam, right

5       at the very.....

6  A    Okay.

7  Q    .....end.

8  A    I found it.  I got it.

9  Q    Yeah.  Okay.  It says your insight and judgment are

10      fair.  Do you think that is a fair statement of your

11      insight and judgment, that it is only fair?

12  A   My -- my perspective of my insight and judgment?  Are

13      you asking for my opinion on my insight and judgment?

14  Q   Right.  Yes.

15  A   Well I have it -- I think I have excellent insight and

16      judgment.

17  Q   And you don't recall having suicidal thoughts because

18      of the letter you got from Social Security?

19  A   No.

20  Q   Okay.  Just one more question.  Now, do you remember

21      seeing Gwen Perr-Crawford at the Langdon Clinic?

22  A   Yes, I do.

23  Q   Okay.  Do you remember seeing her in November of 2003?

24  A   November of 2003?  I think that would be my first

25      meeting with her, or thereabouts.

1  Q    Well actually she saw you quite a bit before that,

2       perhaps in July of 2003, correct?

3  A    Somewhere along there, because Dr. Burgess was closing

4       his practice out, so he referred me over to Gwen.

5  Q    Okay.  So, in November of 2003, Ms. Perr-Crawford,

6       who's a -- is she a licensed clinical social worker?

7  A    I don't know what her qualifications were.  I assume

8       she's eminently qualified if she works at Langdon, but

9       otherwise, I wouldn't know what her background is.  I

10      don't know.

11           MS. PINKEL:  Let me just mark this.  It's Bates

12  numbered 603 and it's some chart notes from 11/26/03 and

13  12/15/04.

14           COURT REPORTER:  All right.  This is going to

15  be Exhibit Q.

16                    **(Deposition Exhibit Q marked)**

17           MS. PINKEL:  And I'm almost done here.

18           MS. BRETZ:  Famous last words there Mary.

19      (Off record comments)

20  Q    (By Ms. Pinkel)  Do you remember with you went to see

21      Ms. Crawford, and talking to her about your -- well

22      your past -- some of your past problems with having

23      some abuse in your past, do you remember that?

24  A    Uh-huh (affirmative).

25  Q    And, she assessed you on that date and she said you had

1           limited insight.  Do you remember saying that?

2   A       Do I remember saying that?

3   Q       No --

4   A       I wouldn't say that.

5   Q       No, but -- I'm sorry.  She's saying that you have

6           limited insight.  Would you agree that you had limited

7           insight when you saw her in November of 2003?

8   A       To what are you referring?  I don't --

9   Q       Well if you look under her chart notes, she saw you on

10          11/26/03, between 4:00 and 5:00 p.m., and it looks like

11          she has an A which I would represent is assessment.  It

12          says limited insight, would you agree with that

13          assessment of you, that you had limited insight into

14          yourself, in November of 2003?

15  A       I don't remember having this meeting with her on -- on

16          2003, so I -- I would need time to look it over and see

17          what she was referring to.

18  Q       Okay.  Well fine.  I guess, I just wanted to ask you

19          generally about that.  Now, you also saw her in

20          December of 2004, and that's the next chart note, and

21          it looks like you had reported to her you were uneasy

22          after having received a letter from Social Security

23          concerning payment.  It says detail and perceived

24          harassment, by the something in the Alaska Social

25          Security Systems.  I would think that's what it's

```
 1        referring to, SS is Social Security.  And then you're

 2        talking about loneliness for some companionship.  Do

 3        you remember talking about those problems with her in

 4        December.....

 5   A    No, I don't.  I would need -- I -- I definitely had

 6        meetings with Gwen Perr but I would have to look these

 7        over and try and remember.

 8   Q    Okay.  Do you know that Ms. Perr assessed you as

 9        paranoid at one point?

10   A    No, I don't.  I never --

11   Q    Okay.

12   A    I never got any kind of evaluation from Gwen Perr.

13   Q    Okay.  Do you know that Risperdal, we talked about it

14        -- you don't remember getting it, but Risperdal is used

15        for treatment in schizophrenia and in bi-polar

16        disorders.

17   A    No, I don't.  I don't know.

18   Q    Okay.

19   A    I don't pay any attention.

20             MS. BRETZ:  Objection.

21             MS. PINKEL:  Okay.

22   A    You already -- you already read the long.....

23   Q    (By Ms. Pinkel)  Well that's why I did.

24   A    .....description of this medicine.

25   Q    I did.
```

1  A    But, I'm not familiar with this medicine.....

2  Q    Okay.

3  A    So --

4  Q    Well.....

5  A    I hope you're not going to read it again.

6  Q    I'm not.  But, I'm just going to ask you one more

7       question.  Risperdal's also used to treat people for

8       symptoms of paranoia, isn't it?

