1                 IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF ALASKA

3
   VIRGINIA DUFFY,                      )
4                                       )
                      Plaintiff,        )
5                                       )
   vs.                                  )
6                                       )
   MUNICIPALITY OF ANCHORAGE,           )
7  ROY LEBLANC, individually and   in )
   his capacity as a police officer    )
8  for the Municipality of Anchorage, )
   and JAMES ESTES, individually and   )
9  in his capacity as a police officer)
   for the Municipality of Anchorage   )
10                                      )
                      Defendants.       )
11 _____)
   Case No. A05-0152 CV (RRB)
12

13              DEPOSITION OF OFFICER JAMES ESTES
                      July 26, 2006
14

15 APPEARANCES:

16

17      FOR PLAINTIFF:           MS. KAREN E. BRETZ
                                 Attorney at Law
18                               P.O. Box 91457
                                 Anchorage, Alaska   99509
19                               (907) 277-5847

20

21      FOR DEFENDANTS:          MS. MARY B. PINKEL
                                 Assistant Municipal Attorney
22                               Municipality of Anchorage
                                 632 W. Sixth Avenue
23                               Suite 730
                                 Anchorage, Alaska   99501
24                               (907) 343-4545

25
                              *  *  *  *

                     *M E T R O   C O U R T   R E P O R T I N G*
                        *745 West Fourth Avenue, Suite 425*
                           *Anchorage, Alaska 99501*
                              *(907) 276-3876*
                     Exhibit D Page 1



1

2            PURSUANT TO NOTICE, the Deposition of **OFFICER JAMES ESTES**

3    was taken on behalf of Plaintiff, before Maureen Green, Notary

4    Public in and for the State of Alaska and Reporter for Metro

5    Court Reporting, at the Municipality of Anchorage, Department of

6    Law, 632 W. Sixth Avenue, Suite 730, Anchorage, Alaska, on the

7    26th day of July 2006 commencing at the hour of 10:00 o'clock

8    a.m.

9

10                              *  *  *  *

11

12                         **TABLE OF CONTENTS**

13

Direct Examination by Ms. Bretz  . . . . . . . . . . .  4
Cross Examination by Ms. Pinkel  . . . . . . . . . . .  28

15

16   **EXHIBITS**

1 - Arrest Report dated March 23, 2003 . . . . . . . .  27

18                              *  *  *  *

19

20

21

22

23

24

25

1                            **P R O C E E D I N G S**

2        (On record)

3              COURT REPORTER:  Good morning, my name is Maureen Green

4    and I'm a court reporter for Metro Court Reporting, 745 West

5    Fourth Avenue, Suite 425, Anchorage, Alaska.  Today's date is

6    July 26th, 2006.  We are at the Municipality of Anchorage, 632

7    West Sixth Avenue, Anchorage, Alaska 99501 for the deposition of

8    James Estes in the United States District Court for the District

9    of Alaska, <u>Virginia Duffy, Plaintiff vs. Municipality of</u>

10   <u>Anchorage, Roy LeBlanc, individually and in his capacity as a</u>

11   <u>police officer for the Municipality of Anchorage, and James</u>

12   <u>Estes, individually and in his capacity as a police officer for</u>

13   <u>the Municipality of Anchorage, Defendants</u>, Case Number A05-0152

14   CV (RRB).

15       Before I swear in the witness could I have counsel identify

16   themselves and who they represent?

17             MS. BRETZ:  Karen Bretz, B-r-e-t-z, for Virginia Duffy.

18             MS. PINKEL:  Mary Pinkel, for James Estes, Roy LeBlanc

19   and the Municipality of Anchorage.

20             COURT REPORTER:  Thank you.  Please raise your right

21   hand.

22       (Oath administered)

23             OFFICER ESTES:  I do.

24

25                        **OFFICER JAMES ESTES**

1  having first been duly sworn under oath, testified as follows on

2  examination:

3        COURT REPORTER:  Please state your full name, spelling

4  your last, sir.

