Mary B. Pinkel
Assistant Municipal Attorney
Municipality of Anchorage Department of Law
Civil Division
P.O. Box 196650
Anchorage, Alaska 99519-6650
(907) 343-4545 (phone)
(907) 343-4550 (fax)
uslit@muni.org

Attorney for Defendants Municipality of Anchorage,
Sergeant Roy LeBlanc and Officer James Estes

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| VIRGINIA DUFFY, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| vs. | ) |
|  | ) |
| MUNICIPALITY OF ANCHORAGE, | ) |
| SGT. ROY LEBLANC, individually and in | ) |
| His capacity as a police officer for the | ) |
| Municipality of Anchorage, and | ) |
| OFFICER JAMES ESTES, individually and in | ) |
| his capacity as a police officer for the | ) |
| Municipality of Anchorage, | ) |
|  | ) |
| Defendants. | ) |

U.S. District Court Case No. 3:05-cv-152-TMB

### AFFIDAVIT OF ROY LEBLANC

Roy LeBlanc, being duly sworn upon oath deposes and states as follows:

1.  I am employed by the Anchorage Police Department as a police officer, a position I have held from 1996. I am currently a sergeant in the patrol

        division. I was promoted to sergeant in early April, 2003.

2. As a police sergeant in the patrol division, my duties entail the supervision of patrol officers and acting as the first line of supervision of the patrol activity in the Municipality of Anchorage ("the Municipality"). The duties of patrol officers involve performing a wide range of police services and a variety of tasks, including taking appropriate action when observing or being informed of matters of health and safety. Anchorage police officers maintain order, enforce traffic codes and ordinances, and protect life and property within the Municipality. My specific duties include criminal investigation, report writing, radio communication, traffic enforcement, patrolling and security.

3. On March 23, 2003 at about 9:46 p.m, pursuant to my duties as acting supervisor in the patrol unit of APD, I was traveling northbound on the Seward Highway in Anchorage at about the 7600 block.

4. I came upon a sedan that was driving north in the right lane. This sedan was driving 10 miles below the speed limit. I kept an eye on this vehicle, as it is extremely rare that a vehicle would go 10 miles below the speed limit on the highway. According to the municipal traffic code, drivers are not supposed to travel at speeds below the speed limit. Under AMC 9.26.040 A., *Minimum Speeds,* "no person may drive a motor vehicle at such a slow

speed as to impede the normal and reasonable movement of traffic, except when reduced speed is necessary for safe operation or in compliance with the law." It appeared her driving was impeding the normal movement of traffic. I therefore followed this vehicle, and noticed it was weaving from line to line in the right lane.

5. As the vehicle approached Tudor Road, it swerved substantially to the right and then sharply corrected itself back to the proper lane of travel.

6. Based on the above observations of the sedan, I had reasonable suspicion to suspect that the driver was impaired and therefore "driving under the influence," in violation of AMC 9.28.020. I then turned on my emergency lights and initiated a traffic stop. However, after taking the Tudor exit, the driver continued to drive past the spot where the frontage road and exit merge. This spot would have been the most logical place to stop. This action on the part of the driver further aroused my suspicion that the driver was impaired or "under the influence."

7. The driver of the sedan then stopped her car. I went and made contact with the driver. When I asked the driver for her driver's license, registration, and proof of insurance, she seemed confused and disoriented. She fumbled and searched through her wallet to locate the items. She searched through her wallet several times before producing her driver's license, and seemed

confused about what she was providing me. This behavior further aroused my suspicions that the driver was impaired. The driver's license produced by the driver indicated that she was a Ms. Virginia Duffy.

8. Ms. Duffy was unable to produce her motor vehicle registration, and stated that she kept it at home. Alaska drivers are required to keep proof of registration with them when they drive. I explained to Ms. Duffy that I had stopped her for weaving on the road and for driving 10 miles per hour under the speed limit.

9. When I asked Ms. Duffy where she had been coming from, she seemed confused and unsure of where she had actually entered the highway. She described an area that sounded like the Dimond Blvd. on-ramp. The fact that Ms. Duffy was unsure of where she had been further aroused my suspicion that she was impaired.

10. Ms. Duffy's poor driving, including her driving 10 miles below the speed limit, weaving back and forth within the lane, and her confusion after I stopped her, led me to decide that I should conduct field sobriety tests on her. As a patrol officer, it is my duty to protect the public from impaired drivers. I did not notice any odor of alcohol coming from Ms. Duffy or her vehicle. However, her behavior and demeanor made me think that she was impaired and under the influence of other substances, such as prescription

medicine. I then asked Ms. Duffy if she was taking any prescription medications, but she denied that she was.

11. I conducted a computer check of Ms. Duffy with respect to her license and registration. I returned to her car so that I could conduct field sobriety tests on her. Had I not conducted these tests on Ms. Duffy after the behavior I had witnessed, I would have been remiss in my duties as a police officer.