9  A    Uh-huh (affirmative).  I don't know.

10 Q    Okay.  Do you think maybe some of your paranoia led to

11      your filing this lawsuit?

12 A    No, I filed --I filed this lawsuit because it's in

13      public, so when Sergeant LeBlanc maims or kills

14      somebody, the Municipality can't say, oh, we didn't

15      know about him.

16 Q    Ms. Duffy, do you know.....

17 A    That's why I filed this lawsuit and I'm going to

18      continue to pursue it too.

19 Q    Okay.  Do you know that Officer LeBlanc is probably one

20      of the best officer in the Municipality?

21 A    He is a thug.

22 Q    Okay.  Well you've expressed your opinion, but I just

23      wanted to ask you if you knew that, and it sounds like

24      you didn't, but --

25 A    No, he is not a good officer.  He's a criminal.

125

1  Q    Okay.  Are you still taking Risperdal?

2  A    I don't have any knowledge of Risperdal.  I told you

3       several times, I don't -- I have never taken it and I

4       don't know what it is.

5  Q    Okay.  So, you're not taking it now?

6  A    I most certainly am not.

7  Q    Has anyone suggested to you that it might help your

8       outlook on life if you took such medication?

9            MS. BRETZ:  Objection.  It's argumentative.

10           MS. PINKEL:  No.

11  Q   (By Ms. Pinkel)  I'm just asking you, has someone

12       recently suggested that that might help your outlook if

13       you took medications that would help your symptoms?

14  A    What exactly are my symptoms?

15  Q    No, I think you would know better than I do.

16  A    Well no, you're the one that.....

17           MS. BRETZ:  Mary, could we just wind this down?

18           MS. PINKEL:  Yeah, sure.  I'm just asking if

19  anyone's -- and it sounds like no one has.

20  Q    (By Ms. Pinkel)  No professional has recently suggested

21       that you take Risperdal?

22  A    Well you're telling me to take it, apparently.  What

23       are you suggesting my symptoms are?

24  Q    Well let me ask you this:  Are you currently seeing a

25       psychiatrist?

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit B Page 125

1    A        No, I'm not.

2    Q        Okay.  When did you stop seeing a psychiatrist?

3    A        When Dr. Burgess closed his practice.

4    Q        Okay.  And when was that?

5    A        I believe it was in the fall of 2003.

6               MS. PINKEL:  Okay.  Thank you.  Do you have any

7    other questions?

8               MS. BRETZ:  I'll just ask a few questions.  Not

9    a whole lot.

10                        **CROSS EXAMINATION**

11   **BY MS. BRETZ:**

12   Q        What medication are you taking now, Virginia?

13   A        Lipidor.

14   Q        Okay.  For high blo- --- it's high blood pressure,

15            correct?

16   A        Cholesterol.

17   Q        Cholesterol.  Do you recall what medications you were

18            taking in March of '03?

19   A        Estrogens and progestogen.

20   Q        Okay.  And what were you taking the beta carotene for?

21   A        I take vitamins, but I had eaten carrots so I -- I

22            didn't take it that night.

23   Q        Okay.  So it's basically just to get an extra boost?

24   A        Uh-huh (affirmative).  Yes.

25   Q        And why did you have the medication in unmarked

1          bottles?

2   A      For convenience.  The progesterone pills in particular

3          are rather large, so I would just carry a few with me

4          at a time.

5   Q      Okay.  How many of those pills were you taking a day?

6   A      One.

7   Q      How long have you had a driver's license?

8   A      1968, I think.

9   Q      Have you ever been involved in a car accident?

10  A      No.

11  Q      Have you ever received any other tickets or citations

12         besides those ones in 2000?

13  A      When I first moved to Alaska, I got a ticket to -- I

14         had to get my New York plates transferred to Alaska

15         plates.

16  Q      So you got a ticket for having improper tags or

17         something like that?

18  A      I just remembered I had to go to court and show that I

19         got new plates, my Alaskan plates.

20  Q      Okay.  But you've never been arrested for DUI?

21  A      No.

22  Q      Never been arrested for reckless driving?

23  A      No, no.

24  Q      Except for this one incident, never been arrested for

25         having an invalid driver's license?

1  A      No.

2  Q      Just this issue with the plates?  And that would have

3         been in about 1988?

4  A      '84.

5             MS. PINKEL:  I'm going to object to that

6  question, because I believe she got cited for not having an

7  operator's license in 2000.

8             MS. BRETZ:  Right.

9  A      I had an operator's license, but it had expired and I

10        did not receive the paperwork from the Municipality.  I

11        didn't know it had expired.