5  A    James Estes, E-s-t-e-s.

6        COURT REPORTER:  And your mailing address please?

7  A    Can I just give my department address?  4501 South Bragaw,

8        Anchorage, Alaska 99508.

9        COURT REPORTER:  And your telephone number please.

10 A    786-8572.

11       COURT REPORTER:  Thank you.  You may proceed.

12                    **DIRECT EXAMINATION**

13 **BY MS. BRETZ:**

14 Q    Good morning.   Have you ever sat through a deposition

15      before?

16 A    I don't believe so.

17 Q    Well, I'm sure that Ms. Pinkel told you that the MO is that

18      I basically ask you questions and it's a discovery process,

19      we're just trying to figure out what happened that evening.

20 A    Uh-hum.

21 Q    And if you don't understand a question or you can't hear

22      it, please ask me to repeat it.

23 A    Okay.

24 Q    And the court reporter will remind you too if you answer a

25      question with a nod of the head or some other type of

1        movement; you'll have to speak, it doesn't register.

2  A    Okay.

3  Q    Body movements don't register here.  But anyway, just

4        getting into here.  You were an APD Officer on March 24th,

5        2003?

6  A    I believe it was on this incident, yes on that day as well,

7        Anchorage Police Officer.

8  Q    What was your assignment then?

9  A    On that time I was assigned to patrol.  My location or the

10       shift I was working was swing shift, which is, I believe,

11       at that time I think they were still from 1500, which is

12       3:00 o'clock in the afternoon to 0100 hours in the morning.

13  Q    Okay.  What's your assignment now?

14  A    I'm back in the detective -- back in the burglary section

15       department.

16  Q    And then how long have you worked for APD?

17  A    I got hired in June of 1999, so seven years.

18  Q    You had contact with Virginia Duffy on March 24th, 2003?

19  A    Yes.

20  Q    Could you just describe in your own words what happened

21       that evening?

22        MS. PINKEL:  Can I just -- I've got -- it's sort of an

23  objection.  I think this case -- this actually took place maybe

24  March 23rd.....

25        MS. BRETZ:  Oh.

1          MS. PINKEL: .....2003 into March 24th, 2003.

2          MS. BRETZ:  Yeah, right.  You're right.  March 23rd,

3     2003 spilling over into March 24th.

4     Q    (By Ms. Bretz)  Could you just describe what happened that

5          evening?

6     A    That evening I was working, again, swing shift hours.

7          Patrol officer -- Officer LeBlanc, at that time who is now

8          Sergeant LeBlanc had made a traffic stop.  He had indicated

9          that he needed another officer to respond to his area,

10         which was me, for a DUI.  When I arrived he had already had

11         the -- Ms. Duffy under arrest.  She was in the back of his

12         vehicle.  He kind of gave me a quick scenario of what had

13         happened and asked me to take over the DUI processing for

14         that incident and also the impound of the vehicle.  I

15         requested a tow truck for her vehicle, took custody of her,

16         and then after we were done, him finishing telling me what

17         was going on, and I had Ms. Duffy in my custody I

18         transported her to the Seely Substation which is off of

19         Spenard and McRae for the DUI processing portion.  At the

20         DUI processing portion, started the 15 minute observation

21         period.  Prior to doing so you ask, you know, is your mouth

22         cleared -- should do the checks that are required.  While

23         the 15 minute observation period goes on, you know,

24         basically if you're not familiar where the, you know, where

25         we conduct the 15 minute observation period, it's basically

1  a desk.  There's the data master right next to the desk is

2  where the defendant, at this time Ms. Duffy had -- was

3  sitting.  And so basically, you know, we're several feet

4  from the defendant.  Start doing paperwork because during

5  that 15 minute observation period, utilize time and once

6  the 15 minute observation period was done, and instructed

7  her to provide a sample, which was triple zeros.  During my

8  contact with her she had indicated that she had not been

9  drinking, which I had told her I believed her and asked how

10  she could prove that she wasn't on anything.  Indicated

11  that there's a blood test once I read her the implied

12  consent law or the independent -- right to independent

13  chemical test, I'm sorry.  She elected to have that done at

14  Municipal expense.  After we were done with all of the

15  required forms at the Seely Substation I then transported

16  her to the -- I believe at that time Alaska Regional is who

17  had the contract, ARH.  There, basically you go in, you --

18  they have you go to one of the back little rooms and the

19  person who comes for the blood draw comes and takes the

20  blood.  After that, because of the scenario as far as -- I

21  used the bail schedule, which is a form that we have

22  available as patrol officers that actually set -- use to

23  determine bail whether or not they use a magistrate or if

24  it falls under the guidelines of being able to use a bail

25  schedule.  I was able to use the bail schedule and

1    basically used it where she was at $250.00 unsecured.