12. When Ms. Duffy stepped out of her car, I noticed that she swayed while standing. I then conducted the following field sobriety tests: the Horizontal Gaze Nystagmus ("HGN") Test; the Walk and Turn Test; and the One Leg Stand Test. Ms. Duffy failed two of these three tests. I again asked Ms. Duffy if she was taking any medications, including prescription drugs. She indicated that she was not taking these substances.

13. Based upon my observations of her impairment, which included her poor performance on the field sobriety tests, the confused behavior after I had stopped her, and the earlier poor driving, I concluded that there was probable cause to arrest Ms. Duffy for being under the influence of drugs. I therefore instructed Ms. Duffy to turn around. I further told her that she was under arrest for Driving under the Influence ("DUI"). Ms. Duffy told me "no." I again commanded her to turn around and told her to put her hands behind her back. I told her that she would be charged with resisting arrest if

    she did not cooperate. Duffy continued to fail to comply with my requests (that she turn around and place her hands behind her back). However, when I placed my right hand on her right arm, she complied. She was then handcuffed without struggle or resistance.

14. Officer James Estes then arrived to provide back-up assistance. He took custody of Ms. Duffy and completed the processing of her for DUI. He requested the impoundment of her car, which is the proper procedure for a DUI.

15. Ms. Duffy requested her back pack and book bag from her car. These two items were on the front passenger seat. The back pack was open. I noticed a plastic bag inside of it with several prescription bottles without labels. One bottle contained aspirin; the other 3 bottles contained unknown drugs. I seized these bottles as evidence. Once under arrest, Ms. Duffy told me that she did take hormone pills, but no other medication. However, my experience and training as a police officer, in addition to the behaviors that Ms. Duffy had exhibited, gave me probable cause to believe that Ms. Duffy was under the influence of a prescription drug of some type.

16. I completed a property and evidence report concerning the drugs that I had found and turned those drugs into the property and evidence department. A copy of the property and evidence report is attached to this affidavit as

Exhibit A.

17. As the property and evidence report indicates, I placed property tags on the following drugs: an unknown maroon pill (Property Tag # 537433); two orange capsules (Property Tag # 537434); and 4 whole pills (with 14 pieces) (Property Tag # 537432). It is my understanding that these pills were never analyzed due to the fact that the Municipal Prosecutor's Office dismissed the DUI charge against Ms. Duffy. I have checked with the Property and Evidence Department custodian and he/she has indicated that the pills I seized have now been destroyed pursuant to department policy.

18. Officer Estes then transported Ms. Duffy to a sub station for processing. He reported to me that Ms. Duffy provided a breath test result of .000, as expected. Officer Estes also indicated that Ms. Duffy elected to have an independent blood test, and that she was transported to Alaska Regional Hospital for a blood draw.

19. On March 26, 2003, I applied for and received a search warrant to have the blood that had been drawn from Ms. Duffy on March 23, 2003 tested for the presence of drugs, including prescription drugs. I served the warrant on Alaska Regional Hospital ("Alaska Regional") with arrangements for the results to be mailed to me at the Anchorage Police Department. Unfortunately, the drug screen performed by National Medical Services at

the request of Alaska Regional did not test for the presence of prescription drugs when it analyzed the blood drawn from Ms. Duffy. Such prescription drugs that should have been tested for include sleeping pills and other central nervous system depressants and stimulants.

20. In my experience and training as a police officer, I have learned that many prescription drugs can cause drivers to be impaired. Users of prescription medications can pose just as much of a threat to fellow drivers as users of illicit drugs. For that reason, when I patrol the streets of Anchorage, I am just as much on the look-out for impaired driving which results from the use or abuse of prescription medications as I am for impaired driving which results from alcohol or illicit drug use.

21. The Anchorage Municipal Code Section 9.28.020, specifically states that a person is guilty of driving under the influence if he operates a motor vehicle while under the influence of an alcoholic beverage, inhalant, or depressant, hallucinogenic, stimulant or narcotic drug as defined in AS 11.71.140 – 11.71.190. AMC 9.28.020 B.1. In addition, the Code states that a person is guilty of driving under the influence if he is driving "under the influence of a drug, or another substance that when introduced into the body acts as a central nervous system depressant or stimulant, to a degree which renders the person incapable of driving safely." AMC 9.28.020 B. 4.

22. Ms. Duffy's behavior on the night I arrested her was consistent with that of someone who is under the influence of drugs or a substance that, when introduced into the body, acts as a central nervous system depressant or stimulant, to a degree which renders the person incapable of driving safely.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

By: _____
Sgt. Roy LeBlanc

Subscribed and sworn to before me this 31 day of August, 2006.

_____
Notary Public in and for Alaska
My commission expires: 2-21-09