12             MS. PINKEL:  Oh, I just thought you were

13  mischaracterizing her testimony.

14             MS. BRETZ:  Oh.

15             MS. PINKEL:  I think if you were referring to

16  the 2000 incident, that's fine.

17             MS. BRETZ:  Yeah, I think I said that.

18             MS. PINKEL:  Okay.

19  Q      (By Ms. Bretz)  Do you have any other misdemeanor type

20        arrests on your record?

21  A      No.

22  Q      Any felony arrests?

23  A      No.

24  Q      So, you've got a clean driving record except for this

25        incident in 2000?

1  A      That's correct.

2              MS. PINKEL:  And 2003?

3              MS. BRETZ:  Yes.

4  Q      (By Ms. Bretz)  Going back to your damages, do you feel

5         like your rights were infringed upon by having the

6         officer go through your backpack?

7  A      Oh, yes I do.

8  Q      Do you feel like you were falsely arrested?

9  A      Oh, I most certainly was.

10 Q      Just to clarify, did you ask one of the officers to get

11        your backpack?

12 A      I did not.

13 Q      Okay.  Has any doctor ever told you that you shouldn't

14        drive?

15 A      No.

16 Q      Okay.

17 A      Not at all.

18 Q      And you've never received anything from the Division of

19        Motor Vehicles indicating that you should not be

20        driving?

21 A      Oh, no.

22 Q      To clarify also, on the evening of the incident while

23        you were driving, do you recall leaving your lane?

24 A      I didn't leave my lane.

25 Q      Okay.  So you didn't drive over the white line on the

130

1          left?

2    A     No.

3    Q     Or it would have been on the right?

4    A     No.

5    Q     You didn't drive over the white line on the right?

6    A     No.

7    Q     And you don't recall driving, crossing the centerline?

8    A     No, no.

9    Q     And you were in the right-hand lane too, right?

10   A     Yes, I was.

11   Q     Do you recall what the weather conditions were then?

12   A     I don't recall it raining or anything like that.  It

13         was -- it was just all right.

14   Q     Okay.  Was there perhaps snow on the road?

15   A     No.

16   Q     Okay.

17   A     It was past break-up and that's why all the ruts were

18         so deep.

19              MS. BRETZ:  I think that's about it.  Let me

20   just check over this.  Oh, okay.

21   Q     (By Ms. Bretz)  One of the officers took your backpack,

22         right -- from your car?

23   A     Yes, he did.

24   Q     Was your backpack open or zipped up?

25   A     My backpack, while it was in the car was zipped up.

1   Q    Okay.  And your pills were in one of the pockets of the

2        backpack?

3   A    Yes.

4   Q    Okay.  Do you recall what time you were initially

5        stopped by Office LeBlanc, approximately?

6   A    It was about a quarter of 10:00.

7   Q    Okay.  And then when were you released at the jail,

8        approximately?

9   A    2:00 o'clock in the morning, the next day.

10   Q    And Officer Estes told you, at some point, that he'd

11       give you a ride home?

12   A    Yes, he did.

13   Q    Did he give you a ride home?

14   A    No, he did not.

15   Q    Did you have any money in your wallet?

16   A    Fortunately, I had $10.00, otherwise I would have had

17       to walk home.

18   Q    And that $10.00 was enough to get a cap ride?

19   A    Yeah, but I didn't know -- know at the time -- I didn't

20       know what the price of the cab was.

21   Q    And how much was that cab ride?

22   A    It was $10.00.

23   Q    Okay.  So, you just had just enough money.....

24   A    Just enough -- just enough, yes.  And I won't leave.

25       I'm afraid to leave without any cash on me in case

132

1        something similar would happen.

2    Q   When you were released at the jail, do you know what

3        part of town you were in?

4    A   No.

5    Q   Had you ever been to that jail before?

6    A   No.

7    Q   Have you been to that jail since?

8    A   No.

9            MS. BRETZ:  Okay.  That's all I've got.

10           COURT REPORTER:  Ms. Pinkel?

11           MS. PINKEL:  I don't have any other questions.

12       (Off record)

13

14

15           *  *  *   END OF PROCEEDINGS   *  *  *

16

17

18

19

20

21

22

23

24

25



**Risperdal**

| Privacy Policy | Legi |
| INFORMATION ABOUT BIPOLAR MANIA | INFORMATI SCHIZOF |

HOME | FULL U.S. PRESCRIBING INFORMATION | CONTACT RISPERDAL | search

About RISPERDAL
About Bipolar Mania
Resource Center
Medication Diary
Interactive Quiz