2    After that paperwork was filled out and we were done at

3    ARH, I transported her over to the jail where she was

4    basically just processed.  You know, she had to sign some

5    form there and she was processed and I believe released

6    shortly later.

7  Q    What time did you get called?

8  A    According to my report it says 2200 hours.

9  Q    Do you recall what time it was that you dropped her off at

10    the jail?

11  A    If I can look at the CAD notes, which is going to be page

12    27 of this thing I have, it looks like -- unfortunately

13    there's a hole punch on the last page, which is page 28 and

14    you see zero then don't see two numbers then a 108 and then

15    the next line down says 0032 so anywhere from between,

16    basically midnight to 12:30 in the morning.  But

17    unfortunately I can't read that on this printout so I don't

18    have the exact time, but basically sometime aft- -- shortly

19    after midnight.

20        MS. PINKEL:  Just for the record Karen we could

21    probably -- he's looking from a copy as am I.  Maybe in our

22    original disclosures it would have a better printout of that.....

23        MS. BRETZ:  Okay.

24        MS. PINKEL:  .....CAD.

25  A    And that's going to be -- it's basically the first one

1      down, the first line of that --

2          MS. PINKEL:  First line on 00028?

3  A   It's right here.  It says at -- basically the first line

4      that says ten, seven, twenty-five, Charlie, One ending mile

5      9.3.

6          MS. BRETZ:  Okay.

7  Q   (By Ms. Bretz)  Were there any other officers there except

8      for you and Sergeant LeBlanc?

9  A   Just me and Officer LeBlanc at that time.

10         MS. PINKEL:  I'm going to just object to that question.

11  What do you mean by when you say there?  Are you talking about

12  the jail or at the scene where he arrived?

13         MS. BRETZ:  At the scene.

14         MS. PINKEL:  So, it was just.....

15  A   It was just -- at the scene where he had conducted the

16      traffic stop it was just me and Officer LeBlanc.

17  Q   (By Ms. Bretz)  Okay.  And you said that when you first saw

18      Ms. Duffy she was in the back of Officer LeBlanc's car?

19  A   Yes.

20  Q   Was she in handcuffs at that time?

21  A   Yes, she was already in custody, which is -- in handcuffs

22      in the back of the car.

23  Q   What was her general demeanor?

24  A   I mean -- throughout?

25         MS. PINKEL:  Object to the form.

1  Q  (By Ms. Bretz)   What was her general demeanor when you
2     first saw her in the back of the car?
3  A  I mean she wasn't -- if you're asking if she was mad or
4     upset, she was pretty up- --
5        MS. PINKEL:   Jimmy, you might want to ask her to
6  clarify what she means by demeanor.
7  Q  (By Ms. Bretz)   Well, did she -- was she sitting up right,
8     was she hunched over, did she look sad?
9  A  You know I -- I know that I don't remember when I walked up
10    in the car how she was, I mean, this happened three years
11    ago.
12 Q  Sure.
13 A  You know, at that point nothing sticks out to me in my
14    recollection or my report that she was highly volatile or
15    anything like that or, you know, or aggressive or anything
16    like that so --
17 Q  You said there's nothing in your report saying that she was
18    volatile or aggressive?
19 A  Yeah and there's nothing in my memory either.
20 Q  Okay.   So, you don't remember her shouting at you or
21    Officer LeBlanc?
22 A  No.
23 Q  Do you recall smelling any alcohol on her breath?
24    (No audible response)
25        COURT REPORTER:   I didn't get a verbal on that.

1  A    Oh, no.  I'm sorry, the last question was no.  Sorry,

2       repeat your other question.

3  Q    Do you recall smelling any alcohol on her breath during

4       this whole time?

5  A    No.

6  Q    Was she pretty compliant with what you asked her to do?

7  A    Yes.

8  Q    You said that when she told you that she hadn't been

9       drinking that you believed her, why is that?