For Healthcare
Professionals Only ▶

# Welcome
to the Web site for RISPERDAL® (risperic

**CATIE 1**
Study Information
> Janssen, L.P. Response
> NIMH Perspective

**CATIE 2**
Study Information
> Janssen, L.P. on
CATIE 2 Results



Please Se
Important

**Important Safety Information**

**Elderly patients with dementia-related psychosis treated with atypical antipsychotic drugs are at an increased risk of death compared to placebo. RISPERDAL® (risperidone) is not approved for the treatment of patients with Dementia-Related Psychosis.**

The most common side effects that may occur with RISPERDAL, in the treatment of BIPOLAR MANIA either alone or in combination with a mood stabilizer (Valproate or Lithium) are: sleepiness, muscle stiffness, restlessness, tremor, indigestion, nausea, abnormal vision, muscle aches, dizziness, runny nose, diarrhea, increased saliva, stomach pain, and urinary incontinence. In the treatment of SCHIZOPHRENIA: anxiety, sleepiness, restlessness, tremors, and muscle stiffness; dizziness, constipation, nausea, indigestion, runny nose, rash and rapid heartbeat.

Studies suggest an increased risk of elevated blood sugar-related side effects, and sometimes potentially fatal, in patients treated with this class of medications, including RISPERDAL. Some people may need regular blood sugar testing.

You may have heard the term "tardive dyskinesia." These are potentially irreversible, uncontrollable, slow or jerky facial or body movements that can be caused by all medications of this type. If you have these symptoms, talk to your health care professional.

A rare but serious side effect that has been reported with this kind of medicine, including RISPERDAL, is known as NMS or neuroleptic malignant syndrome. NMS is characterized by muscle rigidity, fever and can be serious.

For more information, read the Important Product Information by <u>clicking here</u>.





<u>Janssen.com</u>  |  <u>Site Map</u>
© Janssen, L.P. 2000–2006. This site is published by Janssen, L.P. which is solely responsible for its contents.

This site is intended for visitors from the United States.
This page was last updated on: May 11 2006 at 16:20:22 EDT







Welcome to the SEROQUEL.com Web site.

Schizophrenia and bipolar disorder are two different mental disorders that affect millions of people in the United States. The navigation buttons above will enable you to find information about these illnesses, as well as information about the medication SEROQUEL. SEROQUEL is a psychotropic medication shown to be effective in the treatment of many symptoms of schizophrenia, as well as in the treatment of acute mania associated with bipolar I disorder.

Thank you for your interest.

*Please note that the information provided on this Web site is for educational and informational purposes only. It should not be used as a substitute for seeking professional care for the proper diagnosis and treatment of any psychiatric/medical disorder.*

**Important Safety Information**

**This is not a complete summary of safety information. Serious side effects can occur with any psychotropic medication. Please discuss the full Prescribing Information with**

your health care provider.

SEROQUEL is indicated for the treatment of acute manic episodes associated with bipolar I disorder and the treatment of schizophrenia.

**Elderly patients with dementia-related psychosis treated with atypical antipsychotic drugs are at an increased risk of death compared with placebo. SEROQUEL is not approved for the treatment of patients with dementia-related psychosis.**

A rare, but serious, side effect that has been reported with this kind of medicine, including SEROQUEL, is known as NMS or neuroleptic malignant syndrome. NMS is characterized by muscle rigidity and fever. Another serious side effect that has been reported is tardive dyskinesia (uncontrollable movements).

There have been reports of elevated blood sugar and diabetes associated with the use of SEROQUEL and other drugs in its class. If you have diabetes or possible risk factors like obesity, or if diabetes runs in your family, you should talk to your doctor about checking your blood sugar before starting SEROQUEL and throughout treatment. If you develop symptoms of elevated blood sugar or diabetes, including excessive thirst, increased urination, overeating, or weakness, contact your doctor. Complications from elevated blood sugar or diabetes can be serious and even life-threatening.

The most commonly observed side effects associated with the use of SEROQUEL in clinical studies were drowsiness, dry mouth, dizziness, constipation, weakness, abdominal pain, sudden drop in blood pressure when standing, sore throat, abnormal liver tests, upset stomach, and weight gain.

Privacy  |  Legal Information  |  US Corporate Site

**This product information is intended for US audiences only.**

231106 03/06 ©2006 AstraZeneca Pharmaceuticals LP.    All rights reserved.