10  A    Generally, when you -- in cases where you arrest somebody

11       for DUI there's two different categories.  There's one

12       where you know alcohol is on board, you got the odor,

13       everything else, and there's other categories, which it

14       falls under the DUI law that also is impaired by a

15       controlled substance.  You know, when she was in the back

16       of my vehicle which is an enclosed area, you know,

17       generally if somebody's going to have alcohol on board

18       you're going to start, in most cases, start having an odor

19       of alcohol during that time frame.  And I don't -- I didn't

20       annotate nor do I remember any smelling of any alcohol on

21       her so that's the reason I told her I believed she did not

22       have any alcohol on board.

23  Q    Did you believe that she was under the influence of drugs?

24  A    There is nothing in my contact with her that would have

25       made me second guess Officer LeBlanc's decisions.  You

1      know, there's things through the night that confirm that

2      something was going on, however, I wasn't the person that

3      did all the observations of the traffic violation and the

4      pro- -- the actual field sobriety.  But through the night

5      there was nothing that made me second guess Officer

6      LeBlanc's decisions.

7 Q    So, are you saying that you believed -- well, are you

8      saying that everything that Officer LeBlanc told you, you

9      believed to be true based on your observations of Ms. Duffy

10     or because of your prior workings with Officer LeBlanc?

11 A    What I'm saying is the fact that I can't sit there and

12     speak for what Officer LeBlanc had seen other than the fact

13     of what he had -- had told me.  But, the night that I had

14     contact with her because she was very, in my report I put

15     lethargic, kind of slow, and also the fact that she had

16     mentioned that there was microscopic cuts, you know, afraid

17     of microscopic cuts.  When, you know, the handcuffs, you

18     know, they go on your wrist or you know, they generally --

19     they don't -- don't cut the general public.  They're a

20     smooth surface and the fact that she didn't believe that

21     where I was taking her to the Seely Substation which all

22     reflects that something was going on -- that something

23     wasn't quite right with her.  However, again I didn't see

24     her -- her driving behavior, nor did I do the standard

25     field sobriety test other than the fact that those

1    observations that I had with her confirm that something was

2    going on.

3  Q    Okay.  Ms. Duffy is an older woman and.....

4         MS.  PINKEL:    I'm  going  to  object  to  that

5  characterization.  She was only -- and maybe I'm being overly

6  sensitive of that age, but she was only in her early 50s when

7  this occurred.

8         MS. BRETZ:  Well, okay.

9         MS. PINKEL:  I believe her birth date is 1-20-50 and

10  this happened in 2003, so she was only 53 years old.

11         MS. BRETZ:  Okay.

12  Q    (By Ms. Bretz)  You had run a background check on Ms. Duffy

13       at some point?

14  A    I believe before determining the bail schedule because you

15       have  to  know  priors  and  I'm  assuming  that  it's  not

16       annotated in her but because I did the bail schedule I'm

17       assuming that I did.

18  Q    Were you aware of her criminal history at some time prior

19       to running it for the bail schedule?

20  A    I'm not sure; I don't believe so.  I think that -- I don't

21       know if Sergeant LeBlanc had or Officer LeBlanc had done

22       that prior to me arriving and him telling me that or if I

23       had found out her priors prior to using the bail schedule.

24  Q    Well, if -- hypothetically, if a person is maybe in her

25       early 50s, female, and doesn't have much experience or run

1    ins with the police would the -- would Ms. Duffy's behavior

2    that evening seem to be signs of something else going on as

3    you put it?

4            MS. PINKEL:    I'm going to object to the form and

5    foundation and also, compound question.

6            MS. BRETZ:    Okay, let me clarify it.

7    Q    (By Ms. Bretz)    Ms. Duffy's in her early 50s, female,

8        doesn't have many run ins with the police -- not -- doesn't

9        have much experience with the police.

10   A    Uh-huh (affirmative).

11   Q    Would the behavior that she exhibited that night seem to be

12       consistent having that background?

13           MS. PINKEL:    Object to the form of the question.

14           MS. BRETZ:    I don't know what else I can do.

15           MS. PINKEL:    Okay.    He's already testified that what

16   he observed was consistent with what Officer LeBlanc told him.

17   So now, you're asking him to speculate about a situation that

18   wasn't even in existence.