AstraZeneca
life inspiring ideas



advertisement

Pyrazolopyrimidine

| Description | Clinical Pharmacology | Indication & Dosage | Side Effects & Drug Interactions | Warnings & Precautions | Overdosage Contraindications | Patient Information |

## SIDE EFFECTS

The premarketing development program for Sonata included zaleplon e)
patients and/or normal subjects from 2 different groups of studies: approxi
normal subjects in clinical pharmacology/pharmacokinetic studies; and ap
2,900 exposures from patients in placebo-controlled clinical effectivene
corresponding to approximately 450 patient exposure years. The con-
duration of treatment with Sonata varied greatly and included (in
categories) open-label and double-blind phases of studies, inpatients and
and short-term or longer-term exposure. Adverse reactions were as
collecting adverse events, results of physical examinations, vital sign
laboratory analyses, and ECGs.

Adverse events during exposure were obtained primarily by general i
recorded by clinical investigators using terminology of their own
Consequently, it is not possible to provide a meaningful estimate of the p
individuals experiencing adverse events without first grouping similar type
into a smaller number of standardized event categories. In the tables and
that follow, COSTART terminology has been used to classify reported adve

advertisement



The stated frequencies of adverse events represent the proportion of indi
experienced, at least once, a treatment-emergent adverse event of the typ
event was considered treatment-emergent if it occurred for the first time o

while receiving therapy following baseline evaluation.

## Adverse Findings Observed in Short-Term, Placebo-Controlled Trials

*Adverse Events Associated With Discontinuation of Treatment*

In premarketing placebo-controlled, parallel-group phase 2 and phase 3 cl 3.1% of 744 patients who received placebo and 3.7% of 2,149 patients wh Sonata discontinued treatment because of an adverse clinical event. This was not statistically significant. No event that resulted in discontinuation oc rate of ≥ 1%.

*Adverse Events Occurring at an Incidence of 1% or More Among Son: Treated Patients*

Table 1 enumerates the incidence of treatment-emergent adverse events f three 28-night and one 35-night placebo-controlled studies of Sonata at do: or 10 mg and 20 mg. The table includes only those events that occurred in of patients treated with Sonata 20 mg and that had a higher incidence treated with Sonata 20 mg than in placebo-treated patients.

The prescriber should be aware that these figures cannot be used to incidence of adverse events in the course of usual medical practice wh characteristics and other factors differ from those which prevailed in the cl Similarly, the cited frequencies cannot be compared with figures obtained clinical investigations involving different treatments, uses, and investigator: figures, however, do provide the prescribing physician with some basis fo the relative contribution of drug and non-drug factors to the adverse ever rate in the population studied.

**Advertisements**

**Featured Centers**
- Save on your Rx?
- Medicare Drug Benefit
- Nighttime GERD
- Bipolar Rx Info
- Migraine Therapy
- Heart Failure Device
- Epilepsy Assessment

**News From WebMD**

- Company Issues Pacemaker Malfunction Warning
- Deaths Seen With Fentanyl Narcotic Pain Patch
- FDA Reviews Adult Antidepressant-Suicide Link

| Table 1 Incidence (%) of Treatment-Emergent Adverse Events in Long-Term (28 and 35 Nights) Placebo-Controlled Clinical Trials of Sonata[1] | | | |
|---|---|---|---|
| **Body System** | Placebo | Sonata 5 mg or 10 mg | Sonata 20 mg |
| Preferred Term | (n = 344) | (n = 569) | (n = 297) |
| **Body as a whole** | | | |
| Abdominal pain | 3 | 6 | 6 |
| Asthenia | 5 | 5 | 7 |
| Headache | 35 | 30 | 42 |
| Malaise | <1 | <1 | 2 |
| Photosensitivity reaction | <1 | <1 | 1 |
| **Digestive system** | | | |
| Anorexia | <1 | <1 | 2 |
| Colitis | 0 | 0 | 1 |
| Nausea | 7 | 6 | 8 |

| Metabolic and nutritional | | | |
|---|---|---|---|
| Peripheral edema | <1 | <1 | 1 |
| **Nervous system** | | | |
| Amnesia | 1 | 2 | 4 |
| Confusion | <1 | <1 | 1 |
| Depersonalization | <1 | <1 | 2 |
| Dizziness | 7 | 7 | 9 |
| Hallucinations | <1 | <1 | 1 |
| Hypertonia | <1 | 1 | 1 |
| Hypesthesia | <1 | <1 | 2 |
| Paresthesia | 1 | 3 | 3 |
| Somnolence | 4 | 5 | 6 |
| Tremor | 1 | 2 | 2 |
| Vertigo | <1 | <1 | 1 |
| **Respiratory system** | | | |
| Epistaxis | <1 | <1 | 1 |
| **Special senses** | | | |
| Abnormal vision | <1 | <1 | 2 |
| Ear pain | 0 | <1 | 1 |
| Eye pain | 2 | 4 | 3 |
| Hyperacusis | <1 | 1 | 2 |
| Parosmia | <1 | <1 | 2 |
| **Urogenital system** | | | |
| Dysmenorrhea | 2 | 3 | 4 |

1: Events for which the incidence for Sonata 20 mg-treated patients was at least 1% and greater than the incidence among placebo-treated patients. Incidence greater than 1% has been rounded to the nearest whole number.