19           MS. BRETZ:    I'm speaking about a hypothetical person.

20   A person in her early 50s, female, doesn't have much experience

21   of the police.    Would the behavior that you said that Ms. Duffy -

22   - that -- the behavior that Ms. Duffy was showing that night seem

23   to be inconsistent with that type of person?

24           MS. PINKEL:    I'm going to, again, object to the form

25   of the question and you're posing a hypothetical situation that's

1    not even in existence here, Karen.

2         MS. BRETZ:   But, I can pose hypothetical situations.

3    It's always done in depositions.

4         MS. PINKEL:   Well, it -- this is totally inconsistent

5    with the facts here.   If Jim can answer the question to the best

6    of his knowledge, but I'm going to object to the question.

7         MS. BRETZ:   Okay.

8    A    You know, generally, you know, a -- you know, through my

9         contact with a person, a person in their 50s, you know from

10        my experience that A being nervous, that A you're already

11        under arrest, doesn't bring out paranoias, you know, the

12        disbelief of where are you taking me.   You know, most

13        people though regardless if you're under arrest or not my

14        experience is that there's the trust that we're all

15        instilled as a little child unless there's traumatic things

16        that, you know, generally a law enforcement officer is

17        going to be truthful and everything else.   And most people,

18        in my experience, don't really question the fact, you know,

19        hey where are you taking me, Seely Substation, well no

20        you're not taking there.   You know, paranoia isn't really

21        induced, you know, regardless of the age unless there's

22        something going on either mentally or on board controlled

23        substance wise or alcohol.   The other thing too is that,

24        you know, the fact of her thinking that there's, you know,

25        microscopic cuts on her wrists from the handcuffs.   Again,

1   you know, I've dealt with people from, you know, juveniles

2   all the way up well past her age and again those are not

3   normal signs.  You know, just because you've never had

4   contact with the police or whatever else, those areas

5   normally don't come out in a normal person or somebody

6   that, you know, either doesn't have something on board or

7   doesn't have a reason to articulate why those thought

8   processes are there.

9   Q   (By Ms. Bretz)   You've had handcuffs on before, haven't

10  you?

11  A   Yes.

12  Q   And they cut into your skin, don't they?

13  A   No.

14  Q   They don't?

15  A   Well, I've never had actual handcuffs where I'm bleeding or

16  anything else.  Now, if you want to go -- I can't answer

17  the fact of, you know, anytime you put clothing on, you

18  know, skin cells are transferred.  Now, depends on

19  what.....

20  Q   Yeah, right, but we're not talking about clothing, we're

21  talking about metal handcuffs with sharp edges.

22  A   Okay, okay.  Define cutting, I guess I would have to say.

23  Q   You feel like your wrists are pinched.  You feel like

24  they're pinching into your skin.  Isn't that a fair accur-

25  -- fair and accurate description of what they feel like?

1  A    No.

2  Q    No.  Did Ms. Duffy ask you to loosen up the handcuffs?

3  A    I'm, you know, can't remember.

4  Q    Do -- so you're saying that to the best of your knowledge

5       handcuffs don't pinch people's skin?

6  A    No, you said cut.  There's a difference between a pinch and

7       cut.

8          MS. PINKEL:  Why don't you rephrase the question.  What

9  are you trying to ask him?

10         MS. BRETZ:  I'll just skip over that.

11 Q    (By Ms. Bretz)  Did Ms. Duffy seem to be frightened to you?

12 A    You know I don't think -- I can't remember what her actual

13      state of mind was at that time.  This was something that

14      happened three years ago, so --

15 Q    Did you ever tell her that you'd give her a ride home from

16      the jail?

17 A    I don't remember that.

18 Q    Did you ask her whether she had been taking any kind of

19      drugs?

20 A    I don't remember that.

21 Q    Did she volunteer?

22 A    I can't remember.  Let me refer to my notes real quick to

23      see if there's anything in there, but I don't believe there

24      is.

25      (Pause - reviewing documents)

1  A   Nope, I don't remember.

2  Q   Is it part of your training to ask defendants suspected of

3      DUI whether they've been drinking?

4  A   That was all covered generally under the initial stop of

5      the officer.