### Other Adverse Events Observed During the Premarketing Evaluation c

Listed below are COSTART terms that reflect treatment-emergent adverse defined in the introduction to the **ADVERSE REACTIONS** section. These e reported by patients treated with Sonata (zaleplon) at doses in a range of 20 mg/day during premarketing phase 2 and phase 3 clinical trials thro United States, Canada, and Europe, including approximately 2,900 p reported events are included except those already listed in Table 1 or el labeling, those events for which a drug cause was remote, and those even were so general as to be uninformative. It is important to emphasize that a events reported occurred during treatment with Sonata, they were not caused by it.

Exhibit B Page 139

Case 3:05-cv-00152-TMB    Document 24-5    Filed 09/01/2006    Page 39 of 43

Events are further categorized by body system and listed in order of frequency according to the following definitions: **frequent** adverse event occurring on one or more occasions in at least 1/100 patients; **infreque** events are those occurring in less than 1/100 patients but at least 1/1,00 **rare** events are those occurring in fewer than 1/1,000 patients.

***Body as a whole*** - **Frequent:** back pain, chest pain, fever; **Infrequent:** substernal, chills, face edema, generalized edema, hangover effect, neck ri

***Cardiovascular system*** - **Frequent:** migraine; **Infrequent:** angina pecto branch block, hypertension, hypotension, palpitation, syncope, t vasodilatation, ventricular extrasystoles; **Rare:** bigeminy, cerebral ischemi pericardial effusion, postural hypotension, pulmonary embolus, sinus t thrombophlebitis, ventricular tachycardia.

***Digestive system*** - **Frequent:** constipation, dry mouth, dyspepsia; eructation, esophagitis, flatulence, gastritis, gastroenteritis, gingivitis increased appetite, melena, mouth ulceration, rectal hemorrhage, stoma aphthous stomatitis, biliary pain, bruxism, cardiospasm, cheilitis, ch duodenal ulcer, dysphagia, enteritis, gum hemorrhage, increased salivatio obstruction, abnormal liver function tests, peptic ulcer, tongue discolorat edema, ulcerative stomatitis.

***Endocrine system*** - **Rare:** diabetes mellitus, goiter, hypothyroidism.

***Hemic and lymphatic system*** - **Infrequent:** anemia, ecchymosis, lympha **Rare:** eosinophilia, leukocytosis, lymphocytosis, purpura.

***Metabolic and nutritional*** - **Infrequent:** edema, gout, hypercholestere weight gain; **Rare:** bilirubinemia, hyperglycemia, hyperuricemia, hyp hypoglycemic reaction, ketosis, lactose intolerance, AST (SGOT) incre (SGPT) increased, weight loss.

***Musculoskeletal system*** - **Frequent:** arthralgia, arthritis, myalgia; arthrosis, bursitis, joint disorder (mainly swelling, stiffness, and pain), r tenosynovitis; **Rare:** myositis, osteoporosis.

***Nervous system*** - **Frequent:** anxiety, depression, nervousness, thinkin (mainly difficulty concentrating); **Infrequent:** abnormal gait, agitation, apa circumoral paresthesia, emotional lability, euphoria, hyperesthesia, hy hypotonia, incoordination, insomnia, libido decreased, neuralgia, nystag CNS stimulation, delusions, dysarthria, dystonia, facial paralysis, hostility, h myoclonus, neuropathy, psychomotor retardation, ptosis, reflexes decrease increased, sleep talking, sleep walking, slurred speech, stupor, trismus.

***Respiratory system*** - **Frequent:** bronchitis; **Infrequent:** asthma, dyspne pneumonia, snoring, voice alteration; **Rare:** apnea, hiccup, hyperventilat effusion, sputum increased.

***Skin and appendages*** - **Frequent:** pruritus, rash; **Infrequent:** acne, alope dermatitis, dry skin, eczema, maculopapular rash, skin hypertrophy, urticaria, vesiculobullous rash; **Rare:** melanosis, psoriasis, pustular discoloration.

***Special senses*** - **Frequent:** conjunctivitis, taste perversion; **Infrequent:** c

Exhibit B Page 140

eyes, photophobia, tinnitus, watery eyes; **Rare:** abnormality of acco
blepharitis, cataract specified, corneal erosion, deafness, eye hemorrhage,
labyrinthitis, retinal detachment, taste loss, visual field defect.