6  Q   Is it part of your training though, to ask?

7          MS. PINKEL:   I'm going to object to the form of the

8  question.   He's already said that Officer LeBlanc already did a

9  field sobriety test and an interview.

10         MS. BRETZ:   It's a different question.

11 Q   (By Ms. Bretz)   I'm asking if it's part of your training to

12     ask DUI offenders whether they've been drinking?

13 A   At which point of the contact.

14 Q   At any point of the contact.

15 A   Generally, the normal thing is that if a traffic stop is

16     made and you think that there's something going on at that

17     time, you know, you ask have you been drinking, you know,

18     okay, if not, what else is going on?   You know, generally

19     during this observation period, which I believe that you're

20     referring to and I mean, generally there's a form that goes

21     on later, which is the Miranda form at that point that you

22     can read that answers those questions if at that point they

23     want to answer them.

24 Q   How about, is it part of your training to ask during the

25     initial contact to a person who's suspected of DUI, have

1    you been drinking?

2  A    Our training is that if you believe that alcohol is on

3       board then yes that would be a standard question.

4  Q    Is it part of your training to ask during the initial stop

5       whether a person's been taking any drugs?

6  A    It's common to ask questions that if you believe that

7       you're stopping somebody for DUI, whether it's alcohol or

8       if it's a controlled substance to either confirm or deny

9       your suspicions and you do that through asking questions.

10 Q    You don't recall this evening whether there was any

11      conversations between you and Ms. Duffy about use of drugs?

12 A    I don't remember.

13      MS. PINKEL: Again, I'm going to object to that because

14 as he already said his position here was to process and that

15 Officer LeBlanc had already conducted the initial stop and

16 arrest.

17      MS. BRETZ: Right, but they sat in the same room for

18 15 minutes and he transported her around so --

19 Q    (By Ms. Bretz)   I mean surely you guys talked about

20      something, right?

21 A    Some people talk, some people don't.

22 Q    Yeah.

23 A    And I don't pay attention or remember every conversation

24      that is held.

25 Q    Sure.  Going back a little bit, what did Officer LeBlanc

1       tell you had happened when you first arrived on the scene?

2   A   You know, I can't remember exactly what he had told me

3       other than the fact that generally it's a breakdown of his

4       observations. You know, I don't put what he had told me in

5       my report. You know, I can refer to his note and say, you

6       know, this is the gist of what he had told me, but

7       basically he gives me a snapshot of what transpired for

8       purposes of the bail sch- -- bail hearing, if there is one

9       at that time or, you know, if I use the bail schedule

10      that's not needed.

11  Q   Okay. Well, let's see, looking at your report there's a --

12      right, this page or the handwritten page.....

13  A   Yeah.

14  Q   .....it says towards the bottom: On 3-23-03 at about, it's

15      blank hours, the above vehicle was stopped by Officer

16      LeBlanc for swerving in and out of it lane. He contacted

17      the driver, et cetera, et cetera. So, according to your

18      report Officer LeBlanc stopped Ms. Duffy for swerving in

19      and out of the lane?

20  A   I believe that's one thing. Again, you know this is just

21      used, a condensed version of -- a snapshot of what

22      happened. It doesn't say what all happened. It's just a

23      snapshot because there's only that little bit of lines for

24      that so it's basically a quick synopsis. It doesn't cover

25      everything that he did, nor does it cover everything that

1      I did.

2  Q    Okay.

3          MS. PINKEL:  Why don't you -- Karen, you're asking him

4  about what he wrote down and he also, it looks like he reported

5  that LeBlanc told him that Duffy's speech was slow and that he

6  had conducted the SFST, which she failed.  So, he's -- there's

7  also further conversation, not just the fact that she was in and

8  out of her lane, but also that she failed the SFST.

9          MS. BRETZ:  Right, I'm not asking to go through the

10  whole report.

11         MS. PINKEL:  Okay.

12  Q   (By Ms. Bretz)   Was Ms. Duffy cited for anything else

13      besides DUI?

14  A   No, just the DUI.

15  Q   Her driver's license was valid at that time?

16  A   I believe so because if it was suspended or didn't have one

17      then, you know, if it was suspended she would have been

18      charged with driving with a suspended license.