***Urogenital system* - Infrequent:** bladder pain, breast pain, cystitis, decre
stream, dysuria, hematuria, impotence, kidney calculus, kidney pain, m
metrorrhagia, urinary frequency, urinary incontinence, urinary urgency, vag
albuminuria, delayed menstrual period, leukorrhea, menopause, urethri
retention, vaginal hemorrhage.

**Postmarketing Reports**

Anaphylactic/anaphylactoid reactions, including severe reactions.

**DRUG ABUSE AND DEPENDENCE**

**Controlled Substance Class**

Sonata is classified as a Schedule IV controlled substance by federal regula

**Abuse, Dependence, and Tolerance**

*Abuse*

Two studies assessed the abuse liability of Sonata at doses of 25 mg, 50
mg in subjects with known histories of sedative drug abuse. The resul
studies indicate that Sonata has an abuse potential similar to benzodia
benzodiazepine-like hypnotics.

*Dependence*

The potential for developing physical dependence on Sonata and a :
withdrawal syndrome was assessed in controlled studies of 14-, 28-, ai
durations and in open-label studies of 6- and 12-month durations by exami
emergence of rebound insomnia following drug discontinuation. Some patie
those treated with 20 mg) experienced a mild rebound insomnia on the
following withdrawal that appeared to be resolved by the second night. The
Benzodiazepine Withdrawal Symptom Questionnaire and examination o
withdrawal-emergent events did not detect any other evidence for a
syndrome following abrupt discontinuation of Sonata therapy in pre-marketi

However, available data cannot provide a reliable estimate of the ir
dependence during treatment at recommended doses of Sona
sedative/hypnotics have been associated with various signs and sympton
abrupt discontinuation, ranging from mild dysphoria and insomnia to a
syndrome that may include abdominal and muscle cramps, vomiting
tremors, and convulsions. Seizures have been observed in two patients, o
had a prior seizure, in clinical trials with Sonata. Seizures and death have
following the withdrawal of zaleplon from animals at doses many times
those proposed for human use. Because individuals with a history of add
abuse of, drugs or alcohol are at risk of habituation and dependence, they
under careful surveillance when receiving Sonata or any other hypnotic.

*Tolerance*

Exhibit B Page 141

Possible <u>tolerance</u> to the <u>hypnotic</u> effects of Sonata 10 mg and 20 mg wa
by evaluating <u>time</u> to <u>sleep</u> onset for Sonata compared with <u>placebo</u> in tu
placebo-controlled studies and <u>latency</u> to persistent <u>sleep</u> in one 35-nig
controlled study where <u>tolerance</u> was evaluated on nights 29 and 30. No do
of <u>tolerance</u> to Sonata was observed for <u>time</u> to <u>sleep</u> onset over 4 weeks.

## DRUG INTERACTIONS

As with all drugs, the <u>potential</u> exists for interaction with other drugs by
mechanisms.

*CNS-Active Drugs*

*Ethanol*: Sonata 10 mg potentiated the CNS-impairing effects of <u>ethanol</u> 0
<u>balance</u> testing and <u>reaction</u> time for 1 hour after <u>ethanol</u> administration
<u>digit symbol substitution test</u> (DSST), <u>symbol</u> copying test, and the
<u>component</u> of the divided attention <u>test</u> for 2.5 hours after <u>ethanol</u> adminis
<u>potentiation</u> resulted from a <u>CNS</u> pharmacodynamic interaction; zaleplon di
the pharmacokinetics of ethanol.

*Imipramine*: Coadministration of single doses of Sonata 20 mg and imiprar
produced <u>additive</u> effects on decreased alertness and impaired p:
<u>performance</u> for 2 to 4 hours after administration. The intera
pharmacodynamic with no alteration of the pharmacokinetics of either drug.

*Paroxetine*: Coadministration of a single <u>dose</u> of Sonata 20 mg and paroxe
daily for 7 days did not produce any interaction on <u>psychomotor</u> pe
Additionally, paroxetine did not alter the pharmacokinetics of Sonata, re
<u>absence</u> of a <u>role</u> of CYP2D6 in zaleplon's metabolism.

*Thioridazine*: Coadministration of single doses of Sonata 20 mg and thio
mg produced <u>additive</u> effects on decreased alertness and impaired p:
<u>performance</u> for 2 to 4 hours after administration. The intera
pharmacodynamic with no alteration of the pharmacokinetics of either drug.

*Venlafaxine*: Coadministration of a single <u>dose</u> of zaleplon 10 mg and mu
of venlafaxine ER (extended release) 150 mg did not result in any <u>significa</u>
in the <u>pharmacokinetics</u> of either zaleplon or venlafaxine. <u>In</u> addition, the
pharmacodynamic interaction as a result of <u>coadministration</u> of za
venlafaxine ER.