19  Q   To the best of your knowledge she was able to produce

20      registration and proof of insurance also?

21  A   Again, I -- that would have to be a question to ask Officer

22      LeBlanc.

23  Q   Did Ms. Duffy say anything to you during this whole time

24      about having had a stroke or being disabled?

25  A   I don't remember.

1         MS. PINKEL:  Is that yes or a no?

2  A  I'm sorry, I don't recall.

3  Q  And then at some point Ms. Duffy's car was searched also?

4  A  I believe, according to Officer LeBlanc's report, she had

5     requested for her bag to be with her, so he had gone and

6     got his -- her bag or bags.

7  Q  Was the rest of the car searched?

8  A  Not to my knowledge.

9  Q  And then before giving her her bags, you searched them?

10  A  Officer LeBlanc, at that time, did.

11  Q  So, did you participate in the search of her bag?

12  A  Not that -- not that I recall.  Normally, it's just the one

13     officer.  It doesn't take two of us.

14  Q  So, what were you doing during the time that Officer Estes

15     -- I mean, sorry -- Officer LeBlanc was going through her

16     bags?

17  A  You know, I could have been filling out the impound form

18     for the vehicle.  I could have been, you know, watching the

19     defendant who we're responsible for to make sure, you know,

20     back by the vehicle wherever she was at.  You know, I could

21     have been doing numerous things.

22  Q  Why did, if you know, if you could please answer, do you

23     know why Officer LeBlanc searched her bag?

24  A  You'd have to ask --

25  Q  Do you recall Ms. Duffy giving either one of you permission

1      to go through her bags?

2  A   I don't remember.

3  Q   And then Ms. Duffy was transported.    Well, shortly

4      thereafter, I guess after the search of the bag Ms. Duffy

5      was transported to the Seely Substation?

6  A   Correct.

7  Q   By you?

8  A   Yes.

9  Q   Does the front of it say Seely Substation?

10 A   There, I believe, is a sign out front and I believe

11     lettering on the window, but it's been a while since I've

12     been there.

13 Q   There are numerous substations in the city, aren't there?

14 A   Several.

15 Q   Do you know how many there are?

16 A   No.

17 Q   Are you aware of whether the other substations have signs

18     out front identifying what they are?

19         MS. PINKEL:  I'm going to object.  What's the relevance

20 of whether there's a sign on a substation?

21         MS. BRETZ:  You still have to answer the question.

22 A   Normally there's some type of marking, I believe, that

23     distinguishes them that they're substations, whether it's

24     a sign or writing on the -- the window.

25 Q   (By Ms. Bretz)   Do you recall whether Ms. Duffy had any

1        problems walking?    Was she stumbling, tripping over

2        herself?

3   A    I don't remember.  Nothing stood out.

4   Q    Is it fair to say that if something stood out you would

5        have put it in your report?

6   A    Yeah.  That's a yes, sorry.

7   Q    Okay.  Ms. Duffy had asked for the independent blood draw

8        and then you transported her to Regional Hospital, right?

9   A    Correct.

10  Q    Did you transport her in the same car that you had brought

11       her to the Seely Substation in?

12  A    Yes.

13  Q    Are you aware of what the results of the blood draw were?

14  A    No.  If you look at the lab thing I believe that -- I'm

15       going to look here -- look -- all it says is legal blood.

16       I'm not sure exactly what the Alaska Regional Outpatient

17       Report, it just says legal blood and there's nothing on

18       there and that's document 20 on this packet I have.

19  Q    Sure.

20  A    And it's titled Alaska Regional Hospital.

21  Q    Okay.  Are you aware of whether there were any 911 calls

22       made regarding Ms. Duffy's driving?

23          MS. PINKEL:  I'm going to object as to the relevance

24  and also the form.  You can answer the question, if you know.

25  A    I don't know.  You'd have to look at the CAD call.

1  Q    I think those are all the questions I have regarding what

2       happened that evening.    I've just got some general

3       questions for you also.   Have you ever been the subject of

4       any civilian complaints?

5            MS. PINKEL:   I'm going to object as to the relevance

6  of this question and in addition that violates the Anchorage

7  Municipal Code because you're asking for confidential personnel

8  information.