*Promethazine*: Coadministration of a single <u>dose</u> of zaleplon and prome
and 25 mg, respectively) resulted in a 15% decrease in maxin
concentrations of zaleplon, but no change in the <u>area</u> under the <u>plasma</u> cor
time curve. However, the <u>pharmacodynamics</u> of coadministration of za
promethazine have not been evaluated. Caution should be exercised wh
agents are coadministered.

*Drugs That Induce CYP3A4*

*Rifampin*: <u>CYP3A4</u> is ordinarily a <u>minor</u> metabolizing <u>enzyme</u> of zaleplo
dose <u>administration</u> of the <u>potent</u> CYP3A4 inducer <u>rifampin</u> (600 mg ever
q24h, for 14 days), however, reduced zaleplon $C_{max}$ and AUC by approxin
The <u>coadministration</u> of a potent <u>CYP3A4</u> <u>enzyme</u> inducer, although nc

Case 3:05-cv-00152-TMB    Document 24-5    Filed 09/01/2006    Page 42 of 43

safety concern, thus could lead to ineffectiveness of zaleplon. An altern CYP3A4 substrate hypnotic agent may be considered in patients takin inducers such as rifampin, phenytoin, carbamazepine, and phenobarbital.

*Drugs That Inhibit CYP3A4*

CYP3A4 is a minor metabolic pathway for the elimination of zaleplon becau of desethylzaleplon (formed via CYP3A4 in vitro) and its metaboli desethylzaleplon and 5-oxo-desethylzaleplon glucuronide, account for only urinary recovery of a zaleplon dose. Coadministration of single, oral doses with erythromycin (10 mg and 800 mg, respectively), a strong, selectiv inhibitor produced a 34% increase in zaleplon's maximal plasma concentra 20% increase in the area under the plasma concentration-time curve. The of interaction with multiple doses of erythromycin is unknown. Other stror CYP3A4 inhibitors such as ketoconazole can also be expected to in exposure of zaleplon. A routine dosage adjustment of zaleplon is not necessary.

*Drugs That Inhibit Aldehyde Oxidase*

The aldehyde oxidase enzyme system is less well studied than the cytoch enzyme system.

*Diphenhydramine*: Diphenhydramine is reported to be a weak inhibitor c oxidase in rat liver, but its inhibitory effects in human liver are not known. pharmacokinetic interaction between zaleplon and diphenhydramine fo administration of a single dose (10 mg and 50 mg, respectively) of However, because both of these compounds have CNS effects, a pharmacodynamic effect is possible.

*Drugs That Inhibit Both Aldehyde Oxidase and CYP3A4*

Cimetidine: Cimetidine inhibits both aldehyde oxidase (in vitro) and CYP3 and in vivo), the primary and secondary enzymes, respectively, resp zaleplon metabolism. Concomitant administration of Sonata (10 mg) and (800 mg) produced an 85% increase in the mean $C_{max}$ and AUC of zaleplc dose of 5 mg should be given to patients who are concomitantly being t cimetidine (see **DOSAGE AND ADMINISTRATION**).

*Drugs Highly Bound to Plasma Protein*

Zaleplon is not highly bound to plasma proteins (fraction bound 60%±15%) the disposition of zaleplon is not expected to be sensitive to alterations binding. In addition, administration of Sonata to a patient taking another highly protein bound should not cause transient increase in free concentra other drug.

*Drugs with a Narrow Therapeutic Index*

*Digoxin*: Sonata (10 mg) did not affect the pharmacokinetic or pharma profile of digoxin (0.375 mg q24h for 8 days).

*Warfarin*: Multiple oral doses of Sonata (20 mg q24h for 13 days) did nc pharmacokinetics of warfarin (R+)- or (S-)-enantiomers or the pharmac

(prothrombin time) following a single 25-mg oral dose of warfarin.

*Drugs That Alter Renal Excretion*

*Ibuprofen*: Ibuprofen is known to affect renal function and, consequentl
renal excretion of other drugs. There was no apparent pharmacokinetic
between zaleplon and ibuprofen following single dose administration (10 r
mg, respectively) of each drug. This was expected because zaleplon
metabolized and renal excretion of unchanged zaleplon accounts for less
the administered dose.

This Page Last Updated 12/08/2004

**Return to Top** ●    **Search Medical Dictionary** ●    **FAQ/Patient Monograph** ●

RxList Home    Contact RxList    About RxList    Terms & Policies    Privacy Policy

WebMD®    |    Medscape®    |    eMedicineHealth®    |    MedicineNet®

Copyright © 2006 by RxList Inc.