9            MS. BRETZ:   You still have to answer.

10           MS. PINKEL:   I don't think you can ask these questions

11  and maybe we should just go off record to see how we want to

12  resolve that, Karen.   Like I said, I think this violates the

13  Anchorage Municipal Code for you to even be asking these

14  questions.   So unless you have some.....

15           MS. BRETZ:   I'm violating Municipal Code by asking him

16  a question?

17           MS. PINKEL:   About confidential personnel information.

18           MS. BRETZ:   So, what's he going to do, arrest me right

19  now?

20           MS. PINKEL:   No, what I'm telling you is that this

21  -- you're asking for information that you're not entitled to of

22  him and it's in violation of our personnel policies and of our

23  Code.

24           MS. BRETZ:   Well, I can't violate your personnel

25  policies.

1    MS. PINKEL: Well, yet by requesting that information

2  when you're not entitled to it -- yes, you are. So, we can talk

3  about how we want to resolve it, but I don't think you're

4  entitled to ask that question.

5    MS. BRETZ: Okay, can we go off record?

6    (Off record)

7    (On record)

8  Q    (By Ms. Bretz)  What's your middle initial?

9  A    F.

10 Q    F as in --

11 A    Fred or Frank or Friday.

12 Q    What's your date of birth?

13 A    12-13-72.

14 Q    Have you ever received any kind of psychological

15    counseling?

16    MS. PINKEL: I'm going to object as to the relevance

17 of this question and in addition this question may go, and I

18 don't know this for a fact, but if there is anything -- anything

19 like this in his personnel files, that this could violate his

20 HIPPA medical rights and also his personal privacy and the

21 Municipal Code with respect to confidential personnel files.

22    MS. BRETZ: Okay, I'll just skip it. I don't have

23 anything else.

24 A    Okay.

25    COURT REPORTER: Off record.....

1    MS. PINKEL:  Oh, no, excuse me.  I have a few questions

2  I just wanted to clarify with him.  Did you want to take a break

3  first or --

4    MS. BRETZ:  Yeah, I need to refill on water.

5    (Off record)

6    (On record)

7    MS. PINKEL:  I think Karen wanted to enter Jim's report

8  as an exhibit?

9    MS. BRETZ:  Right, I think I'm going to enter this part

10  of the report.  It's actually the City's Bates Numbers three,

11  four and five.

12    MS. PINKEL:  And that's Jim's actual arrest report.

13    MS. BRETZ:  Right.

14  A    The remand sheet and then page one and two of my typed

15      report?

16  Q    This written sheet's called a remand.....

17  A    It's called remand -- remand sheet.....

18  Q    Okay, yes.

19  A    .....or arrest report and narrative, page one and two.

20  Q    Yes.

21    MS. PINKEL:  Are you going to do his intake and

22  disposition number, which is Bates Number two?

23    MS. BRETZ:  No.

24                              **(Deposition Exhibit 1 marked)**

25                          <u>**CROSS EXAMINATION**</u>

1   BY MS. PINKEL:

2   Q   Jim, I just wanted to really quick follow-up here.  Now Ms.

3       Bretz had asked you about your actions after you went and

4       took custody of Ms. Duffy to process her?

5   A   Correct.

6   Q   And you indicated that, and let me just clarify, the

7       behavior that you observed was sort of confirmed what

8       LeBlanc had told you which was that he thought she was

9       under the influence of some type of prescription

10      medication, correct?

11  A   Right.  That basically confirmed that she was impaired by

12      something.  Whether it was, without doing all of the tests

13      and observations, that something was impairing her, whether

14      it was, you know, medication wise or psychologically,

15      which, you know, but something was impairing her and I had

16      no reason to doubt that Of- -- Officer LeBlanc's

17      observations and everything else concluded that there was

18      probably something on board that evening.

19  Q   And you mean something on board that you mean that she had

20      ingested.....

21  A   Some type of controlled substance.  You know, whether it

22      was medication for numerous different types of ailments or

23      whatever it was, something was going on with her that

24      confirmed the fact that, you know, what Officer LeBlanc had

25      told me.

1          MS. PINKEL:   Okay.   I have no further questions.

2          MS. BRETZ:   Okay, I don't either.

3     (Off record)

4               * * * END OF PROCEEDINGS * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25